**SO ORDERED.**

**SIGNED this 14 day of April, 2006.**



_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY E. KRAUSE, | ) | Case No. 05-17429 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATE OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| LINDA S. PARKS, Trustee | ) | |
| | ) | |
| Intervenor, | ) | |
| v. | ) | Adversary No. 05-5775 |
| | ) | |
| GARY KRAUSE, Defendant-debtor, and | ) | |
| RICHARD KRAUSE, Defendant-creditor, | ) | |
| | ) | |
| _____ | ) | |

MEMORANDUM OPINION

1

The current motions before the Court are: (1) debtor Gary Krause's motion for reasonable use of funds from the Gary Krause Trust to pay attorney fees;[1] (2) defendant Richard Krause's motion for use of assets from the Krause Children Trusts to pay his attorney fees as trustee of the Krause Children Trusts;[2] and (3) attorney Edward Nazar's ("Nazar") motion to withdraw as attorney for debtor Gary Krause.[3] The Court received legal memoranda on these motions from the players in this controversy: Gary Krause ("Gary"), Richard Krause ("Richard"), trustee Linda Parks ("Trustee"), and the United States of America ("Government"), and took the motions under advisement.[4]

**Nature of Case**

The current motions were precipitated by the Court's grant of an ex parte temporary restraining order ("TRO") on November 21, 2005 and issuance of a preliminary injunction following a two day hearing December 1-2, 2005.[5] Pursuant to the TRO and preliminary injunction, the Court effectively froze all funds and assets of several trusts and entities, finding that the Government was likely to succeed on the merits of its claim that the trusts and entities were shams intended to shield Gary's assets from the Government's efforts to collect Gary's $3.3 million income tax liability. Gary's and Nazar's motions are essentially predicated on Gary's inability to pay Nazar to represent him in the case absent the Court allowing use of frozen assets to compensate counsel. The Court

---

[1] Dkt. 22.

[2] Dkt. 24.

[3] Dkt. 44.

[4] *See* Dkt. 36, 37, 38, 39, 41, 43, 58, 59, 60, 61, 63, 64, 67.

[5] Dkt. 6, 12 and 17.

2

construes Nazar's motion to withdraw to be predicated upon the Court's denial of Gary's motion to use trust funds for costs of his legal representation. The Court is now prepared to rule on the motions as well as issue its formal opinion on the Government's application for a preliminary injunction that was previously heard and granted.

**Factual Background**

Gary, describing himself as a self-employed entrepreneur, filed his chapter 7 petition on October 10, 2005.[6] Gary was formerly married to Teresa Briggs. They divorced in November, 2002. They have two sons, Drake, age 17, and Rick, age 15, who are beneficiaries under Krause Children's Trust I, II, III, IV, and V ("Krause Children's Trusts" or "KCT"). In his statement of financial affairs Question 18, Gary listed numerous entities in which he was or is currently involved. Gary showed no income on Schedule I and indicated that his living expenses were paid by distributions from the Gary E. Krause Trust ("GKT"). He listed a beneficiary interest under the Gary E. Krause Trust and the Krause Family Trust, both shown as spendthrift trusts.[7] The vast majority of Gary's scheduled debts are for taxes owed to the Internal Revenue Service or the Kansas Department of Revenue.[8]

On November 1, 2005 the Government commenced this adversary proceeding against Gary and his brother, Richard. Richard is a podiatrist residing in Great Bend, Kansas. Richard is the trustee of the GKT and the Krause Children's Trusts. The Government alleges that Gary owes the IRS federal income taxes, interest, and penalties amounting to some $2.6 million for returns dating

---

[6] Gary also has a law degree but is not engaged in the private practice of law.

[7] *See* Schedule B.

[8] *See* Schedule F.

3

from 1975, 1978-1983, 1986, 1994 and 1996.[9]  Gary litigated his liability for some of these taxes

(1975, 1978-83, 1986) in the Tax Court and lost.[10]  The Tax Court litigation was resolved in 2001

by settlement but Gary defaulted on his obligations under the settlement agreement and the

Government issued assessments in connection with all of these taxes.[11]

On July 8, 2005, as part of the IRS' efforts to collect the taxes assessed against Gary, IRS

Revenue Officer Marsha Waterbury ("Waterbury") served an IRS summons on Richard as trustee

of the GKT and KCTs and commanded him to appear at the IRS in Wichita, Kansas on August 5,

2005.[12]  The IRS summons directed him to supply all records in his possession concerning the KCTs

and the GKT.  Shortly after serving the summons, Gregory Franken, Esq., a tax lawyer in Wichita,

phoned Waterbury seeking additional time to secure the documents demanded as Richard was on

---

[9]  The Government alleges that the unpaid balance on Gary's federal income tax
liabilities as of August 29, 2005 was $3,336,321.

[10]  Generally speaking, the Tax Court litigation began in the 1980's and culminated in the
IRS Commissioner disallowing deductions for oil and gas partnership investment losses in which
Gary was involved.  *See Krause v. Commissioner of Internal Revenue*, 92 T.C. 1003 (1989)
(granting in part and denying in part cross motions for summary judgment); *Krause v.
Commissioner of Internal Revenue*, 99 T.C. 132 (1992) (trial), *aff'd R.A. Hildebrand et al. v.
Commissioner of Internal Revenue*, 28 F.3d 1024 (10th Cir. 1994), *cert. denied*, 513 U.S. 1078
(1995).  The Tax Court described  Gary as having "significant experience in selling tax shelters."
99 T.C. at 150.

[11]  *See* Gov't Ex. A-J attached to TRO Application.  Federal tax liens were placed against
Gary's property.  26 U.S.C. § 6321 creates a lien on "all property and rights to property"
belonging to the taxpayer who has neglected or refused to pay a federal tax after demand.  In
general, the lien attaches at the time the assessment is made and filing a notice of the tax lien
with the designated office where the property is situated perfects the tax lien. *See* 26 U.S.C. §§
6322-6323.

[12]  *See* Gov't Ex. O attached to TRO Application.  The IRS summons was issued pursuant
to § 7602 of the Internal Revenue Code which authorizes the IRS to summon persons for
testimony and examine books and records for the purpose of  ". . . collecting any such liability . .
."  26 U.S.C. § 7602(a).

4

vacation.

Rather than comply with the IRS summons, on July 28, 2005, Richard commenced *Krause v. United States*, Case No. 05-1243 (D. Kan.), seeking to quash the IRS summons. Richard argued that the summons sought attorney-client privileged information, but agreed to supply "general factual information" concerning the entities. This action, unwarranted by law, was filed by Richard's new litigation counsel, Brian Grace and Mark Kiefer.

On September 28, 2005, the Government moved to dismiss Case No. 05-1243 for lack of subject matter jurisdiction and commenced its own civil action to enforce the IRS summons, *United States v. Richard Krause*, Case No. 05-MC-113 (D. Kan.). On October 17, 2005, the District Court issued an order to Richard to show cause why the IRS summons should not be enforced and set the show cause hearing for November 29, 2005. When the Government learned of Gary's bankruptcy case it immediately sought a stay of the enforcement proceedings to avoid violating the automatic stay. On November 4, 2005, the District Court granted a temporary stay of the show cause order.[13]

In this adversary proceeding, the Government challenges the dischargeability of Gary's tax liabilities pursuant to 11 U.S.C. § 523(a)(1)(C) and seeks (i) to set aside alleged fraudulent conveyances between Gary and certain entities and trusts; (ii) to determine that the notices of federal tax lien filed against Gary attach to the fraudulently conveyed property; (iii) to declare that entities and trusts are nominees of Gary and that all property held by the alleged nominees is subject to previously filed notices of federal tax lien; and (iv) to enjoin Gary and Richard, in his trustee capacity, from transferring property to or from certain entities and trusts.

---

[13] On December 20, 2005, an order dismissing Case No. 05-1243 was entered pursuant to Richard's notice of voluntary dismissal under Fed. R. Civ. P. 41. Richard intends to contest the IRS summons in the Government's case.

5

**Temporary Restraining Order – November 21, 2005**

Pending the resolution of its complaint seeking a determination that certain entities and trusts were in fact shams, the Government on November 21, 2005 sought and obtained an ex parte restraining order against Gary and Richard prohibiting them from using any of the property (mostly bank accounts) and freezing the assets of the GKT, the Krause Children's Trusts, and the following companies: PHR, LLC; Drake Enterprises, Inc.("DEI"); Financial Investment Management Corporation ("FIMCO"); and Federal Gasohol Corporation ("FGC").[14]

The Government argued that Gary had acted to secrete his assets, both pre- and post-petition, by establishing a series of trusts and companies whose property he uses as his own. In support of the TRO, the Government submitted the declaration of IRS Revenue Officer Waterbury ("Waterbury Declaration") and supporting attachments, demonstrating that debtor had engaged in unexplained and curious transactions, both in the more-remote past and immediately after the IRS served its collection summons in July of 2005, a sampling of which follows.

### A.    Sale of 37 Mission Property.

This property was Gary's home; he acquired this property before he married Teresa Briggs. Notwithstanding a prenuptial agreement with Ms. Briggs that this property would remain Gary's separate property, Gary conveyed his interest to Ms. Briggs in 1988, while his Tax Court case was in controversy. On February 2, 1996, Ms. Briggs conveyed her interest to Drake Enterprises, Inc. (DEI), a corporation formed by Gary Krause and of which he was (and is) the president. Drake Krause, then a child younger than 10 years old, was the principal shareholder. On March 16, 1998, after the Tax Court ruled against him, Gary quitclaimed his interest in the house to DEI.

---

[14]  *See* Dkt. 4 and 6.

Case 05-05775    Doc# 81    Filed 04/14/06    Page 6 of 30

Subsequently, DEI conveyed the house to third parties.

## B. Sale of 7711 Oneida Property.

This property was, and is, Gary's current residence which he inhabits with his two sons. Ms. Briggs acquired this house on October 4, 1995 for $305,000 in cash, while she was married to Gary. The property was titled in Ms. Briggs' name. On April 7, 1998, Ms. Briggs made a mortgage to KCT V supposedly to secure a loan of $305,000. There was no evidence at the time of the TRO that KCT V actually funded a loan to Ms. Briggs. On February 19, 1999, Briggs deeded the house to KCT I (not KCT V). Richard, the trustee of KCT I, II, III, IV and V, recorded the deed. On August 5, 2005, after the IRS served its summons on Richard, KCT I deeded the house to PHR, LLC, a newly formed entity of which Richard is the registered agent, and which was created on July 29, 2005.[15]

## C. IRS Collection Summons

As described in the supporting Waterbury Declaration, Revenue Agent Waterbury's inability to identify any assets in Gary's name and discovery of suspicious transactions between Gary and the KCTs led her to investigate whether the GKT and the KCTs were bona fide trusts or nominees to hold Gary's assets. The IRS summons sought production of the documents establishing the trusts, bank records of the trusts, correspondence regarding the trusts, and all records pertaining to property in which the trusts have an interest. Richard has been less than forthcoming in responding to the IRS summons. He initially evaded the IRS summons by asserting a blanket attorney client privilege (with no log of privileged documents) and petitioning to quash the IRS summons. While Richard

---

[15] PHR was formed one day prior to Richard filing the petition to quash the IRS summons, Case No. 05-1243 and the transfer of 7711 Oneida to PHR occurred 7 days after this case filing.

7

eventually supplied the trust agreements themselves, little else has been produced. For example, the exhibits or attachments referenced in the trust instruments were either not provided or were insufficient to identify the specific property purportedly held in trust. In the Court's mind, this is very basic, straightforward, and critical information concerning the creation and administration of the various trusts. The request for bank account records for each trust is similar. The Court can conceive of no plausible assertion of the attorney-client privilege for these rudimentary documents.

From the documentation that has been produced, it is apparent that Gary created KCT I on December 5, 1988, KCT II on December 23, 1989, and KCT III , IV, and V on May 19, 1990, all while Gary was actively litigating his Tax Court case.[16] The GKT was created February 28, 1989 by Gary's father. DEI, the entity to which Gary and his wife deeded the 37 Mission property, was created in November of 1988 and Gary is its president.

Gary is the president of both FIMCO and FGC and is an authorized signatory on the bank accounts of these entities. He has paid most of his personal and living expenses from checks drawn on the FIMCO account. Gary has also signed sizeable checks drawn on FGC and KCT I that were made payable to FIMCO. These transaction suggest that Gary has the ability to transfer funds from and among the various trusts and entities.

Based upon the information contained in the Government's TRO application and the Waterbury Declaration, the Court issued a restraining order under Fed. R. Civ. P. 65, as made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7065. Because the trusts were created while the Tax Court case was pending and because the debtor conveyed 37 Mission to DEI shortly after losing the Tax Court litigation, the debtor had engaged in unexplained and suspicious

---

[16] Krause Ex. 47, 52, 54, 55, 56.

8

conduct. Further similar conduct was suggested by the fact that Gary appears to pay all of his personal bills from FIMCO. In addition, Gary has deposited funds from the checking accounts of FGC and KCT1 into the FIMCO account. These acts suggest that Gary exercises dominion and control over these assets, essentially treating them as his own. As such, the Court concluded that these entities could be shams or nominees over which Gary maintains control and against which the Government could assert liens to collect his tax obligations. This conclusion was supported by the facts that Gary holds trust records and documents, that he lives on FIMCO assets, that he signs the checks, and that Richard has disclosed very little information concerning these proceedings.

### Preliminary Injunction

The Court convened a preliminary injunction hearing on December 1 and 2, 2005. At the close of nearly two days of evidence, the Court issued a preliminary injunction retaining in full force the TRO with some modifications as will be referenced later. The Court made oral findings of fact which may be summarized as follows.[17]

The Court stated and applied the familiar preliminary injunction standards as set out in *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*[18] The movant must demonstrate that it would suffer irreparable harm if the injunction is not granted, that its potential harm would outweigh that suffered by the defendant if the injunction is granted, that the injunction would not be adverse to the public interest, and that the movant can demonstrate a substantial likelihood of success on the merits. The irreparable harm requirement is the single most important requirement for the issuance

---

[17] As the Court commented at the time of giving its ruling from the bench, this written order would be forthcoming. Tr., Vol II, at 66.

[18] 356 F.3d 1256 (10th Cir. 2004).

9

of a preliminary injunction.[19]

### A. Summary of Evidence and Facts at Preliminary Injunction Hearing

Over the course of the two-day hearing, the Court heard testimony from Richard, Gary, and Revenue Agent Waterbury and received into evidence over 70 exhibits. The Court found most compelling the testimony and conduct of Richard. There is little doubt in the Court's mind that Richard acted at the behest of Gary in virtually every action he took with respect to the KCTs and trust property. Indeed, Gary orchestrated Richard's reaction and response to the IRS summons, the event triggering the Government's adversary complaint and request for injunctive relief. The evidence presented at the hearing suggested substantial trafficking of assets between and among the trusts and Gary's companies during the time of the Tax Court litigation and the IRS' enforcement efforts. This casts doubt on whether these trusts and companies had legitimate purposes.

Shortly after the IRS summons issued, Richard deeded the 7711 Oneida property from KCT I to the newly-formed entity PHR and commenced the meritless District Court action to quash the IRS summons. Richard is the registered agent of PHR, but stated he was not familiar with the nature of PHR's business other than knowing that it was an entity that Gary set up. The Court gives only small credence to Richard's and Gary's explanation for the conveyance that PHR was created as an intermediary for an Internal Revenue Code §1031 like-kind exchange by which KCT I could acquire a new residence at Crestview Country Club for Gary and his sons.[20] The Court does not doubt that

---

[19]  *See Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) ("[A]n injury is not speculative simply because it is not certain to occur. An 'irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages.'" [citations omitted]).

[20]  In May 2005, at Gary's behest, Richard contracted to purchase the golf course residence, 14215 East Wentworth Court, for $430,000 with KCT I assets. He signed the check

10

the exchange was arranged, but suspects that the timing of the PHR transfer so closely to the IRS summons was not coincidental. Even more telling is Richard's admission that he took this course at Gary's direct instruction. Gary even selected Richard's lawyer for him. And Gary, not Richard, formulated the responses to the IRS Summons.

Even before the Oneida property was conveyed to PHR, suspicious transactions occurred with respect to the property while the Tax Court litigation was pending. Teresa Briggs acquired this house on October 4, 1995 for $305,000 in cash, while she was married to Gary. The property was titled in Ms. Briggs' name. On April 7, 1998, Ms. Briggs granted a mortgage to KCT V supposedly to secure a loan of $305,000. However, no money or consideration was exchanged between Ms. Briggs and KCT V. Less than a year later, Ms. Briggs conveyed the property to KCT I (not KCT V). Gary testified that Ms. Briggs granted her mortgage to KCT V as a "gift." Yet Ms. Briggs also granted a mortgage to secure repayment of the "gift" note. No economic justification was given for this, nor can the Court divine what the purpose might be, other than obscuring the title to Oneida while Gary continued to inhabit it and treat is as his own property.

Gary currently lives at the 7711 Oneida property. He also conducts his businesses there. According to Gary, one KCT owns the upstairs of the house that is leased to Gary for living while another KCT owns the downstairs that is leased for offices to FIMCO and FGC, Gary's companies.[21] According to Gary's Statement of Financial Affairs, and the testimony at the hearing, Gary is the

_____

to purchase the Wentworth residence without ever seeing the property. Gary and his sons, however, do not reside in the Wentworth residence but continue to live in the Oneida property. The Wentworth property was not identified as an asset of the KCT I when Richard responded to the IRS summons.

[21] *See* Schedule G in Gary's bankruptcy case listing a residential lease for Gary's portion of 7711 Oneida.

president of FIMCO and FGC and is an authorized check signer on the FIMCO and FGC bank accounts. Gary holds and controls property (vehicles) owned by DEI (the entity in which his minor son is the sole shareholder) and FIMCO. Gary's response to the Court's questions about what FIMCO and FGC actually do or how they generate revenue was nebulous at best.[22] The Court doubts they are businesses in any true sense and notes that no documentary evidence concerning the nature of their business operations was produced by any party. The tax returns of KCT I and KCT II show rental income from 7711 Oneida for tax years 2002 and 2003 even though KCT II does not own the Oneida property.[23] At the hearing, however, the Government produced a lease dated December 16, 2000 between Polo Executive Rentals and Gary for lease of the ground-level premises of the Oneida property.[24] Richard acknowledged that he signed the lease on behalf of Polo but he could not explain why KCT 1 was not a party to the lease. He was evasive when questioned about the origin of the Polo lease other than to say it was not his idea. Thus, instead of KCT, the owner of the Oneida property, receiving the rental income, Gary paid the rent to Polo.[25] Richard admitted that he delegated authority to Gary to manage the real estate (7711 Oneida) held by KCT I and that

---

[22]   In his Statement of Financial Affairs, Gary described FIMCO's and FGC's nature of business as "management." FIMCO and FGC have been in existence since 1979 and 1980, respectively. Gary testified that FIMCO earns management fees from FGC and includes former management of a tanker subcontracted to FIMCO by FGC. Currently, Gary testified that FIMCO was working on a joint venture with other companies to market an age reversal product. FGC was not actively engaged in any management but was still entitled to payment of the fees under its former contract for management of the tanker.

[23]   Gov't Ex. 26.

[24]   Krause Ex. 43.

[25]   A similar lease arrangement was made between Polo and FIMCO for the portion of the Oneida property leased by FIMCO, even though KCT 1 was the owner of the property. Krause Ex. 44.

he considers the 7711 Oneida house to be Gary's.

FIMCO pays Gary's rent for the upstairs, along with his food, medical insurance, utilities and virtually every other living expense.[26] It pays his credit card debts and car payment. It pays his country club bill. He refers to these as "business expenses." Gary shows no income on his personal tax returns for any of this money. Particularly curious is the fact that FIMCO's stock is owned by one of the KCTs. Thus, two KCTs get rent from 7711 Oneida, while the Oneida property is no longer owned by any of the KCTs. PHR owns it. A KCT owns FIMCO, but FIMCO advances the children's expenses as well as paying all of Gary's living expenses. Richard testified that he did not have a clear understanding of the relationship between FIMCO and KCT.[27]

The KCTs were established by Gary in the late 1980's and early 1990's in the midst of Gary's tax disputes with the IRS and the Tax Court litigation. His brother Richard was the trustee of each KCT and Gary's sons were beneficiaries of the KCTs. KCT I was established December 5, 1988 for Drake's benefit.[28] KCT II was established December 23, 1989 for Drake and Rick's benefit.[29] KCT III, IV and V were established May 19, 1990 for all children's benefit.[30] The trust agreements admitted into evidence were incomplete; each KCT referenced a Schedule A that described the trust assets but Schedule A was not attached to the trust instrument. Richard could not recall what property was described on Schedule A to the trust agreements. Gary had access to and check

---

[26] Gov't Ex. 12-23, 29-39.

[27] Richard was unsure which KCT owned FIMCO but he believed it was KCT I.

[28] Krause Ex. 47.

[29] Krause Ex. 52.

[30] Krause Ex. 54, 55, 56.

13

signing authority to at least one bank account for the KCTs. Despite being the trustee for the KCTs, Richard admitted that he had delegated authority to Gary to pay some of his sons' bills such as private school tuition. Richard could not identify both of the private schools that Gary's sons attend. He conceded that he did not pay the children's daily expenses from trust funds and "very rarely" spent trust assets on behalf of the boys. Richard testified that he only wrote checks out of the KCTs when Gary instructed him to do so. He testified that he delegated all of the business management activities of the trusts to Gary. Gary testified that for administration purposes, he paid his sons' expenses with cash or by checks drawn on the FGC bank account and then invoiced Richard for reimbursement from the KCT. No such invoices were produced at trial. Gary prepared and filed the KCT tax returns without Richard's review.[31]

The GKT was established on February 28, 1989 by Lawrence Krause for Gary's benefit. Lawrence is Gary's father and Richard was the trustee. Lawrence died in 1990. In one of the few notable moments of candor by Richard, he responded to questioning from Gary's counsel regarding Gary's waiver of rights of inheritance from his father:

> Yeah. Well, I know we talked about it and he told Dad that he wanted what he was going to inherit passed to his kids, because he knew – Dad died in '90, and he knew this would happen sometime, not bankruptcy, but he knew he would face the IRS at some point in time, and he chose to have those things that my father had passed through him.[32]

Before making conclusions of law, the Court noted that the chapter 7 trustee, Linda Parks, had only recently become aware of the adversary proceeding for injunctive relief. She announced

---

[31]  Richard granted a power of attorney to Gary for the purpose of signing the KCT tax returns.

[32]  Tr., Vol. I at 92, l. 2-8

14

that she would either intervene in the adversary proceeding or file her own action to obtain turnover of estate property in the hands of Gary, Richard, or the entities. If the property of the GKT and KCTs is in fact Gary's property, it is property of his bankruptcy estate. In that event, it would be subject to the trustee's turnover powers under § 542 and § 543. Richard is a custodian of that property within the meaning of § 543 and has a duty to turn that property over to the estate. Placing that squarely in issue requires the trustee to assert those claims via demand and, if necessary, entering this adversary proceeding as a party.[33]

The Court concluded that even though applicable statutes of limitation may have run on some of the transfers demonstrated at trial, it remains the case that Gary treated all of this property as though it were his own. With that conclusion, the Court reviewed the facts to determine if the four preliminary injunction factors were proven at trial.

Irreparable Harm: The overwhelming evidence is that, after he received the August 5 IRS summons, Richard declined to produce the requested documents, retained counsel, and filed a meritless civil action to quash the summons. He admitted at trial that he took this course of action at Gary's direction and that Gary, not he, prepared the response to the IRS summons. This suggested to the Court that further deterioration of the Government's position (not to mention the estate's) would result if Gary and Richard were not restrained from further activities in connection with these potential assets.

Balance of Harm: The Court was conscious that freezing all of these assets would result in family deprivation to Gary and his sons. At the same time, all of Gary's creditors, including the

---

[33] The trustee has now intervened in this adversary proceeding and filed a third party complaint for turnover. *See* Dkt. 42 and 50.

Government, would be harmed were these assets not frozen. Gary's clear proclivity for evasive, if not fraudulent conduct in connection with this property is amply demonstrated by his pattern of conduct over a period of years stretching back to the late 1980's. The Court has little doubt the great part of trust and company assets over which he continues to maintain personal domination and control would disappear or be further shielded from the trustee's and the Government's view were an injunction not issued.

Parenthetically, the Court also noted that when Gary decided to seek relief in the bankruptcy court, he "bit the bullet" as he testified, and decided to put his troubled financial affairs behind him. He apparently lightly regards the other half of the bargain: that in order to put one's troubles behind him in a bankruptcy case, a debtor must commit those assets he has to the payment of his creditors. To the extent the freeze will do harm to Gary's children, the Court has some latitude to remedy that, as noted below.

Public Interest: As documented in the Government's papers, the public has a strong interest in the Government's ability to collect taxes and fund the public fisc for the purpose of providing governmental services to the citizens of this country. Further, there is an overarching public interest in the effective enforcement of the bankruptcy law, the main purpose of which is to marshal a debtor's assets toward the payment of valid claims against him.

Likelihood of Success on Merits: Because the other three requirements were satisfied and tip strongly in its favor, the Government satisfied the fourth factor by demonstrating that the issues going to the merits of its claims were so serious, substantial, and difficult that the merits were ripe for litigation and deserving of more deliberate investigation.[34] Here, given the obvious pattern of

---

[34] *Greater Yellowstone Coalition*, 321 F.3d at 1261-62.

16

evasion and trafficking in assets practiced by Gary and Richard during both the Tax Court litigation and more recently, in reacting to the IRS summons, a more deliberate investigation was warranted.

The Court was particularly struck by the overwhelming number of badges of fraud present in this case. While it may be that the statute of limitations has run on some of the transfers targeted by the Government, ten of the eleven badges enumerated in the Kansas Uniform Fraudulent Transfer Act ("KUFTA") are present in this case. These badges are listed in KAN. STAT. ANN. § 33-204(b) (2000).

(1) Many of these transfers appear to have been made to an insider. Richard is Gary's brother and is the trustee of all of the KCTs established by Gary. Gary's companies (FGC and FIMCO) are controlled by Gary or trusts that are controlled by Gary through his brother. Gary is president of DEI and his son is the shareholder.

(2) Gary retained control of the transferred property. These assets all appear to be under Gary's dominion and control. He uses them as his own, particularly with respect to the Oneida property and FIMCO and FGC assets.

(3) Gary and Richard concealed these transfers. Two striking examples of this are the transactions involving the homes at 37 Mission and 7711 Oneida.

(4) The conduct was maintained under a threat of collection. Gary has been under constant threat of IRS enforcement since the mid-1980s. Many of the activities demonstrated by the Government coincide with Gary either losing the Tax Court case or receiving notice of other IRS enforcement activity, especially in August of 2005 when the IRS summons was served.

(5) The conduct involved all of Gary's assets. This debtor purports to own nothing, yet he enjoys a lavish lifestyle that actively involves the use of trust and corporate assets.

(6) Gary removed or concealed assets. As noted above, his efforts appear to be focused on keeping property from the light of day.

(7) The Teresa Briggs sham mortgage transaction in connection with Oneida appears to be an exchange made without reasonably equivalent value being given in return.

(8) According to his schedules, Gary has been insolvent and certainly was when he took the evasive actions in August of 2005.

(9) Gary's conduct commenced at or about the time of the beginning of his difficulties with the IRS.

(10) Assets have been transferred to a lien holder who then re-transfers them to an insider. This is precisely what happened with the Oneida property.

The only missing badge of the eleven enumerated in the statute is that the debtor has absconded and Gary, for whatever reason, has yet to have done so. The Court concluded that the Government is likely to succeed on the merits.

In light of the forgoing findings of fact and conclusions of law, there was a sound basis for the continuation of the temporary restraining order as a preliminary injunction pending the final hearing in this case. The Government's application for a preliminary injunction was therefore GRANTED, with the following caveats.

To allow the debtor's children, Drake and Rick, to complete their semesters at their respective private high schools, the Court directed defendant Richard Krause to pay $2,000 from the KCT I to Gary's lawyer's trust account for the purpose of paying December tuition at their respective schools. Gary was granted leave to apply to the Court to use other frozen assets for reasonably necessary monthly living expenses with the other parties given an opportunity to be

Case 05-05775    Doc# 81    Filed 04/14/06    Page 18 of 30

heard.

On December 19, 2005 Gary filed his motion for use of GKT funds to pay reasonable and necessary monthly personal and family living expenses.[35]  On December 21, 2005 Richard filed a separate motion to pay from the KCTs, the reasonable and necessary monthly living expenses of trust beneficiaries, Drake and Rick, as set forth in Gary's request and to permit use of KCT funds to replace expenses formerly paid by FIMCO.[36]  Both Gary's and Richard's motions included a request to pay their attorney fees from the GKT and the KCTs.  A hearing was held January 19, 2006 at which the parties advised the Court that they had reached agreement on most of the requested expenses and the Court heard argument on the disputed items.[37]  An agreed order was entered February 6, 2006 permitting Gary to use $3,700 of the GKT assets each month for payment of monthly living expenses through April 30, 2006.[38] Richard was authorized as trustee of KCT I to withdraw $2,000 each month for payment of Drake's and Rick's high school tuition through April 30, 2006.  The Court further allowed monthly withdrawals from KCT I to pay insurance premiums on the 7711 Oneida property and two vehicles retained by Gary and his sons.  Finally, the Court permitted a one time withdrawal from the KCT I to pay the ad valorem real estate taxes due on the

---

[35]  Dkt. 22.

[36]  Dkt. 24.

[37]  At the January 19, 2006 hearing the Court also heard the Government's stay relief motion whereby the Government sought to continue with enforcement of the IRS summons and file a nominee lien against Gary and his nominees. (Case No. 05-17429, Dkt. 6).  The Court granted the Government's motion and an order granting relief from the stay was thereafter entered on February 28, 2006, permitting the IRS to file notice of its federal tax lien against Gary's alleged nominees. (Case No. 05-17429, Dkt. 23).

[38]  Dkt. 66.

19

7711 Oneida property in the amount of $5,072.28.  The Court took the matter of payment of Gary's and Richard's attorney's fees from frozen trust funds under advisement.

### **Current Motions for Payment of Attorney Fees from Frozen Trust Funds**

This brings the Court to consideration of Gary's and Richard's request for reasonable use of funds held by the GKT and the KCTs to pay their attorney fees.  These motions raise the common issue of whether any of the frozen assets may be used to compensate counsel.  In addition to the evidence and testimony previously adduced at the preliminary injunction hearing, the Court received  briefs from the parties.  The Court is satisfied that it has the power to modify its previously-issued preliminary injunction.[39]

The principal factual barrier to resolving this issue is the Court's (and possibly the parties') lack of knowledge or understanding of what assets are contained by these entities and the provenance of those assets.  The Court does not have a good feel for what assets are held by which trust or the amount of funds held by each trust.  No current financial statement for the trusts has been provided to the Court showing the amount of cash or liquid assets held by the trusts or the property held by the trusts and the value of such property.  Richard was unable to definitively state what property and assets comprised each trust.[40]  Gary testified that KCT I, II, and III each contained approximately $150,000 to $200,000 in certificates of deposit and bank accounts.  KCT V owns the mortgage on the Oneida property.  KCT I and II own the Oneida property although KCT II's ownership interest is unrecorded.  KCT I also owns a life insurance policy on Gary's life and various

---

[39]  *See John Zink Co. v. Zink*, 241 F.3d 1256 (10th Cir. 2001).

[40]  He testified generally that the KCTs owned the Oneida house, two cars, FIMCO and the balance of the KCTs was comprised of bank accounts.  Richard estimated that there was between $400,000 and $600,000 in the bank accounts of all the KCTs.

20

life insurance policies on Drake and Rick.  Gary funded KCT I, II, and III in the early years after their inception in accordance with his obligations under the 1986 prenuptial agreement with Teresa Briggs and last made cash deposits to KCT I, II and III in 1993.[41]  In 1998, shortly after the unsuccessful conclusion of the tax court litigation and potentially in connection with the sale of 37 Mission to DEI or third parties, Teresa Briggs contributed $90,000 each to the KCT I, KCT II, and KCT III.  Although Gary indicated that  KCT III, IV and V were created in 1990 to pourover the trusts of his grandparents and father, it was not clear what assets, if any, remain in KCT IV and V.

It is by no means clear that the assets conveyed by Teresa to the three trusts were her own; on the other hand, it is equally unclear that they were not.  But, given the manner in which Gary essentially lives off these trusts, treating their assets as his own, it is difficult for the court to conclude that these assets should be opened up to carte blanche use for Gary's and Richard's attorney fees in the absence of better proof that these assets are not Gary's and, hence, not the estate's property.

The motions implicate several legal problems.  First, the IRS has assessed.  If these assets are Gary's, the IRS is secured as to the assets.  As such, it would be entitled to adequate protection of any collateral used by the trustee or the debtor.  The use of frozen assets to fund a legal defense is questioned in the case law.[42]  Where his liberty is not in jeopardy, should Gary have that right?

Second, if the Government is correct, this is property of the estate.  As such, *Lamie v. United*

---

[41]  *See* Krause Ex. 1.  The Court notes that Teresa had no obligation under the antenuptial agreement to fund the KCTs.

[42]  *Caplin & Drysdale Chtd. v. United States*, 491 U.S. 617 (1989); *S.E.C. v. Cherif*, 933 F.2d 403 (7th Cir. 1991).

Case 05-05775   Doc# 81   Filed 04/14/06   Page 21 of 30

*States Trustee*[43] seems to prohibit Gary's attorney from being paid for any post petition activity without court approval or being employed by the Trustee. If Gary claims he has post-petition income that is not a proceed of estate property, he needs to demonstrate more than has been shown to date.

Third, whether this is estate property, and whether it is encumbered or not, both Gary and Richard would need to demonstrate the ability to adequately protect the estate and IRS from any diminution of their respective positions. No such offer has been forthcoming.

### 1.    Gary's Motion.[44]

Upon first review, three bodies of law collide to make this a cumbersome question to analyze. The GKT is styled as a spendthrift trust, suggesting that as a matter of Kansas law, Gary's creditors may not reach its assets. Yet, the Government argues that even if it is a spendthrift trust, a tax lien may attach to the assets anyway. Finally, if the trust is truly spendthrift, the assets will be withheld from the bankruptcy estate by operation of § 541(c)(2). The Supreme Court has suggested, albeit in a different context, that state law determines which sticks comprise the tax debtor's "bundle of sticks," while federal law determines whether a tax lien attaches to the sticks.[45] This latter determination depends to a great degree on the breadth of the debtor's control over the

---

[43]  540 U.S. 526 (2004) (holding that chapter 7 debtor's attorney must be employed by the trustee pursuant to § 327 in order to be paid attorney fees from the estate).

[44]  Dkt. 22.

[45]  *United States v. Craft,* 535 U.S. 274 (2002) (State law determines which sticks are in a person's bundle of sticks.). State law determines the nature of property subject to federal tax liens. *United States v. Rodgers*, 461 U.S. 677 (1983); *United States v. Wingfield*, 822 F.2d 1466 (10th Cir. 1987). Once a court rules that property or the rights to it exist under state law, the consequences are governed by federal law. *Aquilino v. United States*, 363 U.S. 509 (1960); *Wingfield*, 822 F.2d at 1473.

22

property in question.[46]   As noted by the Government here, numerous Circuits (but not the Tenth Circuit) have held that tax liens extend to property held in spendthrift trusts for delinquent taxpayers.[47]

Non-estate property subject to the IRS lien cannot be subjected to payment of the taxpayer's attorney fees in the absence of concurrence by the Government.  This Court questions whether it would have any jurisdiction over such property to direct that attorney fees be paid from it.

However, if the GKT is not a valid spendthrift trust, its assets would clearly become property of the bankruptcy estate, subject to the Government's pre-petition tax lien.  Use of that property to fund attorney fees or estate operations could be conditioned on the user providing adequate protection.  But if the intended use were for attorney fees for the chapter 7 debtor's lawyer, the *Lamie* prohibition on that allowance would be implicated – suggesting that even if adequate protection could be provided, the Court could not allow the payment of estate assets to Gary's attorney for matters not benefitting the estate.

Any of the foregoing possible legal conclusions are predicated on a dispositive finding concerning the actual nature and ownership of the GKT property.  Here, only a preliminary finding has been made, and, as pointed out by the debtor, the Court should apply a balancing analysis to determine whether the preliminary injunction should be modified to allow use of some of the funds for attorneys fees.  Acting in a   Securities and Exchange Commission (SEC) enforcement

---

[46] *United States v. Craft*, 535 U.S. at 283, *citing Drye v. United States*, 528 U.S. 49, 61 (1999).

[47] *See e.g.*, *In re Orr,* 180 F.3d 656 (5th Cir. 1999); *Bank One Ohio Trust Co., N.A. v. United States,* 80 F.3d 173 (6th Cir. 1996); *Schreiber v. Kellogg*, 50 F.3d 264 (3rd cir. 1995); *First Northwestern Trust Co. of South Dakota v. Internal Revenue Service*, 622 F.2d 387 (8th Cir. 1980); *United States v. Rye*, 550 F.2d 682 (1st Cir. 1977).

23

proceeding, a District Court has stated --

> In contrast, other courts have approved attorney's fees. Notably, the Seventh Circuit indicates, without comment, in *Quinn* that the district court had "indicated willingness to release small amounts so that [the defendant] could defend this suit, and on occasion the court did so. 997 F.2d at 289. Attorney's fees were also granted in *SEC v. Duclaud Gonzalez de Castilla*, 170 F. Supp. 2d 427 (S.D.N.Y. 2001) where the court explained that the defendants had presented a possible challenge to the SEC's evidence and that substantial legal work had already been performed in arguing summary judgment motions. *See also SEC v. International Loan Network, Inc.*, 770 F. Supp. 678, 680 (D.D.C. 1991) (mentioning that it had granted a modification of the asset freeze to permit defendants to retain counsel on their behalf).
>
> This court's central concern is the fairness of the proceedings. The court does not believe that it could achieve a fair result at the preliminary injunction hearing were it to deny defendants the ability to retain counsel. This is a complex legal matter, and lawyers are essential to the presentation of issues related to it. Therefore, the court is ordering the respective attorneys to file with the court, within the next ten days, reasonable estimates of the fees necessary to take them through the hearing on the preliminary injunction. If the estimates are reasonable, the court will approve them.[48]

This Court finds no contrary authority in the law governing revenue collection. While the Court is conscious of the Government's secured status, the ultimate issues in this case remain undecided.[49] It is difficult to imagine Gary being able to mount any sort of effective defense absent having compensated counsel. Moreover, the Court cannot conceive that Gary will be able to cooperate meaningfully with the trustee's or the Government's investigation and discovery without counsel. Not only might his rights be abridged by stripping him of the ability to employ a lawyer, but the efficiency and economy of the bankruptcy process would also suffer.

---

[48] *S.E.C. v. Dowdell*, 175 F. Supp. 2d 850, 855-856 (W.D. Va. 2001).

[49] The Court is also cognizant, as the Government points out, that the *Dowdell* court permitted use of frozen assets for an attorney to defend the taxpayer at the preliminary injunction stage. The Court is of the view that the ultimate determination of the merits of the Government's adversary complaint, is a stage of the proceedings that is equally, if not more critical, to have compensated defense counsel.

24

Accordingly, pending the completion of this adversary proceeding, the Court will modify the preliminary injunction to permit Gary to utilize funds from the GKT to employ and pay his counsel and experts on the following terms.

Gary and Richard will make a complete, sworn disclosure of each and every asset owned or controlled by the GKT within 15 days of this Order. The disclosure will be made to the Government and Trustee, as well as filed with the Court. Gary will make a complete, sworn disclosure of all assets of any entity with which he has a connection of any kind as promptly as possible and shall, in any event, not obstruct or delay any effort by either the Government or the trustee to investigate his affairs.[50]

Gary's counsel will, in the same time frame, provide the Court with a proposed budget that includes fees and expenses earned to date as well as fees and expenses anticipated to be earned through trial. Edward J. Nazar will be employed as special counsel to the estate and shall make interim application for attorneys fees and expenses, documenting the same as though applying for compensation from the estate. Counsel shall submit itemized statements of its time and expenses containing detail similar to that which is typically given in chapter 11 fee applications and in accordance with this Court's Professional Fee and Expense Guidelines ("Guidelines").[51] After receiving responses from the other parties (if any), the Court will independently review these applications and allow them to the appropriate extent. In so holding, the Court suggests that in

---

[50] This disclosure shall include, but not be limited to, Federal Gasohol Corporation (FGC), Financial Investment Management Corporation (FIMCO), Drake Enterprises, Inc.(DEI), PHR, LLC (PHR), Polo Executive Rentals, Krause Family Trust and Krause Children Trusts I, II, III, IV and V.

[51] *See* http://www.ksb.uscourts.gov/Docs/JRENFeeGuidelines011102.pdf

applying for approval of compensation, counsel may tailor their time and expense records to reflect sufficient data to allow the Court to determine how much time was spent on what task and whether the time spent was justified.

Immediately upon Gary becoming employed by an entity outside of those owned or controlled by any of the trusts, he shall advise the Court and parties in writing. Similarly, he shall immediately disclose the source and amount of any outside contribution to his attorney's fees, both to the Court and to the parties.

If, at the conclusion of this adversary proceeding, the Court determines that the property of the GKT is in fact Gary's property and is legally encumbered by the Government's liens, Gary will be required to repay any and all withdrawals authorized under this Order to the Government or the estate, as their interests shall appear, as a condition to his receiving a discharge in this case. In this fashion, the Court believes that it can assure Gary of a fair trial on the merits in this proceeding, while protecting the rights of the Government and his creditors.

If the Court does not approve Gary's counsel's proposed budget, or if Gary fails to make the disclosures upon which this Court predicates his being permitted to use GKT assets to fund his defense, the Court will revisit, and is likely to grant Nazar's motion to withdraw. Stated more directly, Gary Krause's ability to retain and pay Mr. Nazar (or any other lawyer) from the GKT trust assets is strictly conditioned upon his faultless compliance with the conditions enumerated above.

## 2. Richard's Motion.[52]

Richard's motion first requests leave, as trustee of the KCTs, to use KCT assets to finance the children's private educations, medical expenses, car insurance, and "other expenses deemed

---

[52] Dkt. 24.

Case 05-05775   Doc# 81   Filed 04/14/06   Page 26 of 30

appropriate." This portion of the motion was resolved by the entry of the Order described above which sets out the degree and extent to which some of those expenses may be paid from these trusts.[53]

Richard seeks leave to pay his counsel from funds and assets in the KCTs, also frozen under this Court's preliminary injunction order. The Government opposes this Motion for the same reasons it opposes Gary's request for attorneys fees from the GKT. It argues that Richard holds these assets as Gary's nominee, that the Government's liens attach to them, and that, as such, he should be barred from using them. The Trustee essentially agrees, arguing that these assets were nominally intended for Gary's children's benefit. Richard, in turn, argues that he is legally bound to defend the children's use of the assets and that the freezing of the assets effectively precludes him from exercising his fiduciary trust obligations.

Richard's principal argument centers on errors he perceives the Court to have made in entering the preliminary injunction. Yet, nowhere does he advert to any new evidence or novel legal developments that would support the alteration of the Court's order. It was, and it remains this Court's perception that Richard's role as trustee of the KCTs was largely that of a figurehead – wholly controlled by Gary. Even though the trusts were partially funded by checks from Teresa Briggs, the origin of those funds is far from clear. Given that those payments occurred in the same time frame as the loss of the Tax Court matter and the sale of 37 Mission, at least a question of fraud surrounds these payments.

Richard's request for attorneys fees is two-fold. First, he requests that this Court release funds from the KCTs to cover an outstanding check that bounced after the trust assets were frozen.

---

[53] *See* Dkt. 66.

This check in the amount of $9,463.47 was apparently to compensate the Brian Grace law firm for its services in October resisting the IRS summons. As noted above, some of that work was done in pursuit of a non-existent remedy: the unwarranted action to quash the summons. It appears that none of the work to be paid by the check occurred in the course of Gary's bankruptcy or in connection with its filing. Moreover, the evidence was clear that Gary chose the Grace firm and instructed Richard to hire them. Clearly, these were expenses incurred at Gary's direction and presumably in his behalf, not that of the KCTs. Until such time as this Court has made a final determination concerning the ownership of the KCTs' assets, Richard's request to cover the $9,463.47 check is denied.

Nevertheless, this Court must remain cognizant that the pending order is a preliminary injunction and not a final judgment. As all parties have noted, there remains substantial investigation and discovery to be done before a complete picture of Gary's finances and how they connect with the KCTs can be presented here. It appears to the Court that while Richard's role in responding to this investigation and discovery in the *interest of the KCTs* will be very limited, he may require compensated counsel to respond to the Government's and Trustee's requests.

Therefore, the Court will modify the preliminary injunction and allow Richard to draw upon the assets of KCT I, II, and III only to the extent permitted below and on the following conditions.

Gary and Richard will make a complete, sworn disclosure of each and every asset owned or controlled by the KCT I, II, III, IV and V, the Krause Family Trusts, and the GKT and any other related or affiliated entity within 15 days of this Order. The disclosure will be made to the Government and Trustee, as well as filed with the Court.

Richard and Gary will make a complete, sworn disclosure of all assets of any entity with

28

which Gary or Richard have a connection of any kind as promptly as possible and shall, in any event, not obstruct or delay any effort by either the Government or the Trustee to investigate Gary's or the KCTs' affairs.[54]

The Grace firm will, in the same time frame, provide the Court with a proposed budget that includes fees and expenses earned to date as well as fees and expenses anticipated to be earned through trial. The Grace firm represents that as of November 30, 2005, Richard owes $23,626.63 for fees incurred in representing Richard as trustee with future "significant activity" requiring the assistance of counsel in defending the IRS's claims. The Grace firm shall make interim application for attorneys fees and expenses, documenting same as though applying for compensation from the estate and its initial request may include, but need not be limited to the fees and expenses accrued up to November 30, 2005. Counsel shall submit itemized statements of its time and expenses containing detail similar to that which is typically given in chapter 11 fee applications and in accordance with the Court's Professional Fee and Expense Guidelines. After receiving responses from the other parties (if any), the Court will independently review these applications and allow them to the appropriate extent.

If, at the conclusion of this adversary proceeding, the Court determines that the property of the GKT, the KCTs or the Krause Family Trust is in fact Gary's property and is legally encumbered by the Government's tax liens, Richard and Gary will be required to repay any and all withdrawals authorized under this Order to the Government or the estate, as their interests shall appear, as a condition to Gary receiving a discharge in this case.

---

[54] This disclosure shall include, but not be limited to, Federal Gasohol Corporation (FGC), Financial Investment Management Corporation (FIMCO), Drake Enterprises, Inc.(DEI), PHR, LLC (PHR), Polo Executive Rentals, Krause Family Trust and Krause Children Trusts I, II, III, IV and V.

29

**Nazar's Motion to Withdraw as Attorney for Gary**

This leaves the remaining motion filed by Gary's counsel, Edward J. Nazar, to withdraw as counsel in this adversary proceeding and Gary's bankruptcy case.[55]   Gary has objected to this motion, as has the Trustee.  In light of the foregoing ruling concerning use of trust funds for Gary's attorneys fees and expenses, Nazar's motion to withdraw is temporarily DENIED.

**Conclusion**

The foregoing constitutes the Court's order on the three current motions before the Court. It also serves as the Court's formal opinion granting the Government's application for a preliminary injunction following the hearing on December 1 and 2, 2005.

# # #

---

[55]  Dkt. 44.