

**SO ORDERED.**

**SIGNED this 21 day of July, 2006.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY E. KRAUSE, | ) | Case No. 05-17429 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATE OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| LINDA S. PARKS, Trustee, | ) | Adversary No. 05-5775 |
| | ) | |
| Intervenor, | ) | |
| v. | ) | |
| | ) | |
| GARY KRAUSE and RICHARD KRAUSE, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER ON DEFENDANTS' MOTIONS FOR CONTINUATION OF MONTHLY LIVING EXPENSES

1

On May 11, 2006, chapter 7 debtor Gary Krause filed a motion to extend the $3,700 monthly living allowance previously entered by the Court for an additional three months, through July, 2006.[1] On May 25, 2006, defendant Richard Krause, as trustee of the Kansas Children's Trusts (KCT) I, II, III, IV, and V, the Gary E. Krause Trust (GKT) and the Krause Irrevocable Trust, filed a motion on behalf of trust beneficiaries Richard and Drake Krause (Gary's children) for continued authority to withdraw funds from the KCTs to pay private school tuition for the 2006-07 school year, and for authority to reimburse debtor Gary Krause for certain expenses paid for the children, as well as for certain anticipated future expenditures.[2]  Both the case trustee and the Government object.[3]  The Court conducted an evidentiary hearing on the motions on June 15, 2006 and took them under advisement, together with the other pending motions relating to the parties' attorneys fees, attorney fee budgets, and the adequacy of the debtor's asset disclosures.  The Court will issue a separate order on those issues.

Procedural Background

This adversary proceeding was filed by the Government on November 1, 2005. The Government seeks *inter alia* a declaration that certain trusts and entities are nominees of Gary and subject to federal tax liens.  Gary is indebted to the United States for unpaid income taxes for 1975, 1978-1983, 1986, 1994, and 1995.  The Government has filed proofs of claim seeking in excess of $3.0 million in taxes, interest, and penalties.  Both the Tax Court and Tenth Circuit Court of Appeals have held that Gary evaded paying these taxes by establishing abusive tax shelters.  Only after

---

[1]  Dkt. 96.

[2]  Dkt. 109.

[3]  Dkt. 110, 113, 114.

2

seeking to quash a collection summons served by the IRS did Gary file his bankruptcy case on October 10, 2005. On November 21, 2005 the Government sought and obtained an ex parte temporary restraining order (TRO) to prevent Gary and Richard from spending, depleting or transferring the assets of the KCTs, the GKT, and certain other entities: PHR, LLC (PHR), Drake Enterprises, Inc. (DEI), Financial Investment Management Corporation (FIMCO), and Federal Gasohol Corporation (FGC). The TRO effectively froze all accounts held by the trusts and entities, allegedly the only sources of funds available to Gary. The case trustee intervened in this proceeding asserting that if the Government prevailed on its nominee theory, the assets held by the trusts and entities were property of the bankruptcy estate to be administered by her.[4]

Following a hearing on December 1 and 2, 2005, the Court issued a preliminary injunction that continued the TRO with a slight modification allowing Richard to pay the boys' December school tuition totaling $2,000 at Wichita Collegiate High School and Wichita Independent School from KCT I. The Court further permitted Gary to submit a budget request for use of the frozen funds of the GKT to pay necessary monthly living expenses.[5] On December 19 and 21, 2005 respectively, Gary and Richard, on behalf of the trust beneficiaries, filed motions for monthly living expenses.[6] The Government and trustee filed written objections thereto.[7]

The Court convened a hearing on January 19, 2006, treating the motions as ones to use cash collateral. By that time, the parties had reached agreement on most living expense items. The

---

[4] Dkt. 25.

[5] Dkt. 12.

[6] Dkt. 22 and 24.

[7] Dkt. 36-39.

Court ruled on the remaining contested living expenses, namely the number of vehicles Gary would be permitted to keep and insurance issues. The Order on monthly living expenses, essentially an agreed order, was entered February 6, 2006.[8]

The effect of the Order was to modify the preliminary injunction in the following manner. Gary was allowed $3,700 per month from the GKT to pay monthly living expenses for the months of December 2005 through April 2006. The monthly allowance provided for the following expenses: electricity and heat, water, telephone/cell, home maintenance, food, clothing, laundry, uninsured prescription drugs, health insurance and transportation. In addition, the Order authorized Richard to pay the boys' tuition from the KCT I in the monthly amount of $2,000 from January 2006 through April 2006. The Order expressly states that "[t]he parties do not agree to the payment of any tuition after April 30, 2006." The Order further permitted a one-time withdrawal ($5,072.28) from the KCT I to pay the 2005 real estate taxes on the family home at 7711 Oneida Court. The Order required debtor to present a monthly accounting of the funds spent and set out the conditions under which the trustee and Government agreed to payment of monthly living expenses as follows:

> The United States and the bankruptcy trustee have agreed to the relief in this Order to prevent injury to debtor and his minor children, and it is conditioned upon debtor's cooperation in identifying the assets of the estate, the alleged assets of the estate, and the assets of alleged nominees, and in liquidating the assets of the estate that he has not claimed to be exempt. In the event that additional assets of the estate are identified, that provide current monthly income to the debtor, or debtor finds employment or receives income from any source, the debtor will refund any money withdrawn from the accounts pursuant to this order. Furthermore, in the event debtor obtains employment, the parties agree to reduce the monthly payments authorized by this order in an amount equal to that income.[9]

.

---

[8]  Dkt. 66.

[9]  Dkt. 66, ¶ 9.

4

Gary established a bank account with Equity Bank for the deposit of the authorized monthly funds and from which to pay monthly living expenses. He has provided accountings for the months of February, March and April.[10] A summary of those expenditures and the Court's effort to categorize the expenses paid is attached as Appendix A.

The Court has reviewed those accountings and notes that a number of expenditures paid were outside what the Court considers to be necessary monthly living expenses. For example, Gary has continued to maintain a health club membership at Genesis Health Club at the rate of nearly $100 per month, plus incidental charges for drinks and tennis academy. Gary has also paid himself $1,000 per month, thereby giving himself access to cash of over one-fourth of the total monthly living expense allowance. The Court is unable to determine exactly how Gary fully spent this amount and the accountings do not readily indicate such.[11]

In addition, some of the monthly living expenses appear to be unreasonably high. In some instances such as utilities, the expense paid includes substantial past due amounts. In other instances, the nature of the services provided goes beyond basic service and is excessive. For example, the telephone bill from AT&T for the month of April references charges for no less than four numbers for residential service. The Sprint bill for the month of April, presumably cell phone service, was $248. The full copy of the Sprint bill has not been provided so the Court is unable to determine the basic service charge for cell phone service, the number of cell phones on the Sprint

---

[10] Dkt. 76 and 99

[11] The accounting for February contains a handwritten ledger purporting to show out-of-pocket amounts Gary paid to Drake and Rick for allowances, gas for vehicles, lunch money, and haircuts. These presumably were paid by Gary with the cash he obtained. They total $490 for the month of February. There is no evidence before the Court that Drake and Rick actually used the cash for the purposes indicated. *See* Dkt. 76.

5

account, or the contract terms. The Court notes that the Sprint bill consists of 53 pages and lists total usage of 5,361 minutes for a thirty day period, or over 178 minutes per day . . . just on cell phone(s). In all, however, the actual telephone/cell expenses average almost $450 per month.

Further factual background and information can be found in this Court's April 14, 2006 Memorandum Opinion and the Court may refer to such information and facts as they pertain to the current motion. Additional facts will be set forth below in the discussion of the motions as warranted.

Discussion

The Government contends that there is no legal basis for the bankruptcy court to allow a debtor use of estate assets to pay post-petition living expenses and, as a general proposition, the Court agrees.[12] What gives the Court pause here is that this adversary proceeding is only at the preliminary injunction stage and, while this Court has determined that the Government's allegations are "serious, substantial, and difficult" and "deserving of more deliberate investigation," the ownership and encumbrance status of these assets has yet to be finally determined.[13] None of the cases cited by the Government features a similar situation, but all of the cases are most persuasive on the point that estate assets are not available to pay a chapter 7 debtor's post-petition living expenses.[14]      If Gary ultimately prevails on this issue and the trusts and entities legitimately own

---

[12] *See* Dkt. 36 and 113 and cases cited therein.

[13] Dkt. 80, p. 16; *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1261-62 (10th Cir. 2003).

[14] *See In re Thomas*, 91 B.R. 731 (N.D. Tex. 1988) (Government denied stay relief to offset post-petition crop disaster payments against debtor's pre-petition obligations to government agencies because debtor did not have rights in the post-petition crop disaster payments at the time he filed bankruptcy); *In re Peterson Distributing, Inc.*, 82 F.3d 956 (10th Cir. 1996) (creditor sought to setoff credit card invoices against it's claim in debtor's bankruptcy

Case 05-05775    Doc# 124    Filed 07/21/06    Page 6 of 29

the assets they hold, then the assets are not property of his bankruptcy estate and, arguably, not even subject to this Court's jurisdiction. On the other hand, if the Government prevails on this issue, the assets of the trusts and entities are property of the bankruptcy estate and may not be used to pay Gary's and his sons' post-petition living expenses. Until this issue is finally determined, the Court is left to balance these two divergent positions while this case pends.

In this regard, the Court finds *In re Walter*[15] somewhat instructive. In that case, the bankruptcy court issued a temporary restraining order prohibiting the chapter 11 debtor from withdrawing further funds from his pension plan until his contested claimed exemption was determined.[16] Debtors claimed exempt a pension plan valued at approximately $1.2 million that had been established in a previous real estate business. An unsecured creditor objected to the claimed exemption. Debtors claimed authority as debtors in possession and under § 363(b) of the Bankruptcy Code to dispose of or use estate property.[17] The objecting creditor noted the conflict

---

under § 553); *United States v. Sutton*, 786 F.2d 1305 (5th Cir. 1986) (No provision in bankruptcy code authorizes a family support allowance in a chapter 11 reorganization where spouse had no matured claim for support and did not provide services to the estate; bankruptcy court lacked equitable authority under § 105 to award monthly support of $1,500 to debtor's wife and children); *In re Vincent*, 4 B.R. 21 (Bankr. M.D. Tenn. 1979) (No provision in Bankruptcy Code authorizes payment of chapter 11 debtor's necessary living expenses from the estate; payment of necessary living expenses had to come from employment from the trustee or other sources.).

[15] 83 B.R. 14 (9th Cir. BAP 1988).

[16] After debtors filed their chapter 11 petition, debtors withdrew $10,000 per month from the pension plan for family living expenses. At the time of the hearing, debtors had withdrawn $90,000 from the pension plan.

[17] Under § 363(b) a debtor in possession or trustee must articulate a business justification for using or selling estate property outside the ordinary course of business. *See In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th cir. 1986) (listing relevant factors for judge to consider to decide whether use or sale of estate property furthers the diverse interests of debtors, creditors, and equity holders). A debtor in possession has many of the same rights as a trustee. *See* 11 U.S.C. § 1107.

7

of interest that debtor was in.

> . . . Mr. Walter as a bankrupt and debtor in possession is in a situation of conflict of interest, wanting the money for himself, while at the same time, having to protect the estate. The [objecting creditor] maintains that Mr. Walter should be allowed to withdraw no money from the pension plan so that the estate will be protected.[18]

*Walter* is distinguishable from the instant case for two reasons, first that Walter was a chapter 11 debtor in possession while Krause is a debtor in a chapter 7 liquidations, and, second, that in *Walter,* the parties agreed that "until the court rules on this objection [to exemption], the [pension] plan is to be considered property of the estate."[19] While there is no such agreement here, the Court has made a *preliminary* determination that the Government is likely to succeed on the merits of its claim that the assets held by the trusts and entities are property of the estate.

In addressing the debtors' argument under § 363 in *Walter*, the Ninth Circuit BAP agreed with the objecting creditor's contention that it does not allow use of estate property for personal purposes. The court held that in order for a debtor in possession or trustee to use estate property, an articulated business justification must be made. The Ninth Circuit BAP concluded that the bankruptcy court properly exercised its discretion in prohibiting future withdrawals where it was shown "that a substantial asset of the estate may be jeopardized by continued withdrawals."[20] This reasoning is even more persuasive in the chapter 7 context. Were the trustee here to seek to use the assets of the alleged nominee trusts and entities for the benefit of the debtor and his children, that motion would meet a similar fate, particularly where the assets are substantial and in this case, the only potential property of the estate. The Court cannot fathom that a trustee would pursue such a

---

[18]  83 B.R. at 19.

[19]  *Id.*

[20]  *Id.* at 20.

8

motion in a chapter 7 setting. If such a course of action were pursued by the trustee it would likely constitute a breach of the trustee's duty owed to debtor's creditors.[21]

Initially, the Court intended that the allowance of monthly living expenses operate as an incentive for Gary to cooperate with the trustee in disclosing and sorting through the myriad of trusts, entities, and transactions spanning a time period of nearly twenty years in some instances. The Court believed such cooperation and full disclosure would confer a substantial benefit upon the estate and move this proceeding toward final resolution more efficiently. Moreover, this Court has always intended that should the Government prevail, Gary would be required to repay whatever he used, analogous to a debtor whose adequate protection of a creditor's security has failed. Instead, after now having two separate occasions to view Gary's demeanor and hear his testimony, the Court's expectations remain unmet. Exactly the opposite has occurred.

Gary had the security blanket of the $3,700 monthly allowance and admits he has made no effort to obtain employment. The Government complains that Gary has been less than forthcoming in discovery and the court-ordered disclosure of assets. Gary's cooperation was a condition to allowing a reasonable monthly living expense under the February Order. The Court heard evidence on June 15, 2006 that Gary has not met that condition. He omitted certain property and interests from his court-ordered disclosures including storage units containing his personal effects; rental income from an unidentified tenant farmer on the 15 acres owned by Development Associates (wholly owned by the GKT); a safe deposit box held by DEI; a receivable resulting from a mortgage on an oil tanker (the balance of which is uncertain); and a hunting lodge or Gary's interest therein

---

[21] *See* 11 U.S.C. § 704(a).

through Quivera Associates, Inc. (Gary is the named insured on the hunting lodge).[22] According to the Government, the slow progress in discovery and Gary's recalcitrance has necessitated the extension of discovery and the scheduling deadlines.

Gary has offered no security or any other form of adequate protection of the funds expended for living expenses in the event the Court should finally determine that the assets are indeed property of the estate. The Court concludes that as long as Gary has this allowance, his only incentive to cooperate is the risk of being denied a discharge. Even that threat is somewhat hollow. Given the fact that the Tenth Circuit Court of Appeals has already concluded that he evaded taxes, the Government's dischargeability complaint has considerable promise of success. Gary has everything to gain from delay and nothing to lose by defending the complaint.

I.     Gary's Motion for Continuation of Necessary Monthly Living Expenses

Gary seeks to continue the $3,700 monthly allowance for "necessary" living expenses through July 2006. According to Gary's motion, "[t]he requested allowance is for food, utility, auto and medical expenses on behalf of the Debtor and his children."[23]  But the attached budget to support the $3,700 monthly allowance includes other expenditures. Gary allocates the monthly living expenses as follows:

| | |
|---|---|
| Food | $500.00 |
| Utilities (includes gas, water, electricity, trash, and telephone) | $1,025.00 |

---

[22]  The Court will more fully discuss the adequacy of these asset disclosures in a separate order.

[23]  Dkt. 96, ¶ 3.

10

| | |
|---|---|
| Auto/Transportation (includes gas, repairs, tags, and taxes)[24] | $ 480.00 |
| Medical Expenses (includes health insurance and prescription drug insurance premiums, prescription drugs, dental expenses, and "other medical") | $1,270.00 |
| Allowance for boys | $ 160.00 |
| Home maintenance[25] | $ 200.00 |
| Entertainment/Recreation | $ 100.00 |
| Incidental | $ 465.00 |
| Total | $4,200.00[26] |

Gary asserts that this figure is reasonable because it is less than the $56,386 median annual income for a family of three in Kansas.[27]

The Government and the trustee object to continuation of any further monthly living expense allowance for Gary, arguing that Gary has made no effort to find employment and earn an income.

---

[24] Gary and his sons use two vehicles – a 2000 Ford Explorer and a 1999 Dodge Durango, both of which are fully paid.

[25] The home in which Gary and his sons reside, 7711 Oneida Court, is unencumbered so Gary has no mortgage payment. For tax year 2005, it appraised at $392,000. In the initial February 6, 2006 Order, the Court authorized Gary to pay the 2005 real estate taxes on the home in the amount of $5,072.28. Dkt. 66. According to the Government, the 2005 taxes on the Oneida property remain unpaid.

[26] According to the Court's calculations, Gary's itemized monthly budget totals $4,200, not $3,700.

[27] As the Government points out in its response, this figure is a pre-tax figure. The Court agrees. For purposes of means testing under the Bankruptcy Abuse Prevention and Consumer Protection Act effective October 17, 2005 (BAPCPA), the determination of current monthly income is based upon average *gross* monthly income and annualized to compare to the annual median family income. Taxes are a separate deduction. *See* Form B22A, lines 3, 13, 14 and 25.

11

He has submitted no plan to repay the monthly living expenses and seemingly contemplates that the monthly living allowance will continue for the duration of his bankruptcy. The trustee does concede that it is appropriate to insure the assets that may ultimately be deemed to be property of the estate (*i.e.* the house and vehicles). At most, the Government argues, Gary should be entitled to no more that the Internal Revenue Service standards, a sum which the Government calculates as $1,629 per month, allocated as follows:

| | |
|---|---|
| Food, Clothing and other items | $ 835.00 |
| Transportation (operating costs) | $ 384.00 |
| Housing and Utilities (non-ownership costs) | $ 400.00 |
| Total | $1,619.00[28] |

This amount, the Government maintains, is sufficient to cover "necessary" monthly living expenses. The Court observes that the Government's proposed monthly allowance for Gary and his sons makes no allowance for health insurance or unreimbursed health care expenses.[29]

The Court considers a number of factors pertinent to the determination of whether the $3,700 monthly living allowance should continue.

### A.    Gary's Unemployment

This is not a situation where the debtor has made effort to find employment but has failed in his search or the debtor is lacking in skills or education necessary to obtain a job. Gary has utterly

---

[28]  The Court's calculation of these monthly expenses totals $1,619, not $1,629.

[29]  The Court notes that the IRS standard for food and clothing utilized for means testing under BAPCPA § 707(b) and Form B22A does not include an allowance for health care costs. Health insurance premiums and unreimbursed health care expenses are separately-listed deductions. *See* Form B22A, lines 31 and 34.

12

failed to seek any employment.  The Court never contemplated that the monthly living allowance would be a substitute for Gary obtaining gainful employment.

> In the event that additional assets of the estate are identified, that provide current monthly income to the debtor, or debtor finds employment or receives income from any source, the debtor will refund any money withdrawn from the accounts pursuant to this order.  Furthermore, in the event debtor obtains employment, the parties agree to reduce the monthly payments authorized by this order in an amount equal to that income.[30]

Gary says that he has not looked for employment because "no one will hire a 58 year old man with a heart condition."  There is no medical evidence that his health precludes him from working to earn a living.  The Court knows many men of Gary's age and older who are burdened with heart problems, but are gainfully employed.  Given his law degree, entrepreneurial skills, and his apparent extensive business and management experience (in a variety of industries and enterprises), the Court believes that Gary has marketable skills.  Gary's excuses for not searching for outside employment are unacceptable.  Gary chose to file a chapter 7 case, the purpose of which is to give the honest but unfortunate debtor a "fresh start."[31]  Chapter 7 is not a means to sustain the lifestyle to which the debtor had become accustomed before filing bankruptcy.  The Court is left with the conclusion that so long as the $3,700 monthly allowance is in place, Gary has little incentive to search for outside

---

[30]  Dkt. 66, ¶ 9.

[31]  *See Dalton v. I.R.S.*, 77 F.3d 1297, 1300 (10th Cir. 1996) (The purpose of the Bankruptcy Code is to provide the honest, but unfortunate, debtor a fresh start); *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) ("This purpose . . . gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt."); *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (In the same breath that the courts have invoked the "fresh start" policy, they have been careful to explain that the Code limits the opportunity for a completely unencumbered new beginning to the honest but unfortunate debtor, *citing Local Loan Co. v. Hunt, supra)*.

employment and begin his "fresh start."

        **B.**    **Necessity and Reasonableness of Gary's Budgeted Monthly Living Expenses**

The Court has reviewed the initial order allowing monthly living expenses of $3,700. The language of that order is consistent with the Court's recollection that the monthly allowance was for payment of reasonable and necessary post-petition living expenses, not every expenditure incurred by Gary. The order states that the monthly allowance "*shall* be utilized for the payment of pro forma expenses as set forth below."[32] The enumerated expense categories are: electricity and heat, water, telephone/cell, home maintenance, food, clothing, laundry, uninsured prescription drug costs, health insurance and transportation. In his own motion for continuation of the $3,700 allowance, Gary represents that the monthly allowance is for "food, utility, auto and medical expenses" on behalf of himself and his sons.[33]

The Court concludes that Gary's budgeted request for the boys' allowance ($160), entertainment and recreation ($100), and incidentals ($465) are not necessary expenses and should not be paid out of the frozen funds. Gary testified that his sons have summer jobs and are earning some income; this offsets the allowance. Those expense items will be disallowed.

A review of Gary's Schedule J is somewhat revealing of Gary's current situation. While the evidence at the preliminary injunction hearing indicated that FIMCO paid nearly all of Gary's monthly living expenses (explaining a number of significant monthly expenses being zero), he lists an additional $2,171 of monthly expenses of which $600 is for a loan payment on a vehicle that

---

[32] Dkt. 66, ¶ 6.a.

[33] Dkt. 96, ¶ 3.

14

Gary has since surrendered. A comparison of the figures for some of the expense categories on Schedule J, Gary's budget or requested allowance, and actual expenditures, is enlightening.

| **Expense Item** | **Schedule J** | **Budget** | **Actual**[34] |
|---|---|---|---|
| Utilities (electricity, gas, water, telephone, trash) | $ 0.00[35] | $ 1,025.00 | $983.28 |
| Transportation (operating costs: gas, repairs, and taxes) | $150.00 | $ 480.00 | $390.37 |
| Home Maintenance (repairs and upkeep) | $ 25.00 | $ 200.00 | $115.74 |
| Food | $ 400.00 | $ 500.00 | $392.32 |
| Rent (includes taxes and insurance) | $ 371.00 | $ 0.00 | $ 0.00 |
| Health/Drug Insurance | $ 0.00[36] | $ 690.00 | $674.50 |
| Medical/Dental Expenses | $300.00 | $ 580.00 | $384.20 |

The Court concludes that these expenses, while necessary, are unreasonable in amount, especially for a chapter 7 debtor who is seeking to fund them with putative estate assets. A $450 monthly telephone expense is questionable under the circumstances here. The actual phone expense far exceeds the requested allowance of $200. To the extent the telephone expense is attributable to the number of land lines or cell phones utilized by debtor and his sons, the Court suggests that the number of lines and/or phones be reduced. Similarly, the gas costs for two vehicles seems somewhat high given the fact that Gary has no travel to and from a place of employment. Likewise, the car

---

[34] *See* Appendix A attached. This column represents the Court's calculation of the average monthly expense for the months of February, March, and April as gleaned from the accountings filed by Gary.

[35] These pre-filing expenses were paid by FIMCO.

[36] This pre-filing expense was paid by FIMCO.

15

repair/routine maintenance allowance appears to be high in the absence of evidence that there have been mechanical problems with the two SUVs - a 1999 Dodge Durango and a 2000 Ford Explorer. Depending upon the health insurance plan covering Gary and his sons, and the applicable deductibles and co-pays, an unspecified monthly medical expense of $580 (in addition to health insurance premiums of $674.50) is high. The Court assumes that this medical expense is an unreimbursed, out-of-pocket cost above and beyond the covered medical expenses incurred. Likewise, the home maintenance figure of $200 per month appears high. The Court heard no evidence of necessary repairs or maintenance required on the 7711 Oneida property, other than the unsubstantiated testimony of Gary that the air conditioning unit(s) are not functioning properly.

As suggested by the Government, the Court will apply IRS standards for food, clothing and other items ($835); transportation ($384); and housing/utility expense ($400). With respect to medical expenses the Court will allow $675 for health insurance and prescription drug insurance premiums and $130 for prescription drug co-pay or unreimbursed expense. The $400 budgeted by Gary for "other medical" will be disallowed.

The Court thus allows Gary a monthly living expense of $2,424 for the months of May, June and July, 2006.

### C.     Unsubstantiated Expenses

Gary's budget requests for incidentals ($465), other medical ($400) and home maintenance ($200) are unsubstantiated. Gary offers no detail as to what specific expense is entailed in the figures requested. Absent some degree of specification and itemization, these expenses are disallowed.

In addition, what the Court would interpret as "incidentals" would be subsumed in the

16

allowance for "food, clothing and other items" provided above.  Likewise, a portion of the IRS housing allowance provided above is attributable to routine maintenance and upkeep.

In reviewing the accountings for February, March and April furnished by Gary pursuant to the February 6 order, the Court notes that Gary has paid himself $1,000 a month from the $3,700 allowance.[37]  Presumably Gary used these funds to pay some expenses with cash.  However, the accountings do not fully show what monthly living expenses, if any, were actually paid by Gary using these funds.

Finally, the Court questions the propriety of including medical expenses attributable to the boys in Gary's budget request.  The better approach would be to have the KCT trustee request payment of the boys' unreimbursed or out-of-pocket medical expenses directly from the KCT 1. The Court would expect the trustee to submit an insurance benefits statement from the health insurer setting forth what portion of the medical expense was covered by the health insurance and what portion of the medical expense is the responsibility of the insured or patient as a non-covered service, deductible, or co-pay.   The monthly living expense budget requested by Gary should come from the GKT.

### D.        Repayment of Estate Property or Adequate Protection for Use

Nowhere in Gary's motion does he offer or propose to repay the frozen funds utilized to pay his monthly living expense allowance.  Pursuant to the February 6, 2006 order, the frozen funds have now been used to pay five months of living expenses ($18,500), plus substantial additional "one-time" expenditures and tuition expense ($10,000).

Gary has shown no indication that he will earn an income in the future to potentially repay

---

[37] *See* Dkt. 76, check # 1012; Dkt. 99, check # 1016, 1027, 1035, 1042, 1044.

17

the estate. He has not sought employment. Nor does the Court place much credence in Gary's potential source of income through an alleged anti-aging project that Gary has referenced from time to time. Gary has supplied the Court with no information concerning this alleged "anti-aging project." The Court does not know at what stage of development the alleged anti-aging product is in. No business plan or financial projections have been provided with regard to the project. It is not even clear what Gary's role in the project is. The Court views the anti-aging project as a speculative means of repayment at best.

### E. Conclusion as to Gary's Motion

Based on the foregoing, Gary will be permitted to withdraw the amount of $2,424 from the GKT for monthly living expenses for the months of May, June and July. Said funds shall only be utilized for the monthly living expenses allowed (*i.e.* food, clothing, transportation, housing and utilities, health insurance and unreimbursed medical expenses). The Court further orders that no monthly living expenses will be paid from the frozen assets after July 31, 2006 and the Court will entertain no further motion for continuation of monthly living expenses. The debtor is strongly encouraged to commence his "fresh start" by obtaining gainful employment. This Court is not inclined to require the creditors to finance the debtor's speculative ventures with estate assets.

II.    Richard's Motion for Continuation of Monthly Living Expenses

Richard seeks authority to continue paying $2,000 per month for the sons' private school tuition for the upcoming 2006-07 school year (including $550 tuition deposits at each school) and to reimburse Gary for miscellaneous expenditures he has paid on behalf of his sons or is expected to incur.[38] The expenditures already incurred by Gary include annual renewal of vehicle registration

---

[38] Dkt. 109.

18

and personal property taxes on the Durango and Explorer totaling $375 in late May[39] and

psychological testing of Drake in the amount of $800 in March.[40]  Richard requests authority to pay

for Drake's scheduled deviated septum surgery in June and to repair or replace the air conditioning

system at 7711 Oneida (with an anticipated cost as high as $4,000).[41]

The Government objects to Richard's motion on much of the same grounds as asserted in

opposition to Gary's motion for continuation of monthly living expenses.  The Government made

it known when it agreed in January to the payment of the boys' tuition that it would oppose payment

of tuition beyond the current academic year.  The intent was to provide debtor and his family with

a reasonable transition period.

Richard's motion for continuation of necessary monthly living expenses on behalf of trust

beneficiaries Drake and Rick stands on slightly different footing from Gary's motion.  Neither Drake

nor Rick are providing any services to the bankruptcy estate. The Court can conceive of no possible

benefit to the estate.  The Court initially allowed the payment of the boys' tuition to avoid harm to

the boys and because the funds were froze in the middle of the school year, to complete their tuition

obligations for the school year.

On the other hand, the KCT I arguably presents the strongest case that this trust, at least

---

[39]  According to the vehicle registration application signed by Gary in May of 2006 and attached to Richard's motion, the Durango and Explorer are owned by FIMCO. Dkt. 109.  But Gary's asset disclosures filed May 11, 2006 show that the vehicles are owned by the KCT I. *See* Dkt. 98.

[40]  Based upon the documents attached to Richard's motion, the psychological testing related to Drake's dyslexia, ADHD, and other learning disorders.  It is unclear from the record whether Drake, who will be a senior in high school, was diagnosed with those disorders for the first time as a result of that testing.

[41]  According to Gary's asset disclosures, the 7711 Oneida property is owned by PHR which in turn is owned by the KCT I, II and V.  *See* Dkt. 98.

19

when initially created in 1988, was a valid trust created by Gary for the boys' benefits, and not a sham trust. The Court is mindful of the 1986 antenuptial agreement between Gary and his former wife, Teresa Briggs, whereupon the birth of children Gary was to establish the Krause Children Trust.[42] The trust was to be initially funded with $50,000. Upon the birth of the second child, an additional $50,000 was to be added to the trust corpus. Gary's total cash contribution obligation to the Krause Children Trust under the antenuptial agreement was $150,000.[43] While subsequent events indicate that not all terms of the antenuptial agreement were strictly adhered to as it concerns the Krause Children Trust, it nonetheless casts some doubt on the Government's nominee theory, at least where the KCT I is concerned.[44] Nevertheless, the evasive and incomplete nature of the financial disclosures made by Gary in Richard's name reinforce the Court's earlier determination that there is a strong likelihood that these assets will be found to be those of Gary, and hence, of the estate and should therefore be protected pending the outcome of this case.

With the above considerations in mind, the Court now turns to the specific funding requests made by Richard on behalf of the boys, Drake and Rick.

### A.    Private School Tuition

---

[42] *See* Krause Exhibit 1, ¶ 12 admitted by stipulation of the parties at the hearing on the preliminary injunction, December 1, 2005.

[43] Gary suggested that his ex-wife Teresa contributed some of the cash to the KCTs, but the court has not been provided with financial records of the trusts showing the amount, date, or source of original cash contributions to the KCTs.

[44] The KCT I was established December 5, 1988 approximately seven months after Drake's birth. The antenuptial agreement does not appear to contemplate multiple KCTs. The antenuptial agreement contemplates that there would be three trustees, not a single trustee, of the Krause Children Trust to be created. At this stage of the proceedings, the record before the Court has not been sufficiently developed to determine whether the initial funding requirements of the KCT I or any of the other trust terms were consistent with the antenuptial agreement.

The $2,000 monthly allowance from the KCT I for Drake's and Rick's tuition at Wichita Collegiate High School and Wichita Independent School for the 2006-07 academic year is denied as is the request to fund or reimburse Gary for any corresponding tuition deposit from the KCT I. The Government correctly notes that the boys can obtain a public education for substantially less. The Court agrees that the requested tuition expense is both unnecessary and excessive. No doubt many debtors whose chapter 7 and 13 cases are pending in this Court would very much like their children to receive an expensive private education, but those desires should not be funded by estate assets, particularly when there is no statutory justification whatever for such an expenditure in the Code. While the Court empathizes with the debtor's children being uprooted in this way, support of a debtor's dependents with assets that are potential property of the bankruptcy estate is simply without a legal basis. Gary's financial activities and the activities of the KCTs draw legitimate suspicion as to their legitimacy, requiring the Court to take what may appear to be draconian measures to protect the interests of the creditors at the cost of the debtor's children. In a similar vein, had Richard administered the KCT I in his sole discretion as contemplated by the trust instrument, rather than as Gary's cats-paw, there would be little doubt of the validity of the KCTs. Richard's request for a monthly tuition allowance of $2,000 for Drake and Rick is DENIED.

### B. Vehicle Registration and Taxes.

Richard also seeks authority to reimburse Gary for the annual registration fee and taxes on the Durango and Explorer totaling $375. The Court is troubled by the still-existing inconsistency of ownership of these vehicles.[45] Moreover, the Court considers the request duplicative of the transportation expenses previously provided Gary in the $3,700 monthly allowance and subsumed

---

[45] *See* note 39, *supra.*

21

in that category of expense.  As noted above, Gary will be allowed a monthly transportation expense of $384 for May, June and July.  This will be paid from the GKT.  Richard's request to, in addition, reimburse Gary for this annual expense from the KCT I is DENIED.

### C.    Psychological Testing of Drake

Richard seeks authority of the Court to reimburse Gary $800 for psychological testing of Drake on March 1, 2006.  It is unclear whether this medical expense was a covered service under Gary's health insurance plan and whether it was reimbursed by insurance.  No statement from the insurer has been provided by Richard to demonstrate that this service is not payable by the health insurer.  To the extent that the psychological testing is a covered service under Gary's plan, then Richard has provided no explanation why the service could not have been provided by a contracting provider.  In addition, if the medical expense was not covered by the $3,700 monthly allowance, Richard has provided no explanation why he did not seek approval of the Court prior to incurring the medical expense and justify the necessity of the medical service.  In the Court's experience, a diagnosis of ADHD and dyslexia is ordinarily made early in a child's student life and not when the child nears high school graduation.  In the absence of answers to these questions and based upon the limited record before it, the Court DENIES Richard's request to reimburse Gary for this medical expense from the KCT I.  This expense item is clearly in the nature of support for the debtor's dependent without any provision in the Bankruptcy Code for its payment out of assets of the bankruptcy estate.

### D.    Drake's Deviated Septum Surgery

Richard seeks authority of the Court to reimburse or pay for any uninsured or unreimbursed medical expenses associated with Drake's surgery for a deviated septum scheduled on June 1.  At

this point, Richard has presented the Court with no documentation to establish what amount this may be and whether this medical service is covered by Gary's health insurer. Nor has Richard presented the Court with any evidence from a health care provider that the surgery is necessary. If the surgery has already taken place, this information should be readily available. Absent this additional information, Richard's request is premature and temporarily DENIED. Like the psychological testing, this medical expense should be paid from the debtor's future earnings.

### E. Air Conditioning Repair or Replacement

Richard seeks authority to repair or replace the air conditioning system at debtor's home, 7711 Oneida Court. Gary projects that this expense may be as high as $4,000 and requests that it be paid from funds held by a KCT. Conceivably, this expenditure could preserve a potential asset of the bankruptcy estate.[46] Once again, however, Richard has provided no evidence to the Court describing the nature of the problem nor bids to repair or replace the air conditioning system, if necessary. In addition, the original $3,700 monthly allowance included a provision for home maintenance which the Court believes includes this expense item. The monthly living expense allowance going forward for the months of May, June and July includes an allowance for maintenance which is included in the housing and utilities allocation of $400. Absent Richard providing further evidence substantiating the problem and bids to repair or replace, Richard's request is DENIED.

---

[46] The Court notes that its February 6, 2006 order authorized Richard to deposit the necessary funds into Gary's counsel's trust account to pay the 2005 real estate taxes on 7711 Oneida in the amount of $5,072.28 from KCT I. According to the Government in argument and its written objection, Richard has not paid the taxes, but the Court received no evidence of that. If the Government's representation is correct, this only adds to the Court's many serious concerns about the future of this case.

23

**Conclusion**

At the preliminary injunction hearing in December, the Court admonished the debtor to bear in mind the purpose, effect, and benefits of filing a chapter 7 case and that those benefits do not come without cost:

> The United States of America, Mr. Krause, and your creditors are not going to finance a lifestyle of the expanse that you currently enjoy. You said that you entered bankruptcy to put it behind you, and I want you to understand, Mr. Krause, when you're in a bankruptcy you take your financial past and you lay it on the table and a very bright light shines upon it. And you have an absolute duty to be candid with the Court and be candid with the Trustee and to be candid with your creditors to reveal whatever it is they ask of you. It is not, as so often happens out in the non-bankruptcy world, a situation where the race is to the swiftest or the cleverest debtor; it's a different deal in Bankruptcy Court. . . . [Y]ou should not be surprised to learn that everything that you've been up to is going to be under significant scrutiny going forward . . .[47]

This Court will not speculate on Gary's motives in choosing the liquidation chapter over filing a chapter 11 in which he arguably could have acted as a debtor in possession of his assets. Having selected chapter 7 however, he can not reasonably expect to have the use of these assets for living expenses pending the outcome of this litigation. Gary must look to his own lights for his and his family's support. The Bankruptcy Code affords him nothing more.

Gary's motion for continuation of monthly living expenses is GRANTED IN PART AND DENIED IN PART. Gary will be permitted to withdraw monthly from the GKT the sum of $2,424 for the monthly living expenses described herein for the months of May, June and July. Gary will be permitted no monthly living expense allowance after July 31, 2006. Richard's motion for continuation of payment of private school tuition and for payment or reimbursement of Gary for the other expenses enumerated above from the KCT I is DENIED.

---

[47] Dkt. 17, Tr. of Ruling, p. 8-9.

24

# # #

**Appendix A**

**Court's Analysis of Gary Krause's February, March, and April 2006 Expense Reports**

In support of his Report of February 2006 Expenditures (Dkt. 76) and Report of March and April 2006 Expenditures (Dkt. 99), Gary provided copies of various bank statements, checks, utility bills, receipts, and hand-written ledgers for cash expenditures. The Court notes that full copies of the utilities bills were not provided. In addition, Gary did not produce a copy of each utility (i.e., gas, electric, etc..) bill for each month. Gary also did not provide copies of all checks referenced in the bank statements. The figures shown below are supported by a either a utility bill, check, or receipt. Receipts for unknown items were excluded. The Court has adjusted various figures to account for certain anomalies and includes other explanatory notes by footnote reference where appropriate.

| Expense Description | February | March | April | Monthly Average |
|---|---|---|---|---|
| Utilities | | | | |
|   Gas | 396.12 | 315.85[4] | 197.94 | 303.30 |
|   Electric | 130.12 | 202.90 | 93.36 | 142.13 |
|   Water | 68.65 | 76.11[5] | 46.52 | 63.76 |
|   Phone[1] | 579.73[3] | 373.45[6] | 391.92[7] | 448.37 |
|   Trash[2] | 77.18 | _____ | _____ | 25.73 |
| Total - Utilities | **1251.80** | **968.31** | **729.74** | **983.28** |

---

[1] Gary has two phone service providers: AT&T for his land lines and Sprint for his cell phones. Full copies of the telephone bills were not provided. As far as the Court can discern, Gary has 4 land lines. It is unclear the number of cell phones for which Sprint provides service.

[2] The trash service is billed quarterly.

[3] This figure represents $205.12 for SBC (n/k/a AT&T) and $374.61 for Sprint.

[4] Gary had a past due balance and paid $620.28 to Kansas Gas Service in March. Current charges for March were $315.85.

[5] Gary issued two checks to the City of Wichita Water Department in March. The actual bills were not attached.

[6] This figure represents $189.84 for AT&T and $183.61 for Sprint.

[7] This figure represents $194.41 for AT&T and $197.51 for Sprint.

1

| | | | | |
|---|---|---|---|---|
| Auto | | | | |
|    Gas | 224.29[8] | 234.07[9] | 265.63[10] | 241.33 |
|    Repairs | 0 | 447.13 | 0 | 149.04 |
|    Tags & Taxes | 0 | 0 | 0 | 0 |
| Total - auto | **224.29** | **681.20** | **265.63** | **390.37** |
| Home | | | | |
|    Repairs | | 276.25[11] | 55.42 | 110.56 |
|    Upkeep | | 15.56 | | 5.19 |
| Total for Home | **0** | **291.81** | **55.42** | **115.74** |
| Health/Rx Insurance[12] | 674.50 | 674.50 | 674.50 | 674.50 |

---

[8] This figure represents $200 cash allowance to the boys for gas and 2 receipts for gas totaling $24.29 (paid in cash). The Court recognizes that the attached receipts may have been paid using the "gas cash allowance" and may thus be duplicative. Calculating gas expenditures based on receipts only, however, results in an unreasonably low figure.

[9] This figure represents $100 cash allowance to the boys for gas and 4 receipts for gas totaling $134.07 (paid in cash). *See* fn.8, *supra*.

[10] This figure represents $100 cash allowance to the boys for gas and 7 receipts for gas totaling $165.63 (paid in cash). *See* fn.8, *supra.*

[11] This figure represents a check to Sears for $211.90 (no receipt/bill) and a cash receipt for $64.35 to Home Depot for a pump.

[12] These figures represent $634.50 to Preferred Health Systems for health insurance and $40.00 to Maxor Plus for prescription drug coverage.

2

| Out-of-Pocket Medical Expenses (OOPME): | | | | |
|---|---|---|---|---|
|   Rx | | 288.98 | | |
|   Dr. Stone | | 800.00[13] | | |
|   Dentist | 111.00 | 111.00 | | |
|   Misc. | 5.74 | 58.78 | | |
|   Glasses | | | 170.34 | |
|   WichitaClinic | | | 406.75 | |
| Total OOPME | **116.74** | **458.76** | **577.09** | **384.20** |
| Food[14] | 366.33 | 418.31 | 140.34[15] | 392.32[16] |
| | | | | |
| TOTAL Monthly Avg | | | | **$2940.41** |

---

[13] The Court excluded the $800 paid to Dr. Stone for psychological testing of Drake in its average calculation as it is unclear whether this medical expense was a covered service under Gary's health insurance plan and whether it was reimbursed by insurance. Moreover, defendants should have sought court approval prior to incurring this expense.

[14] These figures were obtained by adding the receipts for groceries. Receipts with unknown items were excluded.

[15] Debtor submitted only two receipts for groceries for the month of April.

[16] Because the figure for April is clearly low, the Court averaged food expense for February and March only.

3

**Cash Flow Analysis**

**Cash withdrawn by Gary (February-April):**

| Description | Amount |
|---|---:|
| Check # 1012 (2/16/06) | $500 |
| Check # 1016 (2/28/06) | $500 |
| Check # 1027 (3/16/06) | $500 |
| Check # 1035 (3/24/06) | $500 |
| Check #1042 (4/05/06) | $500 |
| Check # 1044 (4/20/06) | $500 |
| ATM withdrawal (2/28/06) | $ 30 |
| **Total** | **$3030** |

**Cash Expenditures (February-April):**

| Description | Amount |
|---|---:|
| Allowance for Drake | 240 |
| Allowance for Rick | 240 |
| School lunch money (Drake only) | 225 |
| Haircuts (Drake & Rick) | 90 |
| Gas Allowance (Drake & Rick) | 400 |
| Food paid by cash | 590.71 |
| Gas paid by cash | 323.99 |
| **Total** | **$2109.70** |

*See* discussion on page 5 of Monthly Living Expense Order: "Gary has also paid himself $1,000 per month, thereby giving himself access to cash of over one-fourth of the total monthly living expense allowance. The Court is unable to determine exactly how Gary spent this amount and the accountings do not readily indicate such." Approximately $920 cash is unaccounted for.

4