

**SO ORDERED.**

**SIGNED this 04 day of June, 2007.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

PUBLISHED

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **GARY E. KRAUSE,** | ) | **Case No. 05-17429** |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ ) | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **and** | ) | |
| | ) | |
| **LINDA S. PARKS, Trustee** | ) | |
| | ) | |
| Intervener, | ) | |
| **v.** | ) | **Adversary No. 05-5775** |
| | ) | |
| **GARY KRAUSE and RICHARD KRAUSE,** | ) | |
| | ) | |
| Defendants | ) | |
| **and** | ) | |

1

**DRAKE KRAUSE and RICK KRAUSE,** )
)
)
**Intervener.** )
)
_____)

# MEMORANDUM OPINION

## NATURE OF CASE

This adversary proceeding was commenced by the United States of America (Government) in the fall of 2005 and later joined by the Chapter 7 Trustee Linda Parks' (Trustee) intervention, against defendant-debtor Gary E. Krause who owes an income tax liability in excess of $3 million dollars. The Government seeks to have debtor's tax debt excepted from discharge under 11 U.S.C. § 523(a)(1)(C), to set aside alleged fraudulent conveyances by the debtor, and to have numerous trusts and entities declared to be nominees of the debtor, subject to the Government's federal tax lien.[1] The Trustee likewise asserts that the trusts and entities are nominees of debtor and therefore are property of the estate subject to turnover under 11 U.S.C. § 542 and § 543 and subject to the Trustee's administration for unsecured creditors. Early in these proceedings, the Government obtained a preliminary injunction which effectively froze all the assets of certain identified trusts and entities and enjoined debtor from using, transferring, spending or depleting any cash, property, or assets of the trusts and entities. Since that time, the parties have been engaged in discovery.

## JURISDICTION

This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H),

_____

[1] Debtor's brother, Richard Krause, was also named as a party defendant in his capacity as trustee of several of the trusts in question. Since the entry of the preliminary injunction, Richard has largely ceased any active participation in these proceedings.

Case 05-05775   Doc# 311   Filed 06/04/07   Page 2 of 61

(I) and (O).[2]  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and § 1334(b).

## INTRODUCTION

In the current matter before the Court, the Trustee seeks an order (1) determining that debtor Gary Krause has despoiled certain electronically stored evidence prior to turning over his two computers; and (2) administering appropriate sanctions up to, and including, the entry of default judgment on the Trustee's claims ("Spoliation Motion").[3]  The Government filed a Motion for Contempt and Default Judgment based upon a series of allegations that Krause has knowingly defied this Court's orders compelling him to turn over documents and respond to written discovery ("Contempt Motion").[4]  Krause has filed a response denying the spoliation allegations and asserting, as he has done before, that his responses to document discovery have been complete and accurate to the best of his ability.[5]

The Court convened a two-day evidentiary hearing on the Spoliation Motion and the Contempt Motion on March 22-23, 2007.[6]  The Court was unable to complete this hearing within that time frame when Mr. Krause fell ill while testifying in his case-in-chief at the close of the second day's proceedings.  Thereafter, the Court adjourned the matter for Mr. Krause's health

---

[2]  *See* Fed. R. Bankr. P. 7001

[3]  Dkt. 219, 220 and 230.

[4]  Dkt. 235

[5]  Dkt. 231 and 257.

[6]  The chapter 7 trustee appeared by her attorney, F. James Robinson of Hite, Fanning & Honeyman, L.L.P., Wichita, Kansas.  The Government appeared by its attorney Janene Marasciullo of the United States Department of Justice, Washington, D.C.  Defendant-Debtor Gary E. Krause, a licensed but non-practicing attorney, appeared *pro se*.  Defendants-Intervener Drake and Rick Krause appeared by their attorney Val Wachtel of Klenda, Mitchell, Austerman & Zuercher, L.L.C., Wichita, Kansas.  Defendant Richard Krause did not appear.

3

considerations and completed the proceedings on April 12, 2007. Over the course of the two and a half days, the Court heard extensive testimony about the spoliation claims as well as Krause's possible ownership interests in yet more entities and his activities in connection with those entities even after this Court preliminarily enjoined him from further trafficking in the entities' assets. The Trustee's experts presented to the Court a virtual "live" tour of the imaged hard drives from Krause's computers. This vastly simplified the Court's understanding of the technical aspects of the spoliation issues. Many of the exhibits referenced in this Order are computer screen shots from that virtual tour. After carefully considering the evidence, the arguments of the parties, and the applicable law, the Court makes the following findings and conclusions.

**FACTUAL BACKGROUND**

**I.    The Spoliation Motion**

        **A.    The Trustee's Allegations.**

The Trustee invokes this Court's inherent powers under 11 U.S.C. § 105(a) to protect its jurisdiction as well as its discovery administrative powers under Fed. R. Civ. P. 37(b)(2) as made applicable in bankruptcy by Fed. R. Bankr. P. 7037. The Trustee seeks redress for Krause's actions in wiping, erasing or otherwise eradicating electronically stored information on the hard drives of his desktop and laptop computers before turning them over to the trustee. Some recitation of the time line of events leading up to that turnover will facilitate the reader's understanding of what happened here.

After this bankruptcy case was filed on October 10, 2005, Ms. Parks was appointed trustee. She intervened in the present adversary proceeding, seeking turnover of any and all assets of the various trusts and other entities that the Court might declare to be nominees or alter egos of Krause.

4

This Court has exhaustively detailed the scope of these entities and Krause's apparent direct involvement in them in previous decisions.[7] Suffice it to say that the evidence adduced in numerous prior evidentiary hearings points to a vast network of trusts, business concerns, and possible off-shore entities that, although they are not owned by Krause, appear to be controlled by him. The Government wants this network of trusts and entities to be declared Krause nominees so that it can collect his sizeable income tax obligations from their assets. Discovery in this case has been intensive, often requiring the Court's direct intervention and necessitating several extensions of the discovery deadlines.[8] Krause's secretiveness and reluctance to comply with his discovery obligations, combined with the vast ambit of the Government's requests have combined to make discovery somewhat arduous.[9]

In July of 2005, the IRS served a Collection Summons on Richard Krause in his capacity as trustee of several trusts, commanding him to appear and produce all records pertaining to the five Krause Children Trusts and the Gary E. Krause Trust.[10] At Gary Krause's direction, Richard Krause

---

[7] *See* Dkt. 80, Memorandum Opinion dated April 14, 2006 (Krause Children Trusts I, II, III, IV and V; Gary E. Krause Trust; PHR, LLC; Drake Enterprises, Inc.; Financial Investment Management Corporation (FIMCO); Federal Gasohol Corporation; Polo Executive Rentals; and Krause Family Irrevocable Trust); Dkt. 124, Order on Defendants' Motions for Continuation of Monthly Living Expenses dated July 21, 2006; Dkt. 128, Order on Adequacy of Defendants' Asset Disclosures, etc. dated August 8, 2006 (discussing Krause's omissions from asset disclosures: hunting lodge in Reno County; Drake Enterprises, Inc. safe deposit box; storage units at Security Self Storage containing Krause's property; Federal Gasohol Corporation's receivable generated by a mortgage on an oil tanker; and rental income generated by 15 acres owned by Development Associates (wholly owned by Gary Krause Trust)).

[8] *See* Dkt. 226, Amended Scheduling Order entered February 9, 2007 (last revised scheduling order setting a discovery cutoff deadline of July 1, 2007 and a final pretrial order deadline of August 1, 2007).

[9] Because Krause's tax dispute with the Internal Revenue Service dates back as far as the early 1980's and his tax liabilities include tax years 1975, 1978-1983, 1986, 1994 and 1996, the scope of the Government's discovery efforts reach back to this same period and in some instances, encompass the ensuing twenty-five years.

[10] *See* Dkt. 4, Ex. O attached. Section 7602 of the Internal Revenue Code authorizes the IRS to summon persons for testimony and examine books and records for the purpose of collecting a tax liability. *See* 26 U.S.C. § 7602(a).

resisted the collection summons by filing an action in federal district court to quash it. After some period of legal wrangling, the Government filed a summons enforcement proceeding in federal district court in late September, 2005, which resulted in the District Court's issuance of an order to show cause.[11] This prompted the filing of Gary's chapter 7 bankruptcy petition on October 10, 2005, staying the enforcement proceeding. The Government then commenced this adversary proceeding on November 1, 2005 and obtained the previously referenced temporary restraining order and preliminary injunction. Thereafter, the Trustee was allowed to intervene.

Discovery began in earnest in February of 2006 with the Government serving its Request for Production of Documents, numbered 1-37 on Krause (RFP) pursuant to Fed. R. Civ. P. 26 and 34, made applicable to bankruptcy adversary proceedings by Fed. R. Bankr. P. 7026 and 7034, respectively.[12] The RFP did not contain any time period parameters. The RFP expansively defined "document" to include *inter alia*, "computer print-outs, electronic mail messages . . ." and "any file, document, data, words, or information, in draft or final form, on a computer disk or hard drive or in the memory of a computer network or mainframe or on a file server." These computer or electronic records were "to be printed and produced on paper, as hard copy."[13]

Debtor, then represented by counsel, made a written response to the Government's document requests in late March of 2006 and produced some 15 banker's boxes of documents in April.[14] That

---

[11] *United States v. Richard Krause*, Civil No. 05-mc-113 (D. Kan.)

[12] Ex. 66.

[13] Ex. 66, p. 2-3, ¶ H.

[14] Dkt. 130, attached as exhibit 4. It became apparent in later hearings that the documents produced by Krause were not bates-stamped or indexed by Krause prior to their production and that the Government did not retain all the documents produced, deeming many of them non-responsive. From the evidence presented to the Court, it appears that the April document production did not contain any computer or electronic records.

production was followed by a request for further documentation and a "Golden Rule" letter from the Government, the Government believing that Krause had more responsive documents in his possession or control.[15]  At a hearing on Krause's motion for living expenses on June 15, 2006, he testified that he had accounting records for the trusts and entities on his computer.  He subsequently took actions, to be discussed below, that had the effect of modifying the hard drive of his laptop and altering its data.  After more wrangling over documents, and a second Golden Rule letter,[16] the Government filed its motion to compel on August 24, 2006.[17]  The Court conducted a hearing on that motion on September 14, 2006.  At that hearing, debtor's counsel took the absurd position that documents as defined in the requests for production did not embrace electronic information or computer data.   On September 18, the Court ordered that debtor produce the electronic computer files not later than September 29 and admonished the debtor that severe sanctions could attend his failure to heed its direction.[18]   On September 27, debtor filed a motion for clarification and reconsideration of the September 18 order.[19]  That motion was heard on October 12 at which time the Trustee made her oral demand for turnover of the computers.[20]  The Court directed the Trustee to file a written motion to compel.  That was done on October 13,[21] and the Court convened an

---

[15]  Dkt. 191.

[16]  Dkt. 130, letter dated August 18, 2006 attached as exhibit 2.

[17]  Dkt. 130.  *See* Dkt. 135, Defendant's Response to the Motion to Compel.

[18]  Dkt. 139.

[19]  Dkt. 143.

[20]  The Court issued an Order on October 12, 2006 clarifying its previous September 18, 2006 Order. *See* Dkt. 161.

[21]  Dkt. 158.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 7 of 61

expedited hearing on October 17. At that hearing, the Court ordered Krause to turnover the computers by October 23.[22]

Pursuant to a verbal understanding among the Trustee, the Government, and Krause, he delivered two computers (a laptop and a desktop) to the Trustee's law offices on October 17,[23] at which time the Trustee's information systems manager removed the computers' hard drives, copied their content to new hard drives, and placed the new hard drives into the computers, returning them to Krause shortly thereafter. Only when the Trustee's staff made imaged drives from both retained hard drives and began to study their content did it become apparent that Krause had installed a program called GhostSurf Platinum 2006 on his laptop on October 16, the day preceding turnover, and on his desktop on October 4, shortly after the Court had ordered him to produce the electronic records on September 18. The consequences of that installation are explored below.

The Trustee alleges that Krause used GhostSurf, nominally an internet security program, to permanently wipe or purge files, thereby destroying electronic files on both hard drives, files that may have been important evidence in this adversary proceeding and in the bankruptcy case. The Trustee asserts that by destroying these files, Krause thwarted the Trustee (and the Government) in their efforts to track the assets of the various entities and Krause's connection or involvement therein, and cannot meaningfully enforce the preliminary injunction. The Trustee argues that the only appropriate sanctions are incarceration of Krause until he comes forward with his backup media containing the despoiled information and files, if he has any, and until he reveals the identity of his off-shore holdings. The Trustee also requests that judgment be entered against Krause on her

---

[22] Dkt. 170. An agreed order on the computer turnover and protective order was entered October 26, 2006. *See* Dkt. 177.

[23] Ex. 106.

turnover complaint, asserting that his misconduct is so pervasive and extreme that it warrants the most serious sanctions the Court can muster. The Government joins in this request and further asserts that the Court should enter an order denying Krause a general discharge for his discovery misconduct. For reasons not apparent, however, neither the Government nor the Trustee asserted a general objection to Krause's discharge nor prayed for any relief under 11 U.S.C. § 727(a) in their respective complaints.

### B. Factual Findings on Spoliation.

Highly summarized, the Trustee asserts that Krause installed GhostSurf on his computers and used it to permanently wipe or purge sensitive files and e-mails from both hard drives. The Court finds that Krause installed the GhostSurf program on the desktop on October 4,[24] after the Court ordered him to turn over electronic evidence and that he installed the program on the laptop on October 16, 2006,[25] the day before he turned it over to the Trustee. Krause argues that both hard drives crashed during the spring and summer of 2006, requiring him to "restore" the computers and re-install GhostSurf on them. He states that he previously used GhostSurf to protect his computers from viruses and worms that he feared would infect them because of his extensive use of the internet in his work. There is no credible evidence that Krause used wiping software on his computers before the GhostSurf 2006 version was installed and given the fact that it is the 2006 release, it presumably was not available until late 2005 or early 2006.[26]

---

[24] Ex. 110.

[25] Ex. 111.

[26] Indeed, Krause never identified when he "first" purchased the GhostSurf software and installed it on his computers. He did testify that it was at the suggestion of one Mark Bernat, a former employee of FIMCO (a Krause management company), that he install security software for protection. However, Krause never specified when this conversation with Bernat took place or whether Bernat specifically recommended the GhostSurf program for this purpose. According to Krause, Bernat left the employ of FIMCO in 2001.

9

1. **Krause's Computers**

Krause has two computers that he uses and considers his – a Dell desktop and a Sony Vaio laptop.[27] Two additional computers are located in Krause's residence which he claims his two sons use and own. Other than occasional access of the internet, Krause testified that he does not use his sons' computers. Krause acquired the desktop in late 2003 and bought the laptop in September of 2004. He conceded on cross examination that all computers were on a network as recently as 2004. Both computers turned over to the Trustee were configured to access a wireless network and drive a wireless print server. Krause's computers also had USB ports; this signifies the ability to communicate with peripheral devices such as portable storage devices, thumb drives, flash drives, and external hard drives. Both computers had a CD or DVD drive.

Krause uses the desktop and laptop as back ups to each other in the event one of them crashes. He periodically copies his "My Documents" file from one computer to the other to keep the computers current and also backs up his files to portable storage devices, CD-ROMs, external hard drives and the like. Krause runs Windows XP operating software on his computers and uses Outlook Express as his e-mail program. Among the other software programs, applications or utilities installed on his computers are Quickbooks (an accounting software program), Norton Antivirus (a security protection program), GhostSurf (a security program that also erases or wipes deleted files), and PC Relocator (a program that enables the migration of applications and data from one computer to another).

Krause testified that his laptop "crashed" in May of 2006. He restored the laptop using a restore disc. The desktop "crashed" in July of 2006 and he likewise restored it. These restored

---

[27] Krause testified that both of these computers are owned by FIMCO

10

computers are what Krause turned over to the Trustee on October 17, 2006.

### 2. What GhostSurf Does

According to both the Trustee's and Krause's experts, GhostSurf is designed to wipe or eradicate data and files as part of its protective and security functions. GhostSurf wipes files that may be infected with viruses and worms. It can also be set to purge or wipe "deleted files" in such a way that the data is actually overwritten, precluding the ability to recover or restore the files and data. Both experts agreed that when a user "deletes" files from a hard drive, the data remains intact. The act of deletion merely eliminates the "pointer" that allows the computer to locate the data on the hard drive. By using data recovery software, that data may be extracted (as, indeed, some has been in this case). An additional step is necessary to eradicate this data entirely. GhostSurf performs this function by overwriting the file with a new file that contains no bytes of data and is named in a manner inconsistent with Windows operating system naming conventions. Rather than simply eliminating the pointer to the data, the actual recording of the data on the hard disk is erased (like taping over an existing tape recording). While this is a process that can be managed manually in GhostSurf, the evidence was that, in default condition, the data and file wiping function was activated on both Krause computers.

Deleted e-mail leaves a different set of tracks. When a user "deletes" an e-mail in Outlook Express, the "fields" are deleted and sent to the trash or recycle bin. What remains on the hard drive are the HTML internet codes that define the fields, font, graphics, etc. of each message. What also remains is the actual e-mail message. When the trash bin is emptied, the matter itself is deleted. Because e-mail files are internet files, each time they are accessed, a temporary internet file ("temp file") is created. Thus, even though the e-mail itself is deleted, the temp file remains on the hard

11

drive, unless it is wiped.

In general, files do not delete or wipe themselves. The Windows operating system reclaims space on the hard drive as it needs it, but, according to the Trustee's experts, it only reclaims space by overwriting files if the hard drive is 90 per cent full. Krause's expert disagreed, saying that Windows does not necessarily wait for the drives to be that full. The evidence in this case was that these hard drives had very little used space, far short of the 90 per cent content allegedly necessary to effect automatic reclamation of drive-space.

### 3. Krause's Imaged Hard Drives

Both the Trustee's expert, Michael Aguirre,[28] and the Trustee's systems manager, James Taylor, testified about the Krause computers and hard drives. When Krause turned his computers over, Taylor created imaged drives so that their contents could be studied without altering the actual status of the data or the hard drive itself. He used software called Norton Ghost to create the mirrored copies of the hard drives. He explored the imaged hard drives as did Aguirre. Krause's expert, Chris TenBraak,[29] did not explore the imaged hard drives.

When Taylor and Aguirre scanned the drives by compiling a list of the files on each, they found very few system files and no deleted files. This is notable because each time a computer is activated, system files are created that essentially record when the computer started and what all it did in the process. A computer that has been used for some period of time would likely have numerous system and deleted files. A computer without such files may well have been "wiped" or

---

[28] Aguirre is the owner and operator of a computer consulting firm, Network Consultants, LLC, in Wichita, Kansas.

[29] TenBraak is employed as a systems consultant with Network Management Group, Inc. of Hutchinson, Kansas.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 12 of 61

purged – i.e., the files have been deleted and the data overwritten.

These computers were turned over in October. According to the hard drive data, the desktop computer was first booted up on July 8, 2006.[30] Krause states that he lost data when he "restored" his computer after a crash; presumably the July 8 date is the first boot after the restoration.[31] The laptop's logged first use is May 17, 2006.[32] Again, Krause says that this computer's drive crashed and had to be replaced. Unfortunately, there is no extrinsic evidence of this, nor did Krause tell Taylor about the crashes when he turned over the machines.

Taylor did find a program called PC Relocator on both hard drives. This suggests that data and programs were migrated from other computer drives (or from back up disks) to these computers. PC Relocator resides in a directory of programs called "AlohaBob" on both computers. That directory has a "last modified" date of July 8, 2006. Taylor testified that when applications are installed to directories, the date of installation is the "last modified" date, suggesting that Relocator was installed on the desktop on July 8, 2006.[33] Relocator was installed on the laptop on June 21, 2006,[34] about five days after the living expenses hearing on June 15 (the first time Gary testified about his owning a computer and having accounting records thereon).

It also appears from the evidence that these computers were both configured to be wireless

---

[30] Ex. 120.

[31] Restoring a hard drive file system with the manufacturer's "restore" disk has the effect of reformatting the drive and eradicating all of the data on it. Typically, a "restore" returns the hard drive to the default settings and programs that came with the computer when it was purchased. Non-bundled software programs like GhostSurf and Quickbooks would have to be re-installed. Therefore, few conclusions can be drawn about activity on these computers before they were restored.

[32] Ex. 121.

[33] Ex. 122.

[34] Ex. 123.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 13 of 61

network access points and to drive a wireless printer.[35] According to Taylor, the computers could be used to access a wireless network. The computers also appear to have been accessed by a portable storage device (PSD) such as an external hard drive or a flash drive. Krause never turned over any such backup material or devices.

As noted above, both Taylor and Aguirre commented on the very low number of deleted files that appeared on either the laptop or the desktop, suggesting a high probability that the drives had been "wiped." There is, of course, an alternative explanation: that the files were lost when Krause "restored" the computers after they crashed. This would not, however, explain the absence of deleted files after the May and July restoration dates of the laptop and the desktop, respectively. The more plausible explanation is that GhostSurf was installed on each computer and that it did its work. The proximity in time between GhostSurf's installation on the computers and this Court's orders to produce electronic files and to turnover the computers is probably more than a coincidence. While no one testified to seeing Krause install the utility, the Court concludes that he likely installed it on October 16 on the desktop and October 4 on the laptop. The Trustee demanded turnover of the computers on October 12, filed her motion for that relief on October 13, and this Court heard that motion on October 17. Moreover, this Court orally directed Krause to turn over all documents in electronic format on September 18.

GhostSurf is manufactured by a company called Tenebril, which advertises the product as being a solution for masking a user's identity when visiting internet websites by erasing temp files.[36] Among its applications is one called "Tracks Cleaner" which, according to the Tenebril website,

---

[35] Ex. 118a and 119a.

[36] Ex. 180, GhostSurf User's Manual.

14

tracks and cleans files in all applications. In other words, when the program is activated, it locates and eradicates all temporary files that have been created since the last time it ran. Tenebril represents on its website that its program can "protect your privacy and wipe these files away to Dept. of Defense standards for data destruction."[37] The software is also "powerful enough to prevent undelete tools and aggressive hardware recovery systems" from restoring deleted files.[38] The user can select which "elements" – browsers, email programs, Office applications, etc. – to wipe. Previously deleted files may be targeted for wiping as part of this process.

Taylor testified that GhostSurf wipes files by searching the hard drive for files that Windows "no longer knows about" because they have been previously deleted, and writing data over those locations with random data to obscure it from undeleting. Once the files are overwritten in this fashion, an undelete utility cannot recover them. This "wiping" may be "scheduled" so that the computer runs this function daily or at other intervals. According to the GhostSurf User's Manual, the application may be set to erase files using different strength algorithms. If the weaker algorithms are used, the manual suggests "nearly all" of the targeted files will be erased. In short, GhostSurf is a very powerful tool that Krause could easily have used to purge files and data from his computers before turning them over to the Trustee.

For his part, Krause testified that he uses both the desktop and laptop as "back-ups" for each other. He also stated that he backs up both the desktop and laptop on portable drives (drives or PSDs that have never been turned over) and that, prior to the turnover of the computers on October 17, he copied the contents of both hard drives to CD-ROMs. When the Court inquired regarding the

---

[37] *Id.* at 6.

[38] *Id.*

whereabouts of those CDs, he stated that he did not know whether he had preserved them or not.[39] According to Krause, both the laptop and desktop crashed after discovery began in this case; the laptop in May and the desktop in July. When the laptop crashed in May, Krause restored it with the factory restore disk (having the effect of wiping the entire hard drive), and copied all the files he had backed up to the desktop back onto the laptop.[40] In July, after testifying in hearings in this Court that he maintained electronic financial records, Krause acted to restore his desktop after a crash (again, wiping the entire volume). He readily admits that he installed GhostSurf on these computers after restoring them. Whether GhostSurf was installed by Krause immediately after their restoration as he testified, or later, prior to their turnover as the Trustee's experts contend, the fact remains that GhostSurf was installed after this adversary proceeding was commenced and after the Government had served its document requests on Krause.

Krause stated that he only uses GhostSurf for internet security against worms and spyware. On cross-examination however, Krause admitted that he had installed Norton Antivirus on both computers, a program that provides similar security functions. Krause says he installed GhostSurf on the advice of Mark Bernat, a former employee of FIMCO who performed some IT services for Krause after leaving FIMCO.[41] Krause did not specify when Bernat made this suggestion. Indeed, Krause stated that Bernat kept the books on the activities of all the trusts and other entities using the

---

[39] The Court finds this response suspicious at best, given Krause's professed penchant for security devices and measures for his computers.

[40] Krause testified that the desktop has once again crashed since the October turnover. The Court finds it interesting that Krause has been the victim of three hard drive crashes within one year, all during periods when there were outstanding discovery requests for information contained on the computers.

[41] According to Krause's Interrogatory answers, Bernat was employed by FIMCO from 1997-2004. *See* Ex. 63, Interrogatory No. 3.

16

Quickbooks program and that Krause had preferred that Bernat handle all data entry in the Quickbooks files. When Bernat stopped assisting with the record-keeping, sometime after 2001, Krause stopped maintaining the Quickbooks accounts for the various entities, preferring to maintain paper accounts. Curiously, Krause never identified when he first installed and began using GhostSurf. Even more revealing to the Court is the fact that Krause did not call Bernat to testify at the hearing and corroborate Krause's story.

Krause admits that he took no action to disable the wiping component of GhostSurf, and admits that it has been running on these computers at all times since the Government's first document requests. He also admits that he never accessed the computers to determine if there were responsive electronic files or e-mails on them in addition to the paper documents he produced to the Government in response to the RFP. Clearly, files were "wiped" during the discovery period, if not intentionally, as a result of Krause's allowing the Tracks Cleaner component to run daily.

With respect to deleting e-mails, Krause says that he generally deleted e-mails once they were no longer relevant to his ongoing enterprises. If he received an e-mail with a business proposal that he was unable to sell to an associate, he would delete the message. E-mails or other communications he wished to save would be organized into folders in the "My Documents" folder on both computers.

Krause supported his contention that he did not install and run GhostSurf on the eve of turning over the computers by asserting that he bought a one-year license and by showing a computer screen for GhostSurf indicating that as of April 12, 2007, 35 days remained on that one-year license, suggesting the license was procured for the laptop on or about May 17, 2006 – at or about the same time he restored it after the crash. Apart from disputing the timing of GhostSurf's

17

installation, Krause does not dispute that it *ran* and wiped files before the computers were turned over.

Both Krause hard drives contain log files that record the activities of GhostSurf. As portrayed in the screen shots, GhostSurf keeps daily logs call "SpyCatcher logs."[42] This is the proof that GhostSurf ran on both these computers. Exhibit 112 is a depiction of the SpyCatcher logs. It appears GhostSurf ran on the desktop everyday from October 4, the day it was installed, through October 17, the day it was turned over. Exhibit 113 shows the log on the laptop, demonstrating that GhostSurf ran on the date is was installed on the laptop. October 16, and on October 17, the date it was turned over.

As to the temp files, as noted above, these are created by internet programs and e-mail programs. Taylor testified that when he scanned the drives, he found a number of files that bore file names like "[1]," were unlike Windows naming conventions, and contained no data. These, he stated, were the likely result of data wiping with something like GhostSurf. He also found numerous temp files that contained e-mail messages and other information. These survived GhostSurf's wiping, he opined, because they were likely "orphan files." It is not uncommon for Windows to lose track of these files. In order for GhostSurf to wipe files, the Windows file system must reflect the presence of these files. When Taylor extracted these orphan files from Krause's computers, he located some content that, taken in the context of this matter, arouses great interest on the part of the Trustee and the Court.

As an example, Exhibit 115 is a printout of the content of a temporary internet file containing a record of an airplane trip taken by Krause to Zurich, Switzerland on July 21, 2006 and another trip

---

[42] *See* Ex. 112 and 113.

18

to the same place from October 6 to November 6, 2006. Taylor also extracted deleted e-mails from purported business contacts as well as preserved internet pages. Among other exhibits of interest to the Court was Exhibit 181. This page contains a lengthy advertisement for books offered by one Bob Baumann on behalf of the "Sovereign Society" concerning how to live and invest tax-free in Panama and essentially defeat the reach of the United States taxation system there.

Of more importance, however, are temp files that Taylor retrieved that contained e-mail message content from e-mails that were not found in the in-box of Krause's computer. Several of these are found at Exhibits 116 and 117. These are messages to Krause offering investment opportunities to him by people in Switzerland. While the dates of these messages are not contained in the temp files, they can be placed in time by the version of the virus checker software used to inspect them. It is clear that these messages were received after July 1, 2006, and, as they do not appear in any Outlook Express in-box, they were deleted by someone prior to the computers being delivered to the Trustee in October. Not only is the fact of their deletion pertinent, but so is their content.

One message, Exhibit 117, is a lengthy note from one Torsten Kruemmel of Germany, concerning an opportunity for Krause to invest some 2.5 million euros in a medical technology venture called "BMDsys." Krause's own physician, Joseph Galicia, M.D. of Wichita, is mentioned as a possible clinician for trials of the product being offered. Kruemmel signs this e-mail, "best Regards from Germany/Switzerland." This e-mail was virus-checked by a program updated as of September 20, 2006, making the date the e-mail was received on the computer at or after that date. As noted, this message was deleted from Krause's Outlook Express.

19

Exhibit 126 is an e-mail from Hans Holzgang of Omnimedica AG in Switzerland.[43] Holzgang is requesting Krause's investment of 500,000 Swiss Francs in the business. This file appears to have been last accessed on October 15, and thereafter deleted (but not erased).

These e-mails interest the Court on several levels. First, assets of the many entities with which Krause is connected or which he established were frozen by this Court's temporary restraining order and remain frozen pursuant to the preliminary injunction entered in this matter on December 5, 2005. This provokes the Court's curiosity about how someone who is a chapter 7 debtor with minimal assets and no income,[44] and whose potential assets are frozen, can contemplate investing hundreds of thousands of dollars/euros/Swiss Francs in anything. Second, the nature of these e-mails, combined with the fact that they were all deleted before the computers were turned over, strongly suggests the deletions were in fact intentional.

As further persuasive evidence that these, and many other electronic files were intentionally copied, wiped, or otherwise "touched" by Krause before he turned over his computers, Taylor searched both hard drives and concluded that a high level of files had been accessed in the days leading up to the turnover. As Exhibit 166 shows, very few files were created or accessed on the laptop between October 3 and October 12, never exceeding 435 files in a day. On October 13, the day after the Court orally directed that the computers be surrendered, over 2,200 files were accessed.

---

[43] At his Rule 2004 examination, Krause testified that he is employed by Omnimedica and now receives $8,000 per month for undefined services.

[44] In his initial schedules and statement of financial affairs filed in his chapter 7 case, Krause reported 2005 year to date income from employment or operation of a business of a meager $5,500 without identifying the source of that income. Krause listed ownership of no real estate and no vehicles. On Schedule I, Krause listed himself as a "self-employed entrepreneur" with no income. On Schedule J, Krause says he draws no salary from any entity and that his living expenses are paid by the Gary E. Krause Trust. In previous hearings before the Court, the Government fairly clearly demonstrated Krause paid many of his expenses from FIMCO (Financial Investment Management Corporation) accounts.

On October 15, over 4,500 were accessed in some manner. On the desktop, very minimal activity occurred until October 17, the turnover date, at which time over 27,000 files were accessed. It is possible these files were backed up or copied, but Taylor could not say which from his examination of the drives. If they were merely copied by Krause to PSDs to preserve the files and data before turnover, the backup or copied files have not been provided.

It also appears that certain of the Quickbooks files contained on these computers may have been copied or transferred. Quickbooks is an off-the-shelf enterprise accounting application made by Intuit. It appears that Krause stores these Quickbooks files in various directories on both his desktop and laptop. The hard drives that were turned over contained Quickbooks files for three of the Krause Children Trusts, Federal Gasohol Corporation, FIMCO, Kanzoil Corporation, Western Associates, and the Gary E. Krause Trust. All of these entities have previously been identified in hearings before this Court as entities that Krause controls. Both the Government and Trustee allege Krause actually owns or controls them as his nominees. Moreover, in the preliminary injunction order entered in this case in December of 2005, the assets of most of these entities were frozen.

As previously noted, Krause says he replaced the hard drives on each of these computers in the spring and summer of 2006. Yet none of the entity Quickbooks files contains accounting activity for any time period after 2001. For example, Exhibit 163 is a screen shot of the Krause laptop "My Documents" directory containing files for each of the above named entities. Shown on that exhibit is the "properties" screen for the database pertaining to the Krause Children's Trust III. That file purports to have been created September 26, 2006. Yet, when that file is opened, the last accounting entry is shown as May 16, 2001.[45] This is the case as to each of the other entities whose Quickbooks

---

[45] Ex. 164.

accounting records were found on the Krause hard drives. Because these files predate the restoration of the hard drives, we can conclude they were transferred from backup media or another computer.

Krause's testimony supports this conclusion. He testified that former FIMCO employee Mark Bernat did the Quickbooks data entry until he left in 2001. Krause says that at that point he stopped accounting for the activity in the trusts and entities with Quickbooks. This is a plausible explanation concerning why the financial records on the computers do not bear current dates. The Court is not persuaded by the evidence on Quickbooks. The most that can be concluded from the Quickbooks evidence is that Krause had the ability to transfer or copy Quickbooks files from one computer to another and to store them on external hard drives or other portable storage devices. No credible evidence was presented by the Trustee that the data in the financial records themselves had been altered or that Krause had not produced hard copies of these electronically stored financial records.

The testimony of Krause's computer expert, Chris TenBraak, bears discussion. As noted previously, TenBraak did not conduct his own independent analysis of the hard drives turned over to the Trustee. Instead, TenBraak went through Taylor's affidavit,[46] countering those statements with which he disagreed and making his own affidavit.[47]

TenBraak criticized the Trustee's experts' methods in performing their forensic work. He stated he would make an exact image of each drive and then create an additional image to work on. He would not have started up the computers with the ghosted images in them.

TenBraak also differed with Taylor's interpretation of creating temporary files and how

---

[46] Ex. 177.

[47] Defendant's Ex. E.

22

Windows does that. Quickbooks, for instance, does not create temp files. When a Quickbooks file is opened by a user, actual work is done in the file, not in a temp file. When an internet site is opened, however, TenBraak agreed that temp files are created to speed up the access to the website. He also differed with Taylor's interpretation of the presence or absence of deleted files, stating that even on his own computer there are few deleted files because Windows "does a pretty good job of cleaning up after itself." TenBraak did not perform a forensic analysis of the hard drives and he did agree with Taylor's conclusion that wiping software was installed on these computers, that it ran, and that the existence of zero-byte files demonstrated that data files had been wiped or purged. He also agreed that the GhostSurf utility was installed and ran for the first time on the desktop on October 4 and on the laptop on October 16. Similarly, Quickbooks was installed to the desktop on October 11, 2006. Any files predating that would have been copied or transferred from some other source. On the laptop, Quickbooks was first installed on June 2, 2006. The Court affords TenBraak's affidavit[48] and his testimony little weight, given the fact that he did not analyze Krause's hard drives at a point in time and in the same condition as when they were turned over to the Trustee.

### 3. Causation

Krause's explanation of the removal of the e-mails and presence of "zero files" is as follows. He emphatically denies that he intentionally deleted any "relevant" information from his computers. Krause says that he installed Ghost Surf for the purpose of protecting his computers and his personal information when surfing the internet, but that he did not knowingly or intentionally activate or execute the Tracks Cleaner component that wipes files. He also suggests that the wiping of these

---

[48] Defendant's Ex. E.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 23 of 61

files may have been the result of Windows overwriting deleted files, rather than his own volitional actions. Both Krause and TenBraak suggest that Taylor's version of how Windows reclaims space on the hard drive is not accurate and that Windows randomly reclaims deleted files. Where Taylor states that once a hard drive has reached 90 per cent of its capacity Windows automatically begins to reclaim space by deleting (overwriting) files, TenBraak counters that Windows in fact sets ten per cent of a disk's capacity aside for deleted files and that if there are deleted files not in the Recycle Bin (the ten per cent area), those may be overwritten and reclaimed. Krause also hinted that Taylor's and Aguirre's method of imaging these drives before reviewing them may have altered them and changed the result of any forensic examination of them. GhostSurf is designed to automatically purge files by default and, according to TenBraak, that capability must be overwritten.

Perhaps most persuasive is their suggestion that Krause's GhostSurf license only lasts one year and that GhostSurf was installed on the desktop in July. This would, to some degree, detract from the Trustee's position that GhostSurf was installed with the intention of wiping the hard drive *immediately* before the turnover of the computers. However, even if Krause installed GhostSurf on his computers in May and July of 2006 as he suggests, he purposefully installed it after he restored his computers and during the pendency of this litigation. More importantly, he allowed it to operate or run after that point and erase files, never disabling it. Moreover, Krause clearly knew GhostSurf was wiping deleted files and erasing traces of his internet activity.

Finally, Krause and TenBraak each suggest that when Taylor rebooted Krause's computers before returning them to him, he somehow altered the hard drives in a way that opens his forensic examination of them to question.

When Krause testified on April 12, 2007, he connected his laptop computer to the courtroom

24

monitors to project his computer screen to the Court and showed several of his directories. He is candid on one point: he periodically deletes e-mails that are no longer pertinent to his enterprises. As an example, he showed an e-mail involving a business proposition from the above-mentioned Torsten Kruemmel for some medical technology. He also showed a Word file of a letter he wrote to Dr. Galicia seeking to determine what interest he might have in this venture. Krause testified that Dr. Galicia was not interested in the proposition. Thereafter, Krause deleted the e-mails. It is clear that these deletions were ongoing even after the Government commenced the IRS collection summons and enforcement proceeding, this adversary proceeding and its written discovery requests and even after the assets of the trusts and entities were frozen.

## II.  **The Contempt Motion**

In addition to the spoliation issues raised by the Trustee, both the Trustee and the Government have sought sanctions against Krause for violations of discovery orders and for violating the Court's preliminary injunction. The Trustee's motion seeks fairly specific remedies for very specific alleged violations of discovery orders and duties. The Government's motion is more sweeping in its scope, alleging a number of different discovery violations as well as an ongoing pattern on Krause's part of using or trafficking in assets of the frozen entities. Both movants seek sanctions of the most draconian nature, including the incarceration of Krause until such time as he divulges information they believe he has withheld, as well as entering judgment by default against him on their complaints. At the hearing, the Court implored the movants, particularly the Government, to provide concrete examples of Krause's offending conduct instead of presenting a lengthy case that would, of necessity, duplicate the merits of the case that remain for ultimate disposition at trial. Both the Government and the Trustee presented such examples.

25

The Spoliation Motion contains allegations that, the Court believes, are brought to support the Trustee's general view that Krause has not been forthcoming in his responses to the Trustee's discovery. These allegations arise out of his deleted e-mails pertaining to off-shore activities in Switzerland and his Rule 2004 examination testimony that relates to allegedly diverting FIMCO assets, specifically note payments due from Entity, Inc. (owned by Andrew Peressin) to a Swiss agent, ASI Iseppi. This, in turn, causes the Trustee to demand that Krause disclose his Swiss banking connections and that, should he fail to do so, he be incarcerated until he does so.

The Government's motion is more far-reaching in nature and requests, among other relief, that the Court deny Krause a discharge under § 727, although, as noted above, the Government has not pleaded for that relief as required by Fed. R. Bankr. P. 7001(4). In any case, the Government joins the Trustee in requesting that default judgment be entered against Krause for violating orders to compel, for failing to respond to a variety of requests for production, and for violating this Court's April 14, 2006 order[49] that Krause make full financial disclosures in connection with being permitted a living expense allowance from the frozen assets. It also seeks a finding that Krause is in contempt, having violated the preliminary injunction.

### A. The Computers/Electronic Evidence

The Court first addresses the discovery related allegations in the Spoliation Motion. They begin with the Trustee's allegation that Krause in fact owns or uses more than the two computers he ultimately turned over in October, 2006. In fact, the Court can conclude from Krause's testimony, TenBraak's testimony, and from statements contained in Krause's Rule 2004 examination

---

[49] Dkt. 80, p. 25 (ordering Krause to " . . . make a complete, sworn disclosure of all assets of any entity with which he has a connection of any kind . . .and shall, in any event, not obstruct or delay any effort by either the Government or the trustee to investigate his affairs.")

26

that Krause not only has the laptop and desktop computers, but also has in his home at least two other computers that his sons use. The evidence also shows that Krause's computers have network capability, not only for network access, but also for printer and file-sharing. Krause further admitted at trial that he had on occasion used his sons' computers to access the internet. A fair and complete response to the Court's turnover order in open court on October 17, would have included all of these computers.

The Trustee also demands that Krause supply foreign banking information. This information has not been the specific subject of any formal discovery request, although it arguably falls under the Court's April 14, 2006 Asset Disclosure Order requiring Gary to make "a complete, sworn disclosure of all assets of any entity with which Gary or Richard have a connection of any kind . . . ."[50] She believes this information is discoverable because the e-mails described in the Spoliation section above, as well as Krause's Rule 2004 examination testimony strongly indicate that Krause has extensive off-shore dealings in Switzerland. The scope of the Asset Disclosure Order did not stop at the water's edge and the Court would have expected Krause to disclose this information in his asset disclosures or in his statement of financial affairs even if it were not specifically responsive to subsequent written discovery. While the evidentiary path may be torturous, it is not impassable, and once traversed, clearly shows that Krause did and continues to do business off-shore.

The Court also notes Krause's forthright admission that he never really examined what was on his computers in attempting to respond to the Government's document requests. Those requests were served, and presumably reviewed by him, in February of 2006. Those requests clearly sought

---

[50] Dkt. 80, pp. 28-29.

electronic evidence. After he made his response and after the Government's "golden rule" letter of May 2, 2006, Krause restored his laptop following an alleged "crash," effectively destroying whatever was on it. If there was discoverable material extant at that time, it is now lost. While neither the Government nor the Trustee can prove what Krause destroyed, Krause certainly cannot show that he took the necessary measures to preserve these potentially discoverable and valuable troves of information. Indeed, he admits that he destroyed information in the process of restoring his crashed computers. Furthermore, what information or data was restored or reloaded onto his computers, Krause destroyed when he installed and operated the GhostSurf wiping software.

## B. The WKCSC, Inc. Acquisition

A discussion of the evidence surrounding the acquisition of WKCSC, Inc. reveals not only Krause's penchant for off-shore dealings that violate the preliminary injunction, but also exemplifies his lack of responsive disclosure of assets and connections in this case. In early 2002, Krause, along with his close friend and sometime business partner Andrew Peressin, pursued acquiring an interest in a Wichita business known as Kansas Coil Spring Company ("KCSC"). KCSC was a corporation whose stock was owned by Lloyd (Dick) Leavitt, a Californian and the father of Christine Davies. Christine Davies, who managed the KCSC business with her husband, credibly testified that she was approached by Linda Peressin, Andrew's wife, who expressed an interest in buying the business. Ms. Peressin's interest ran to operating the business as a "woman or minority" owned enterprise that might derive some advantage in obtaining contracts with the federal government. After some negotiation back and forth (not really relevant here), WKCSC, Inc., a Kansas corporation of which Krause was the incorporator, bought the KCSC assets. While Krause and the Peressins both testified that Krause had no equity interest in WKCSC, it appears that he was deeply involved both in the

28

negotiation and closing of the sale, as well as certain day-to-day functions.[51]  Correspondence from

attorney Nelson Van Fleet addressed to Krause and Peressin (but not Linda Peressin), addressed

disbursements from the closing of the WKCSC acquisition.[52]  Mrs. Davies testified that Krause fired

her from the company a year after the sale.  WKCSC, Inc. appears to be wholly owned by Linda

Peressin.  The evidence established that Krause's company, FIMCO, and Peressin's company,

Lincoln, Inc., loaned money to another Peressin company, Entity, Inc. to fund WKCSC's acquisition

of KCSC; Peressin further testified that Krause and/or FIMCO were given a purchase option for a

49% interest in WKCSC, which Peressin testified Krause never exercised.

Krause and the Peressins have numerous business connections to one another and this is not

the first time the Peressins' involvement has arisen in this case.  Andrew Peressin and Krause go

back many years according to Peressin, to when both worked for Garvey Industries in the 1970's.

In the initial hearings concerning the preliminary injunction, Peressin's name emerged as a selling

broker for a home in east Wichita, near the Peressin's own home, that Krause attempted to acquire

for him and his sons to inhabit.[53]  This home was to be purchased by one of the Krause Children's

Trusts, but that purchase was thwarted when this Court entered the preliminary injunction freezing

---

[51]  Krause's precise role in WKCSC is disputed.  On the one hand, the Government introduced a March 2002 Asset Purchase and Sale Agreement, signed by Krause as president of WKCSC (Ex. 52) that was retrieved by Revenue Officer Waterbury from Krause's previously undisclosed storage unit.  The Government also produced a 2004 corporate annual report for WKCSC listing Krause as a director. (Dkt. 53).  For his part, Krause contends that he is neither an owner, officer or director of WKCSC, notwithstanding these documents.  He testified that the purchase contract introduced by the Government was subsequently modified and that Linda Peressin signed the final contract as president of WKCSC.  The final contract was not introduced into evidence.  Krause did introduce into evidence a stock certificate in Linda Peressin's name, showing her as the owner of 1,000 shares of stock in WKCSC (Ex. M); minutes of the WKCSC organizational meeting showing Krause present in his capacity as the incorporator of WKCSC (Ex. N); and a security agreement granted by WKCSC in favor of Entity, Inc. that was signed by Linda Peressin as president of WKCSC (Ex. O).

[52]  Ex. 45, bates stamp DOJ0742.

[53]  This was identified as the Wentworth property. Dkt. 80, p. 10, fn 20.

29

the Krause entities' assets.  At the March 22 evidentiary hearing on these motions, Barry Ellis, the intended seller of the property, testified that in May 2005, he was introduced to Krause by Peressin who described Krause as a "close friend" and a "partner" in numerous business ventures including the spring business.  While Ellis conceded that Krause attempted to acquire the home in the name of one of the Krause Children Trusts, Ellis' demeanor and expression during Krause's cross-examination of him suggested that Ellis had concluded he was doing business with Krause personally.

### C.        The Entity, Inc. Notes and FIMCO

Evidence of another Peressin-Krause venture leads the Court to conclude that Krause used Peressin to evade or violate the preliminary injunction and freezing of the assets of FIMCO. FIMCO, a corporation of which Krause is president, is owned by the Krause Family Irrevocable Trust.  It is difficult to articulate what FIMCO does, other than funnel funds or shelter assets that might otherwise by imputed to Krause.  As demonstrated at the preliminary injunction hearing, Krause essentially lives off of FIMCO.[54]   In response to certain RFPs served on Krause, the Government obtained information that led it to serve document subpoenas on Peressin.  In response to those subpoenas, Peressin produced documents that were entered into evidence in this hearing and that demonstrate the following course of events.[55]

Peressin's company, Entity, Inc., signed a series of 1 year promissory notes to FIMCO in

---

[54] Dkt. 80, pp. 8, 11-13.

[55] Since this is a discovery motion alleging Krause's misconduct, what is noteworthy here is the fact that Krause did not produce any of these documents.  The Government had requested such documents in RFP No. 1 and No. 3. *See* Ex. 66.  It is unknown whether Krause had any of these documents in his possession, custody or control.

September of 2002 through July of 2003.[56]  The proceeds of these notes financed Entity's and/or

WKCSC's acquisition of KCSC assets for Linda Peressin.  These notes totaled about $165,000 in

principal and drew interest at 8.5 per cent.  Peressin testified that this was a competitive rate when

Entity borrowed this money from FIMCO.  Exhibit 56 contains checks memorializing the

disbursement of the note proceeds to Entity, Inc. and WKCSC, Inc.  It appears that sometime in

March of 2005, Krause, on behalf of FIMCO, assigned these three Entity notes to Administrative

Services Iseppi ("ASI"), a Swiss entity.  The assignments purport to have been made March 25,

2005 and, on April 18, Krause wrote Peressin a letter enclosing a copy of them.  According to

Peressin's bank records, Peressin or Entity, Inc. paid the notes to ASI on or about December 30,

2005, well after this Court enjoined further trafficking or transfer of FIMCO assets.[57]  This was

clearly done at the instance, and with the knowledge of Krause.  What is not clear from this maze

of transactions is what consideration was exchanged between FIMCO and ASI for the assignments

or whether ASI is "holding" the funds for FIMCO in some fashion.

### D.    FIMCO and Live Wire Media

Another violation of the injunction involves Live Wire Media Partners, LLC.    Again,

Peressin and  Krause are the actors.  Live Wire Media Partners, LLC was established to buy a radio

station in Nevada.  FIMCO is a member of this LLC.[58]  Peressin's company, Lincoln, Inc. is also a

member of Live Wire.  The Government specifically requested documents pertinent to Live Wire

---

[56] Ex. 57.

[57] *See* Ex. 58.  The Entity, Inc. promissory notes had one year terms and there was no evidence that it had made any payments on the notes to FIMCO in the 2-3 year period when FIMCO held the notes and prior to being assigned to ASI.  Peressin admitted that he knew Krause had filed bankruptcy but denied knowing that a preliminary injunction had been entered when he paid the FIMCO notes.

[58] *See* Dkt. 98.  Krause disclosed FIMCO as holding a 43% member interest in Live Wire.

31

in a RFP, but received none from Krause.[59]  Via a document subpoena, it obtained Exhibit 34 from

Peressin.  Exhibit 34 is a September 2006 notice of cash call for Live Wire to FIMCO and the other

investors.  FIMCO appears to have continued making contributions to Live Wire well after the entry

of the TRO (November 21, 2005) and preliminary injunction (December 5, 2005), freezing the assets

of FIMCO, among others.[60]  In July of 2006, again well after the date of the asset freeze, Overseas

Trust Company (also somehow associated with Krause) and Lincoln filed a financing statement

against the assets of Live Wire with the central filing office in California suggesting some

continuing lien or other interest in Live Wire.[61]  These actions violate the preliminary injunction's

asset freeze.

These transactions are relevant to the discovery issues at hand because they indicate the

degree to which Krause continues to control and traffic in the frozen assets of the various companies.

 The Court believes the foregoing exhibits and documents described are arguably encompassed by

the Government's RFP served upon Krause.  The Government subpoenaed these documents from

Peressin after Krause referred to him in the interrogatory responses.  The Government did not prove

that Krause actually possessed any of these records while denying he had them, except for the

WKCSC purchase agreement.  As for WKCSC, Overseas Trust Company, and Administrative

Services Iseppi, Krause correctly notes that the Government's first RFP did not request documents

---

[59]  Ex. 66, Request Nos. 2 and 3.

[60]  Ex. 34, p. 2.  FIMCO paid $18,417 on December 7, 2005; $29,606 on January 1, 2006; and $11,687 on
February 1, 2006.

[61]  Ex. 61.  *See also,* Ex. 24, an agreement between FIMCO and Overseas Trust Company indicating that
Overseas Trust Company would fund FIMCO's investment in Live Wire.

regarding these entities.[62]

### E. Teresa Briggs

Krause's ex-wife Teresa Briggs also figures prominently in the discovery issues. She testified that she had possession of some documents and that Krause had a basement full of records, along with lots of other possessions, stored at Krause's Oneida residence. While some of the documents that surfaced had apparently resided in Krause's basement, the Court cannot conclude that he knew they were there or were responsive to the Government's RFP. Briggs stated that she left the documents in the basement when she moved out, but that they were boxed up, among many other possessions.

Krause testified variously that he has turned over 70,000, 80,000, or 100,000 pages of documents to the Government in response to its RFP. He also stated that he had fully and accurately responded to all the written discovery to the best of his ability. During cross-examination, however, he admitted not producing documents pertinent to Overseas Trust Company, a Swiss entity with which he does much business, or WKCSC, Inc. His reason for not producing these documents was that they were not specifically requested. As an example, one of the Government's interrogatories asked Krause to identify all the "clients" of FIMCO. Krause disclosed a number of businesses but not WKCSC, Inc., Entity, Inc. (the Peressin entity), or Overseas Trust Company. This was during a time when Krause was shown as a director of WKCSC, was doing business with Overseas Trust, and when FIMCO held notes from Entity in connection with the WKCSC transaction. Krause testified that FIMCO extended credit from time to time to other of the disclosed "clients" but

---

[62]  The Government's RFP did, however, seek documents regarding FIMCO, Live Wire, and Andrew Peressin. *See* Ex. 66.

insisted that he did not consider these three entities "clients."

Written discovery concerning the divorce proceedings between Krause and Briggs exposes another semantic gap. Request No. 18 of the Government's RFP sought all documents pertaining to Krause's property settlement agreement with Teresa Briggs. Krause stated that he assisted Briggs with her responses to document subpoenas issued by the Government (as he did with his brother, Richard, the trustee of numerous trusts). He then identified several copies of pleadings filed in his 2000 divorce case in Sedgwick County district court that the Government obtained from court records.[63] Included in these pleadings is a motion by Briggs to add as parties defendant in the divorce proceedings all of the trusts and several other Krause entities. In her motion, Briggs alleges that each of these entities is in fact a nominee of Krause. She further alleges that Krause forced her to sign blank checks on money market accounts to facilitate the transfer of assets in and out of the trusts. Briggs sought to reach these entities as a source of alimony and maintenance. Another pleading reflects a motion by Richard Krause as trustee of the various trusts to dismiss with prejudice the divorce case concerning the entities because a settlement has been reached between them and Briggs. Krause testified that he did not have possession of these records and that he did not consider these "property settlement agreements" or even documents pertaining to such agreements. In the same vein, Krause denies that he had possession of any documents reflecting the Overseas Trust loan to Live Wire Media, again asserting that neither of these entities is an agent or a "client" of FIMCO.

Ultimately, the Court is persuaded that Krause has been less than forthcoming in his

---

[63] The 2000 divorce proceedings between Krause and Briggs ended up getting dismissed. Krause claimed that he had none of the documents or pleadings from this divorce proceeding. According to Krause, no property settlement agreement was reached in the 2000 divorce case and none was introduced by the Government.

responses to the RFPs and, to some degree, to the interrogatories. He has engaged in "words" gamesmanship when responding to discovery. At the same time, the Government has not shown that Krause in fact had the documents that it sought from him, but ultimately obtained from other sources. He did identify who might be in possession of some of the documents and the Government obtained them from Peressin and Briggs. The Government has not made a formal document request with respect to some of the entities – entities or enterprises discovered by the Government after its document requests in February of 2006 (*i.e.* Overseas Trust Company, Omnimedica, Administrative Services Iseppi), but it is apparent that Krause has some connection with them. The Court concludes that Krause has withheld information about his banking interests in Switzerland and activities with Swiss parties that may lead to potentially relevant information or evidence in these proceedings; this information is discoverable. The Court also concludes that he has caused assets of FIMCO to be transferred off-shore by assigning the Entity, Inc. notes to ASI and directing Peressin to pay Iseppi. He obscured all of this information, forcing the Government and the Trustee to dig for it, and failed to satisfactorily explain his or FIMCO's connection or relationship to ASI and Overseas Trust Company. Krause, through FIMCO (or some other unknown entity), has violated the asset freeze by meeting cash calls for Live Wire. These actions are consistent with his previously demonstrated pattern of unusual business activity and deception.

## CONCLUSIONS OF LAW

### I.     The Spoliation Claim

#### A.     Spoliation – What is it?

35

*Zubulake v. UBS Warburg, LLC ("Zubulake IV")*[64] is one of the leading cases addressing discovery disputes involving electronic evidence.[65]  In *Zubulake IV*, spoliation is defined as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[66]  The Trustee's and the Government's factual contentions, if proven, squarely fall within the meaning of spoliation.  A wealth of case law recognizes common law claims of spoliation of evidence.  More recently, the spoliation case law has dealt with electronic evidence as in the *Zubulake* decisions and at issue here.

### B.    Burden of Proof

The Trustee, as the movant, has the burden of demonstrating that Krause failed to preserve evidence or destroyed it.[67]  She must carry her burden by a preponderance of the evidence.[68]

---

[64]  220 F.R.D. 212 (S.D. N.Y. 2003) (*Zubulake IV*) (sanctions sought for failing to preserve electronic evidence).

[65]  *Zubulake* has produced a series of five discovery-related decisions: *Zubulake I*, 217 F.R.D. 309 (S.D.N.Y. 2003); *Zubulake II*, 230 F.R.D. 290 (S.D.N.Y. 2003); *Zubulake III*, 216 F.R.D. 280 (S.D. N.Y. 2003); *Zubulake IV*, *supra* n. 64; and *Zubulake V*, 229 F.R.D. 422 (S.D.N.Y. 2004).  *Zubulake IV* (sanctions of re-depositions for failure to preserve all relevant backup tapes) and *Zubulake V* (sanction of adverse inference instruction given for willful destruction [deletion] of relevant e-mails) have the most bearing on the Trustee's Spoliation Motion in this case.

[66]  220 F.R.D. at 216, quoting *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir. 1999). *See School-Link Technologies, Inc. v. Applied Resources, Inc.,* Slip Op. 2007 WL 677647 at *3 (D. Kan. Feb. 28, 2007).

[67]  *See Accounting Outsourcing, L.L.C. v. Verizon Wireless Personal Communications*, Slip Copy, 2006 WL 2669063, *1 (M.D. La. 2006).

[68]  *United States v. Koch Industries, Inc.*, 197 F.R.D. 463, 486 (N.D. Okla. 1998) (Plaintiffs failed to carry their burden of proof to establish by a preponderance of the evidence that defendant destroyed the computer files intentionally or with bad faith.).  The preponderance standard makes sense when one considers that the Trustee and the Government are subject to the same preponderance of the evidence standard in proving their underlying claims asserted in the complaints and that an allegation of spoliation is essentially a discovery dispute. *See Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (preponderance of evidence standard applies to all dischargeability exceptions under § 523(a), including the fraud exception); *In re Sly*, 305 B.R. 72 (Bankr. N.D. Fla. 2003) (IRS had burden to show that debtors' federal income tax debt should be excepted from discharge as a tax for which they had willfully attempted to evade under § 523(a)(1)(C)). *See also* Hon. Barry Russell, Bankruptcy Evidence Manual § 301.103 (Thomson/West 2007) (burden of proof on party seeking to pierce corporate veil).

36

## C.      The Duty to Preserve Evidence

In *Zubulake IV*, the district court addressed a litigant's duty to preserve electronic documents.   Similar to the Trustee's and Government's argument in the instant case, the plaintiff Zubulake, who was suing her employer for sex discrimination, contended that the evidence she needed to prove her case was contained in e-mail correspondence sent among employees and stored on the employer's computer systems.  As noted in *Zubulake IV*, the spoliation of electronic evidence germane to proof of an issue at trial may support an inference that the destroyed evidence would be unfavorable to the party destroying it.[69]

Citing to Second Circuit authority, the *Zubulake* court held that a duty to preserve evidence arises when the party has notice that the evidence is relevant to litigation or should know that the evidence may be relevant to future litigation.[70]  The Tenth Circuit Court of Appeals also recognizes a litigant's duty to preserve evidence that he knows or should know is relevant to imminent or ongoing litigation.[71]  The discoverability of electronically stored information, including the duty to preserve, is now expressly recognized by the 2006 amendments to the Federal Rules of Civil Procedure that went into effect December 1, 2006.[72]  The preservation of relevant evidence cannot be selective, saving evidence favorable to the party's case while destroying evidence favorable to the party's opponent or adversary.  A party can only be sanctioned for destroying evidence that it

---

[69]  220 F.R.D. at 216.

[70]  *Id.* citing *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423 (2d Cir. 2001).

[71]  *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.*, 1998 WL 68879 at *5, 139 F.3d 912 (Table) (10th  Cir. 1998). *See also School-Link Technologies, Inc. v. Applied Resources, Inc., supra.*

[72]  *See* Fed. R. Civ. P. 26(f) (Rule 26(f) planning meeting "to discuss any issues relating to preserving discoverable information," and to address "any issues relating to disclosure or discovery of electronically stored information."); Fed. R. Civ. P. 34 (making electronically stored information "in any medium from which information can be obtained," subject to production).

37

had a duty to preserve.

The issue here, then, is whether Krause had a duty to preserve the electronic evidence on his computers and when that duty was triggered. A review of key events on this case time line is critical. In the summer of 2005, Richard Krause, the trustee of several Krause Children Trusts and the Gary E. Krause Trust, was served with the IRS Collection Summons. Gary Krause was intimately involved in Richard's response to the summons. Krause knew as early as this summons that the Government was looking into the validity of the trusts and was attempting to collect his tax obligations with whatever assets it could find and attribute to him.

If Krause was not on notice that his electronic evidence may be relevant at the time of the collection summons, he certainly was on fair notice when the Government commenced its adversary proceeding against him in November of 2005, obtained a temporary restraining order, and a preliminary injunction in December of 2005. The Government's adversary complaint specifically sought a declaration that the trusts and entities through which Krause conducted his personal and business activities were nominees or shams, putting him on notice that his dealings in these areas would be scrutinized. The preliminary injunction froze the accounts and assets of the following specified trusts and entities: Krause Children Trust I, II, III, IV and V; Gary E. Krause Trust, PHR, LLC; Financial Investment Management Corporation (FIMCO); Federal Gasohol Corporation; and Drake Enterprises.[73] Thus, by December 2005 Krause knew that evidence pertaining to these entities would be relevant. Moreover, it can be reasonably concluded that any unnamed entity or party with which Krause had a connection or dealings would be explored by the Government in its

---

[73] It appears that these named trusts and entities were the ones that the Government had connected to Krause at this time. The Government has become aware of other entities with which Krause has a connection during the pendency of this case.

search for assets to satisfy Krause's tax debt.

If the duty to preserve was not triggered by the Government's commencement of the nondischargeability complaint and the preliminary injunction, it was most certainly triggered, *at the latest*, when the Government served its first RFP on Krause on February 15, 2006. In these document requests, the Government expressly sought e-mail, computer print-outs, and any file, data, or information on a computer disk or hard drive. Given the breadth of the requests and the numerous persons and parties identified in the requests, it is clear the Government was seeking discovery from Krause concerning every person or entity with which he had contacts or dealings or with which he was involved in some capacity.

The Court concludes that the Government's adversary complaint filed November 1, 2005 (and service of the RFP on February 15, 2006, at the latest), triggered Krause's duty to preserve electronic evidence, whether it resided on the hard drives of his computers or was stored on a CD-ROM, external hard drive, flash drive, or some other portable storage device. If, as Krause suggests by his testimony, he was running GhostSurf on his computers and wiping electronic files at these times, he was obligated to disengage the wiping software to preserve the electronic evidence. Once the duty to preserve attached, Krause was required to suspend his routine document destruction practices, be it the deletion of e-mails or the operation of wiping software to prevent recovery of the electronic evidence.[74] If the electronic evidence was stored other than on the hard drives, Krause had a duty to preserve any such storage devices and any backup or copied files.

So was Krause obligated to preserve each and every e-mail or electronic document he generated or existed on his hard drive? Not necessarily. He was, however, "under a duty to

---

[74] *Zubulake IV*, 220 F.R.D. at 218.

preserve what [he] knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request."[75] Even if Krause had electronic evidence relating to some entity or party not specifically named in the discovery requests or the complaint, he had a duty to preserve it if it was pertinent to the Government's and Trustee's underlying theme that he carried on his financial affairs and business dealings through the guise of nominee entities or off-shore accounts.

Based upon the evidence presented here, it is clear that Krause (a licensed Kansas lawyer) violated his duty to preserve electronic evidence. He candidly admitted that he never reviewed his hard drives to determine if he had electronic evidence that was responsive to the Government's RFP. In fact he took the belated and frivolous position that the RFP did not encompass electronic evidence. He continued his routine practice of deleting e-mails. Finally, he made no claim that he deactivated or uninstalled the GhostSurf wiping software program upon service of the Government's adversary complaint or RFP. Nor is Krause saved by his alleged computer crashes. One, those crashes occurred several months after the adversary was commenced and the Government's document requests were served. If he had backed-up his computers, he has not been forthcoming with the back-up data or files. Two, once Krause restored the computers, he again installed GhostSurf and ran the wiping program on both computers.

### D.    Intentional or Bad Faith Destruction of Electronic Evidence

Having concluded that Krause failed to preserve electronic evidence, the Court now turns to the question of whether Krause willfully or intentionally (*i.e.*, in bad faith) destroyed electronic

---

[75] *Id.* at 217.

evidence.  This question is important in two respects.  One, if Krause willfully or intentionally destroyed electronic evidence, the Trustee and Government are excused from proving that the destroyed evidence was relevant to their claims.  Two, as discussed in the next section, a bad faith spoliation of evidence may result in harsher sanctions than evidence destroyed through the party's ordinary negligence.

Generally, a party claiming spoliation of evidence must show the following elements: (1) that the party had an obligation to preserve the electronic evidence at the time it was destroyed; (2) that the electronic evidence was destroyed with a culpable state of mind (may include ordinary negligence, gross negligence, recklessness, willful, or intentional); and (3) the destroyed evidence was relevant and favorable to the party's claim such that a reasonable trier of fact could find it would support that claim.[76]  When evidence is either willfully or intentionally destroyed in bad faith, that fact alone is sufficient to demonstrate the third prong of relevance.[77]

As noted in the previous section of this Opinion, the duty to preserve electronic evidence arose in November 2005 when the Government commenced its case (and again in February 2006 when it served document requests upon Krause).  The testimony of the Trustee's expert witnesses, for the most part corroborated by Krause's own expert, TenBraak, established that GhostSurf was installed and run on Krause's two computers after these dates.  Moreover, it is apparent that after Krause's computers crashed in the spring of 2006, *during the pendency of the adversary proceeding*

---

[76]  *Zubulake V*, 229 F.R.D. 422, 430 (S.D.N.Y.  2004).

[77]  *Id.* at 431, citing *Residential Funding Corp. v. DeGeorge Fin. Corp.,* 306 F.3d 99, 109 (2d Cir. 2002) and characterizing it as a "presumption" of relevance.  *See also Phoenix Four, Inc. v. Strategic Resources Corp.,* 2006 WL 1409413 (S.D.N.Y. May 23, 2006) (Relevance may be inferred from a showing of bad faith because bad faith alone is sufficient circumstantial evidence from which a finder of fact could conclude that the missing evidence was unfavorable to that party.)

41

*and after the document requests had been served,* he installed GhostSurf when he restored them and resumed operating the wiping software. This leaves no doubt in the Court's mind that Krause destroyed electronic evidence after the duty to preserve had attached.

The deliberate and intentional use of a wiping software program such as GhostSurf and the timing of its use further leads the Court to the inescapable conclusion here that Krause willfully and intentionally destroyed electronically stored evidence. Although Krause professed earnest concern for the protection and security of his computer files and personal and financial information, he testified to no incidents where his computer or internet security had been previously compromised while using other standard security software or protective measures (*e.g.* Norton Antivirus) that were also loaded on his computers. No evidence was presented that these standard non-wiping security protections were inadequate for Krause's use of his computers. Apparently, no previous experience or incident prompted him to go out and buy a software wiping program such as GhostSurf 2006. Nor was any credible evidence presented that Krause had run GhostSurf or any other wiping software program on his computers at any period of time prior to the commencement of the adversary complaint in November 2005. The Court concludes that Krause purchased the GhostSurf 2006 wiping program after the adversary complaint was filed and after the duty to preserve attached. He installed and ran it. This constitutes a willful or intentional spoliation of evidence.

Nor can Krause claim that his use of GhostSurf 2006 was a good faith "routine operation" of his computers. With the 2006 amendments to the Federal Rules of Civil Procedure, a party enjoys a safe harbor from sanctions where electronic evidence is "lost as a result of the routine, good-faith operation of an electronic information system."[78]   The Advisory Committee Notes to the 2006

---

[78] Fed. R. Civ. P. 37(f) (Thomson/West 2007).

Amendments regarding this safe harbor are enlightening and offer some guidance to the Court here:

> Subdivision (f) is new. It focuses on a distinctive feature of computer operations, the routine alteration and deletion of information that attends ordinary use. Many steps essential to computer operation may alter or destroy information, for reasons that have nothing to do with how that information might relate to litigation. . . .
>
> The "routine operation" of computer systems includes the alteration and overwriting of information, often without the operator's specific direction or awareness . . .
>
> Good faith in the routine operation of an information system may involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information, if that information is subject to a preservation obligation. . . The good faith requirement of Rule 37(f) means that a party is not permitted to exploit the routine operation of an information system to thwart discover obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve.[79]

The undisputed evidence established that Krause's hard drives were far from being at full capacity thus making it improbable that electronic information was being overwritten or deleted by routine operation of his computers. Just as a litigant may have an obligation to suspend certain features of a "routine operation," the Court concludes that a litigant has an obligation to suspend features of a computer's operation that are not routine if those features will result in destroying evidence. Here, that obligation required Krause to disable the running of the wiping feature of GhostSurf as soon as the preservation duty attached. And it certainly obligated Krause to refrain from reinstalling GhostSurf when his computers crashed and he restored them.

Even more compelling in this case is the timing of Krause's restorations and installation and running of the GhostSurf software program as established by the Trustee's evidence and how those events coincided with proceedings in this case. This evidence established that when Krause's computers crashed, presumably sometime prior to the May and July 2006 restorations and first boots

---

[79] *Id.* at p. 192, Advisory Committee Notes, 2006 Amendment.

of these computers, he lost all software applications, including GhostSurf, that did not come with the computers and had to be separately re-installed after the restorations. It is apparent that Krause re-installed GhostSurf, either at the time of the restorations or later on as the Trustee contends in close proximity to when he actually ran the wiping program.[80] To the Court, the timing of the installation of GhostSurf is not as crucial as the fact that Krause *ran* GhostSurf, purging his electronic data and files immediately prior to turning over his computers and after learning that the Court was ordering their production. The Court heard the Government's Motion to Compel on September 14, 2006 and on September 18, 2006 ordered Krause to produce all electronic evidence.[81] On October 13, 2006, the Trustee filed her motion to compel turnover of the computers and at an expedited hearing on October 17, 2006, the Court ordered their turnover.[82] The Trustee's evidence of GhostSurf's log files (showing the activities of GhostSurf) establish that GhostSurf ran on the desktop from October 4-17 and on the laptop on October 16-17. This evidence was not disputed by Krause with any credible evidence. The running of GhostSurf would explain the high number of electronic files that were accessed or touched in some fashion on October 13, 2006, the date the Court orally directed that the computers be surrendered and on October 17, 2006, the date Krause actually turned over the computers to the Trustee. Even if Krause copied the contents of his desktop and laptop to an external hard drive (or backed up his electronic data to another computer) to preserve the same before turning the computers over, he has yet to come forward with that back-up or copy. If, as Krause contends, the backup or copied files and data have no relevance to the

---

[80] The Trustee's evidence established that GhostSurf was installed on the desktop on October 16 and on the laptop on October 4.

[81] Dkt. 138 and 139.

[82] Dkt. 158 and 170.

44

Government's and Trustee's claims, only he is in a position to produce the same and demonstrate that the electronic evidence that was on his computers has no bearing on any issue in this case. Having failed to do so, the Court is soundly convinced that Krause willfully and intentionally destroyed electronic evidence on his computers.

Because no one will ever know what was on those computers before they were wiped and purged with GhostSurf, the Trustee and the Government have been severely prejudiced in the prosecution of their claims against Krause. It may have irretrievably lost relevant and probative evidence that supports their case against Krause. A sampling of some of the orphan files and temporary internet files that the Trustee was able to salvage from Krause's hard drives suggest that Krause has been engaged in significant internet activity during the pendency of this case related to investments, more involvement with additional entities, use of off-shore contacts and conduits to conduct business and financial activities and trafficking in frozen assets. Because the computers appear to be the "nerve center" of Krause's business interests, including all of the alleged "sham" entities of which he denies ownership, their alteration significantly harms the Trustee's and the Government's ability to go forward and show Krause's connection. The Trustee has shown enough from the salvaged e-mails and temporary internet files, however, to persuade this Court that the electronic evidence purged by Krause would have been relevant to these proceedings. The Court infers that the lost electronic evidence is relevant, as it is entitled to do, because of Krause's willful and intentional destruction of it.[83]

### E. Sanctions

The Court now turns to the issue of appropriate sanctions for Krause's bad faith spoliation

---

[83] *See* note 77, *supra.*

of evidence. This determination is committed to the discretion of the Court and is assessed on a case-by-case basis.[84] The Court's authority to sanction Krause for discovery misconduct derives from Fed. R. Civ. P. 37(b)(2)(C) and the Court's powers under 11 U.S.C. § 105(a).[85]

The Court may consider two heavily weighted factors when considering an appropriate sanction: (1) the degree of culpability of the party who destroyed the evidence; and (2) the degree of actual prejudice to the other party.[86] A court should impose the least onerous sanction that will remedy the prejudice, punish the past wrongdoing, and deter future wrongdoing.[87]

Krause's willful misconduct with respect to the spoliation of electronic evidence and turnover of his computers cuts to the heart of a chapter 7 bankruptcy debtor's duties, far more onerous than those of a litigant involuntarily snarled in civil litigation. The Bankruptcy Code and Rules are designed to prevent, not foster, a game of "hide the pea" with the Trustee. The Court has repeatedly warned Krause about the repercussions of not making full, complete, and accurate disclosure and not cooperating with the Trustee.[88] The Court has progressively conditioned Krause's

---

[84] *Zubulake V*, 229 F.R.D. at 430, citing *Fujitsu Ltd. V. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir. 2001). *See also, Workman v. AB Electrolux Corp.,* 2005 WL 1896246, *5 (D. Kan. Aug. 8, 2005); *Metropolitan Opera Assn., Inc. v. Local 100, Hotel Employees and Restaurant Workers,* 212 F.R.D. 178 (S.D.N.Y. 2003).

[85] Rule 37 is made applicable to bankruptcy adversary proceeding by Fed. R. Bankr. P. 7037. Here, Krause violated the order compelling him to produce electronic evidence (Dkt. 139) and the order compelling him to turnover his computers (Dkt. 170 and 177). 11 U.S.C. § 105(a) authorizes a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of Title 11. *See also Smith v. Northwest Financial Acceptance, Inc.,* 129 F.3d 1408 (10th Cir. 1997) (recognizing federal court's authority to impose sanction as part of its inherent power to control and supervise its own proceedings).

[86] *Jordan F. Miller Corp.,* 1998 WL 68879 at *4; *Workman v. AB Electrolux Corp.,* 2005 WL 1896246 (D. Kan. Aug. 8, 2005).

[87] *Jordan F. Miller Corp., supra* at *6.

[88] *See* Dkt. 17 (transcript of hearing held December 1-2, 2005 on preliminary injunction); Dkt. 142 (transcript hearing held on September 14, 2006 on Government's motion to compel discovery).

46

conduct, without success. There is nothing left for the Court to do now but administer sanctions that mirror the egregiousness of his conduct.

A willful and intentional destruction of evidence may give rise to an adverse inference that the unavailable evidence would have been unfavorable to Krause in connection with the Trustee's and Government's claims.[89] It is not uncommon for courts to give the jury an adverse inference instruction at trial in this situation.[90] This is of little consequence here where trial will be to the Court.

The Trustee requests the harshest of sanctions – entry of a default judgment against Krause on her complaint. In that complaint, the Trustee seeks a determination that the entities identified therein are Krause's nominees and alter-ego, and therefore, are property of the bankruptcy estate and subject to turnover: Gary E. Krause Trust, Krause Family Trust, Federal Gasohol Corporation, Federal Investment Management Corp. (FIMCO), and Krause Children Trusts I, II, III, IV and V.

The willful destruction of electronic evidence has supported the most severe of sanctions, including entry of judgment against a defendant and dismissal of a plaintiff's case.[91] Krause's

---

[89] *Jordan F. Miller Corp., supra* at *4, citing *Aramburu v. Boeing Co.,* 112 F.3d 1398 (10th Cir. 1997)

[90] *See e.g., Anderson v. Crossroads Capital Partners, L.L.C.,* 2004 WL 256512 (D. Minn. Feb. 10, 2004) (plaintiff installed and ran a data wiping software application called CyberScrub, precluding recovery of data from the hard drive); *Aramburu v. Boeing Co.,* 112 F.3d 1398 (10th Cir. 1997) (adverse inference instruction as sanction for spoliation requires a showing of bad faith destruction)

[91] *See Kucala Enterprises, Ltd. v. Auto Wax Co., Inc.*, 2003 WL 21230605 (N.D. Ill. 2003) (Magistrate judge recommended dismissal of plaintiff's case where plaintiff used computer program called "Evidence Eliminator" to delete documents from computer and "clean" hard drive); *Krumwiede v. Brighton Associates, L.L.C.*, 2006 WL 1308629 (N.D. Ill. May 8, 2006) (plaintiff continued to perform defragmentation procedures, delete files and used USB devices to transfer data off employer's laptop computer after notice of employer's counterclaim up until the night before he turned over laptop; court concluded default judgment on defendant's counterclaims was the only appropriate remedy where plaintiff's conduct showed blatant contempt for the court and a fundamental disregard for the judicial process.); *Computer Associates Intern., Inc. v. American Fundware, Inc.,* 133 F.R.D. 166 (D. Colo. 1990) (sanction of default judgment on liability entered against developer of computer program that destroyed source code after service of complaint, request for production and motion to compel discovery of source code); *Leon v. IDX Systems Corp.*, 464 F.3d 951 (9th Cir. 2006) (plaintiff's willful spoliation of data on his

47

running of the GhostSurf wiping program after being ordered to produce electronic evidence and before turnover of his computers is simply inexcusable. As the court in *Kucala Enterprises* explained.

> The Court is not convinced that Kucala did not act willfully and with the purpose of destroying discovery by purchasing and then using Evidence Eliminator on his computer. Any reasonable person can deduce, if not from the name of the product itself, then by reading the website, that Evidence Eliminator is a product used to circumvent discovery. . . .

> Although it is true that the Court has no evidence that Evidence Eliminator actually deleted relevant information, . . . over 14,000 files had been deleted from Kucala's computer. The possibility that relevant documents were included in that mass deletion is something this Court cannot overlook . . .[92]

In an unpublished decision from this Circuit, the dismissal of a plaintiff's claims for spoliation of evidence was upheld even though in that case, there was no finding that plaintiff willfully destroyed evidence.[93] The Tenth Circuit found no abuse of discretion and agreed with the district court which concluded the spoliation of critical evidence was so prejudicial that it impaired the defendant's ability to obtain a fair trial and defend the claims.

> The district court here found that the destruction of the landing gear severely prejudiced [defendant]. As the court noted, before the landing was lost or destroyed, [plaintiff] and his agents had an opportunity to inspect its components, both on and off the aircraft, and to develop a theory of liability. [Defendant], however, had no such opportunity. . ..

> Based on the evidence before it, the district court concluded that 'hands-on inspection and testing is critical to a fair trial and due process for the Defendants.'[94]

---

employer-owned laptop supported sanction of dismissal) .

[92] *Kucala Enterprises*, supra at *5-*6.

[93] *Jordan F. Miller Corp., supra. (*destruction of aircraft's landing gear precluding inspection by defendant).

[94] 1998 WL 68879 at *6.

48

Similarly, in *103 Investors I, L.P. v. Square D Co.,* the Tenth Circuit Court of Appeals held that proof of bad faith was not a requirement for the imposition of sanctions for spoliation of evidence.[95] In that case, the Tenth Circuit noted its prior decision in *Aramburu v. Boeing Co.*[96] where it required proof of bad faith spoliation before the sanction of an adverse inference jury instruction was warranted. It also cited to its unpublished decision in *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.*[97] where the Circuit Court upheld the dismissal of plaintiff's damages claim as a spoliation sanction without a showing of bad faith. The Tenth Circuit in *103 Investors* thus concluded that proof of bad faith in destroying evidence was not required in order to obtain all types of spoliation sanctions and the district court did not abuse its discretion in striking plaintiff's expert testimony as a sanction.[98] This Court concludes that *103 Investors* instructs that when the spoliation sanction of an adverse inference jury instruction is sought, there must be a showing of bad faith; for other types of spoliation sanctions, no showing of bad faith spoliation is required.

Based upon the foregoing, the Court concludes that Krause's actions warrant the severest of sanctions. Here, the Trustee has shown both bad faith and severe prejudice. Krause has disregarded this Court's repeated admonitions to cooperate and comply with legitimate discovery efforts. Therefore, the Court finds that the following sanctions are warranted:

1. Partial default judgment shall be entered against Krause on the Trustee's complaint, determining that the Gary E. Krause Trust, the Krause Irrevocable Family Trust, FIMCO and

---

[95] 470 F.3d 985, 988-89 (10th Cir. 2006) (striking testimony of plaintiff's expert as sanction for spoliation where plaintiff asserted claim that busway lacked a warning and plaintiff threw away most of busway).

[96] 112 F.3d 1398 (10th Cir. 1997).

[97] 1998 WL 68879 (10th Cir. Feb. 20, 1998).

[98] 470 F.3d at 989.

Federal Gasohol Corporation are the nominees or the alter ego of Krause and are thus property of the estate subject to the Trustee's administration. Because no other entities are specifically named or identified in the Trustee's complaint, default judgment is not appropriate as to those unnamed entities;

2. Within ten (10) days of the entry of this Order, Krause shall:

(a) turnover to the Trustee *all* computers (including his sons' two computers) that are networked;

(b) produce the back-up or copy of his computer contents that he allegedly made prior to turnover of his computer, on whatever medium it is stored;

(c) turnover all portable storage devices, external hard drives, thumb drives, flash drives, CD-ROMs containing electronic messages, files, data, records, documents, or information that are in his possession, custody, or control;

(d) reimburse the Trustee her costs in copying and creating imaged hard drives of Krause's computers, including those hard drives turned over to date and any hard drives turned over in the future; and

(e) execute waivers, releases, or any other documentation or authorization necessary for the Trustee to obtain documents, bank records, or account information concerning any foreign or off-shore bank accounts to which Krause or any of his alleged nominees has access or control, or are held for their benefit, including but not limited to, accounts in Switzerland and Panama;

3. If after a period of ten (10) days Krause has not satisfied the foregoing sanctions:

(a) default judgment will be entered against Krause declaring that the Krause Children's Trusts I, II, III, IV and V are his nominees and property of the estate subject to turnover; and

50

(b) a bench warrant will issue for Krause's apprehension and he will be incarcerated until he complies with these orders. The Court advises Krause that he remains subject to the jurisdiction of this Court notwithstanding the default judgments that may be entered against him if he fails to comply with the above orders.

## II.      The Contempt Claim

This brings the Court to the Government's claim that Krause violated his discovery obligations and Court orders for which he should be found in contempt. On August 24, 2006, the Government filed its motion to compel after lengthy colloquy between counsel regarding what the Government asserted was Krause's incomplete discovery.[99] This motion sought responses to the Government's first RFP served in February of 2006. The Court granted that motion and issued the September 18, 2006 Order granting the Government's motion and explicitly directing Krause to produce responsive electronically stored information.[100] The Trustee's motion to compel turnover of Krause's computers filed on October 13, 2006 followed.[101] This Court granted this motion, resulting in Krause's turnover of two computers on October 17, 2006.[102] These are the only orders to compel before the Court today that the Government claims Krause violated. The other orders the Government contends Krause has violated are the the preliminary injunction entered December 5, 2006 and the "asset disclosure order" contained in the Court's April 14, 2006 Memorandum

---

[99] Dkt. 130. The motion to compel did not specifically complain about Krause's failure, to that point, to produce electronic files, even though the RFP clearly called for their production. The Government has never filed a motion to compel regarding Krause's interrogatory responses.

[100] Dkt. 139.

[101] Dkt. 158.

[102] Dkt. 177.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 51 of 61

Opinion.

### A.    Contempt

For this Court to hold Krause in contempt, the Government must demonstrate (1) the existence of a valid court order; (2) that Krause had knowledge of the order; and (3) that Krause violated the court's order.[103]    The Government's showing must be by clear and convincing evidence.[104]    Krause does not argue that he was unaware of the four orders described above.    The Contempt Motion boils down to a determination of whether Krause violated any of these four orders. Krause argues that he has complied to the best of his ability with the discovery orders and fully responded with the documents he has in his possession or control.

In determining whether Krause violated the September 18, 2006 order, his non-electronic, "paper" production of documents in response to the Government's RFP bears specific mention.    The Government never requested documents pertaining to some entities and parties – Overseas Trust Company, Mr. Urs Trepp, Administrative Services Iseppi, Esther Iseppi, Omnimedica, WKCSC, Inc., Mr. Torsten Kruemmel, and Mr. Hans Holzgang  It is also true that Krause identified some parties (*i.e.* Andrew Peressin, Teresa Briggs, Steve Coombs) to whom the Government issued document subpoenas to obtain some responsive documents.    The Government did not  prove that Krause had any of the responsive documents in his possession, custody or control.    The Government obtained many of these documents through other sources and document subpoenas.    In some instances (*e.g.* WKCSC, Inc.), Krause denies that he has an ownership interest in the entity and

---

[103]    *Federal Trade Comm'n v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004) (citing *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998); *Lucre Management Group. LLC v. Schempp Real Estate, LLC (In re Lucre Management Group, LLC)*, 365 F.3d 874, 875 (10th Cir. 2004).

[104]    *Federal Trade Comm'n v. Kuykendall, supra.*

therefore justifies his nondisclosure of the entity or asset.[105]  In other instances, Krause's interest was transferred prior to his bankruptcy and therefore he did not disclose the asset (*e.g.* FIMCO's March 2005 assignment of Entity, Inc.'s notes to Administrative Services Iseppi in connection with the WKCSC acquisition).  In yet other instances, Krause contends that these entities are not "clients" of FIMCO, which is what  the Government sought.  Applying a clear and convincing standard of proof to the Government's contempt allegation, the Court cannot conclude that Krause disobeyed the September 18, 2006 order compelling production of documents.  While many questions are raised about Krause's role or connection to these people and entities, the Court cannot  conclude at this time and on this record, that Krause is in contempt of the Court's order compelling production of documents.

### B.     Violation of October 17, 2006 Computer Turnover Order

As concluded in the Court's analysis of the Trustee's Spoliation Motion, Krause's compliance with the orders compelling him to produce electronic records and turnover his computers stands on a different footing from the "paper" production of documents.  Krause had an obligation to preserve all relevant and responsive electronic data, files, and records from November 1, 2005 forward.  He failed to do so and his installation and running of the GhostSurf wiping software violated both the September 18, 2006 Order compelling production of electronic files and the October 17, 2006 Order compelling turnover of the computers.

### C.     Violation of December 5, 2005 Preliminary Injunction[106]

This court's December 5, 2005 Order unequivocally enjoined Krause from the use of any of

---

[105]  Evidence of Krause's interest in or connection with WKCSC, Inc. was conflicting at best. *See* note 51, *supra.*

[106]  Dkt. 12.

Case 05-05775    Doc# 311    Filed 06/04/07    Page 53 of 61

the entities or assets listed therein, including those of FIMCO. The most damning evidence that Krause disobeyed the preliminary injunction entered in this case, is FIMCO's payment of cash calls for its (or Krause's) Live Wire Media investment. In this regard, the Government introduced Exhibit 34 showing that FIMCO, as of September 2006, had met cash calls after the temporary restraining order and preliminary injunction were in place. Specifically, Exhibit 34 shows payments attributed to FIMCO totaling $59,710.[107] While it is not clear how FIMCO met these cash calls while its assets and accounts were frozen, the Government infers that the payments were made by Overseas Trust Company on FIMCO's behalf, by Overseas Trust Company filing a financing statement against Live Wire's assets.[108] Even more compelling is the fact that Krause did not refute in any fashion or explain the post-injunction cash calls attributed to FIMCO. Indeed, Krause wholly failed to address Exhibit 34 or FIMCO's contributions in his case-in-chief.

The Court is also highly suspicious of the purported FIMCO assignments of the Entity, Inc. notes to Administrative Services Iseppi and the subsequent payoff of those notes by Andrew Peressin's company after the asset freeze. No apparent consideration exchanged hands between FIMCO and ASI and Krause has not revealed what ASI is or does or his connection to ASI. Krause offered no explanation why FIMCO assigned the Entity notes to what appears on the surface to be nothing more than a foreign agent for Krause and/or FIMCO. And if, as the Court suspects, ASI holds those payments for Krause or FIMCO, Krause has effectively skirted the preliminary injunction by diverting assets of FIMCO.

The Court concludes that the Government has shown by clear and convincing evidence that

---

[107] *See* note 60, *supra* and Exhibit 34, p.2.

[108] *See also* Ex. 24.

Krause violated the preliminary injunction by FIMCO's contributions to Live Wire as well as in his direction of Entity's payments to ASI.

### D. Violation of April 14, 2006 Asset Disclosure Order[109]

As a condition to modifying the preliminary injunction to allow payment of living expenses from frozen assets of the Krause Children Trusts or the Gary Krause Trust during the pendency of the adversary proceeding, this Court ordered Krause to make a full and complete disclosure of his assets:

> . . . Gary will make a complete, sworn disclosure of all assets of any entity with which Gary or Richard have a connection of any kind as promptly as possible and *shall, in any event, not obstruct or delay any effort by either the Government or the Trustee to investigate Gary's or the KCTs' affairs*. (Emphasis added).

The mandated disclosures included, *but were not limited to*, the entities known to the Government at that time: Federal Gasohol Corporation, FIMCO, Drake Enterprises, Inc., PHR, LLC, and Polo Executive Rentals.

While Krause's disclosures identified assets of all of these entities,[110] he provided no disclosures regarding Omnimedica, Overseas Trust Company, Administrative Services Iseppi, WKCSC, Urs Trepp, Torsten Kruemmel, Hans Holzgang or any of the other persons, entities, or projects linked to Krause by the salvaged e-mails. Even if Krause had no interest in these other entities, he was still required to disclose his connection (of any kind) to these other entities and individuals. And it is apparent from the documentation and salvaged e-mails that the Government and Trustee produced at trial, that Krause indeed has some connection to each of these entities. Krause has refused to articulate what those connections are. The Government and the Trustee have

---

[109]  Dkt. 80, pp. 28-29, fn. 54.

[110]  *See* Dkt. 98.

55

had to dig to the depths of earth to uncover these connections and relationships and try to piece together the trail of transactions. Instead of cooperating with the Trustee and Government and answering their inquiries, Krause has been evasive, incomplete and uncooperative. This is exactly counter to what the law and the Court expect from a debtor in bankruptcy. Full and complete disclosure of one's financial activities and unmitigated cooperation are the heart of a debtor's duties.[111] The Court concludes that Krause has violated the asset disclosure order of April 14, 2006 as well as his duties as a debtor in bankruptcy.

### E.    Contempt Sanctions

Having concluded that Krause is in contempt of the preliminary injunction, the asset disclosure order, and the compel orders in one or more respects, the Court considers what sanctions are appropriate. The Government seeks to have Krause incarcerated until he purges the contempt and complies with the Court's orders. Failing that, the Government, like the Trustee, seeks a default judgment on its § 523(a)(1)(C) complaint and its related claim that the trusts and entities identified in its complaint are Krause's nominees and subject to its federal tax lien.

In addition to the discovery sanctions the Court must impose in connection with the spoliation issues, the Court must fashion a contempt sanction that remedies Krause's wrongdoing while enabling him to purge his contempt and protecting the dignity of this Court's its processes and orders.[112] Civil contempt sanctions serve two purposes: to compel or coerce obedience of a court

---

[111] *See* 11 U.S.C. § 521(3), (4) (Thomson/West 2005).

[112] The Court is cognizant of the limitations on its contempt authority. *See In re Skinner,* 917 F.2d 444 (10th Cir. 1990) (Bankruptcy courts have civil contempt power under 11 U.S.C. § 105(a).); *Lucre Management Group, LLC, supra; International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 828, 114 S. Ct. 2552, 129 L.Ed. 2d 642 (1994) (A civil contempt sanction is remedial in nature; the disobedient party is able to purge the contempt and obtain his release by committing an affirmative act, thus carrying "the keys of his prison in his own pocket.")

order and to compensate parties for losses resulting from the disobedient party's non-compliance with a court order.[113] The Court has thought long and hard about an appropriate sanction in this case. Its prior admonitions to Krause to make full disclosure and the attendant consequences have gone unheeded. Monetary sanctions are unlikely to remedy Krause's recalcitrance and in all probability prove uncollectible by the Government given Krause's huge tax debt. This case has been on file nearly two years and yet the scope and extent of the bankruptcy estate is not known. It would be difficult to articulate adequately the level of frustration that Krause's non-compliance has caused.

In one final effort to compel Krause's compliance with his duties as a debtor and a litigant, remedy the substantial prejudice he has inflicted upon the Government and the Trustee by his actions, and to purge his contempt of this Court's orders, the Court assesses the following sanctions:

1. As a further discovery sanction for spoliation of electronic evidence, partial default judgment shall be entered against Krause on the Government's complaint, determining that the Gary E. Krause Trust, the Krause Irrevocable Family Trust, FIMCO, Federal Gasohol Corporation, Drake Enterprises, Inc. and PHR, LLC are nominees or the alter ego of Krause and are thus property of the estate and subject to turnover;

2. Also as a discovery sanction, within ten (10) days from the date of this Order Krause shall:

(a)  turnover *all* computers (including his sons' two computers) that are networked;

(b) produce the back-up or copy of his computer contents that he allegedly made prior to turnover of his computer, on whatever medium it is stored;

---

[113] *In re Skinner*, 917 F.2d at 447, n. 2, citing *Gibbons v. Haddad (In re Haddad)*, 68 B.R. 944, 952 (Bankr. D. Mass. 1987).

(c) turnover all electronic data, files, or records located on any external hard drive, flash drive, CD-ROM, or any other portable storage device; .

(d) cause the return of $59,710 to the account of FIMCO, the amount of contributions to Live Wire Media attributed to FIMCO after the preliminary injunction was entered; and

(e) execute waivers, releases, or any other documentation or authorization necessary for the Government to obtain documents, bank records, or account information concerning any foreign or off-shore bank accounts to which Krause or any of his alleged nominees has access or control, or are held for their benefit, including but not limited to, accounts in Switzerland and Panama;

3. if after a period of ten (10) days Krause has not satisfied the foregoing sanctions:

(a) Krause shall be incarcerated until he purges his contempt and complies with the foregoing orders;

(b) default judgment will be entered against Krause declaring that the Krause Children's Trusts I, II, III, IV and V are his nominees and property of the estate subject to turnover; and

(c) default judgment will be entered against Krause on the Government's claim under § 523(a)(1)(C), excepting Krause's tax debt from discharge and permanently enjoining all activities in and out of the following entities and trusts: Gary E. Krause Trust; Krause Irrevocable Family Trust; Krause Children's Trusts I, II, III, IV, and V; FIMCO; Federal Gasohol Corporation; Drake Enterprises, Inc.; and PHR, LLC.

4. The Court notes Krause's frequent trips to Switzerland, even while seeking living expenses from the estate and pleading poverty in support of those efforts. The Court concludes that allowing Krause to retain his passport and flee beyond the territorial jurisdiction of this tribunal would be detrimental to the best interests of the creditors and the estate. The Court therefore directs

58

that Krause forthwith surrender his passport to the Clerk, the same to be maintained in the safekeeping of the Court, subject to its further order.

**CONCLUSION**[114]

The Trustee's motion for sanctions for spoliation of electronic evidence is GRANTED. The Government's motion for contempt and for default judgment is GRANTED in part and DENIED in part.

The Court imposes the following sanctions against Krause for spoliation of electronic evidence and for contempt of this Court's preliminary injunction entered December 5, 2005, asset disclosure order entered April 14, 2006, and orders compelling production of electronic evidence and turnover of computers entered September 18, 2006 and October 17, 2006.

A.    Partial default judgment shall be entered against Krause on the Trustee's and Government's complaints, determining that the Gary E. Krause Trust, the Krause Irrevocable Family Trust, FIMCO, Federal Gasohol Corporation, Drake Enterprises, Inc. and PHR, LLC are the nominees or the alter ego of Krause and are thus property of the estate and subject to turnover;

B.    Within ten (10) days from the entry of this Order, Krause shall:

(1)     turnover *all* computers (including his sons' two computers) that are networked;

(2)    bear the costs incurred by the Trustee or Government in copying his hard drives and creating imaged hard drives of the computers turned over as well as any further hard drives that are copied or imaged; within five (5) days, the Trustee shall submit a statement of its costs incurred to date in copying Krause's hard drives and creating

---

[114] The Court has received and reviewed the Trustee's Supplement to the Record in Support of its Motion for Sanctions filed under Fed. R. Civ. P. 59 on May 24, 2007. *See* Dkt. 306. The Court has decided this case on the record as of the close of proceedings on April 12, 2007 and has not considered the matters raised in the Trustee's Supplement in this Opinion.

59

imaged hard drives and Krause shall remit payment of such statement to the Trustee within five (5) days of receipt of the statement.

(3)    produce the back-up or copy of his computer contents that he allegedly made prior to turnover of his computer, on whatever medium it is stored;

(4)    turnover all portable storage devices, external hard drives, thumb drives, flash drives, CD-ROMs containing electronic messages, files, data, records, documents, or information that are in his possession, custody, or control;

(5)    execute waivers, releases, or any other documentation or authorization necessary for the Trustee and Government to obtain documents, bank records, or account information concerning any foreign or off-shore bank accounts to which Krause or any of his alleged nominees has access or control, or are held for their benefit, including but not limited to, accounts in Switzerland and Panama; and

(6)    cause the return of $59,710 to the account of FIMCO, the amount of contributions to Live Wire Media attributed to FIMCO after the preliminary injunction was entered;

C.    If after a period of ten (10) days Krause has not satisfied the foregoing orders in paragraphs B(1) - (6), the following additional sanctions shall follow:

(1)    default judgment shall be entered against Krause with respect to the Krause Children Trusts I, II, III, IV, and V, declaring that these trusts are his nominees or alter egos and are property of the estate and subject to turnover;

(2)    default judgment shall be entered against Krause on the Government's claim under § 523(a)(1)(C), excepting Krause's tax debt from discharge and permanently

60

enjoining all activities in and out of the following entities and trusts: Gary E. Krause Trust; Krause Irrevocable Family Trust; Krause Children's Trusts I, II, III, IV, and V; FIMCO; Federal Gasohol Corporation; Drake Enterprises, Inc.; and PHR, LLC.; and

(3)    a bench warrant will issue for his apprehension and he will be incarcerated until he purges himself of contempt and complies with these orders.

D.    Krause shall turnover his passport to the Clerk immediately upon issuance of this order as provided for above.

IT IS SO ORDERED.

# # #
