

**SO ORDERED.**

**SIGNED this 21 day of April, 2008.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

DESIGNATED FOR PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY E. KRAUSE, | ) | Case No. 05-17429 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| and | ) | |
| | ) | |
| LINDA S. PARKS, Trustee | ) | |
| | ) | |
| Intervener, | ) | |
| v. | ) | Adversary No. 05-5775 |
| | ) | |
| GARY KRAUSE and RICHARD KRAUSE, | ) | |
| | ) | |
| Defendants | ) | |
| and | ) | |

-1-

| DRAKE KRAUSE and RICK KRAUSE, | ) |
| | ) |
| Intervener. | ) |
| | ) |
|_____| ) |

## MEMORANDUM OPINION

## TABLE OF CONTENTS

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

       A.    Nature of Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       C.    The June 4, 2007 Sanctions Order . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.    FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.    Krause's Business Ventures and Corporate Activity . . . . . . . . . . . . . . . . 11

             1.    Real Estate Partnerships - Section 8 Housing Projects . . . . . . . . 11

             2.    Barton Enhanced Oil Recovery Income Fund . . . . . . . . . . . . . . 12

             3.    Energy Associates, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

             4.    Federal Gasohol Corporation . . . . . . . . . . . . . . . . . . . . . . . . . 13

             5.    Financial Investment Management Corporation . . . . . . . . . . . . . 13

             6.    Development Associates, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . 15

             7.    Drake Enterprises, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

             8.    PHR, L.L.C. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

             9.    Polo Executive Rentals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             10.   Quivira Associates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       B.    Krause and the IRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

             1.    Krause's IRS Examinations . . . . . . . . . . . . . . . . . . . . . . . . . . 19

             2.    Krause's Tax Court Litigation . . . . . . . . . . . . . . . . . . . . . . . . 21

             3.    Krause's Tax Assessments and Federal Tax Liens . . . . . . . . . . . 23

             4.    IRS Collection Summons . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.      Krause and Teresa Briggs ................................... 24

     1.      Krause's Premarital Holdings ........................... 25

     2.      Krause's Antenuptial Agreement ......................... 26

     3.      Gary's and Teresa's Health ............................ 29

     4.      Krause's Personal Financial Statements ................... 31

     5.      Krause's Transfers to Teresa ........................... 32

         a.      Mission Property .............................. 33

         b.      Note Receivable Assignments ..................... 34

         c.      Security Interests in Partnership Interests ............ 35

         d.      Quivira ...................................... 35

     6.      Krause's Disclaimed Inheritance ........................ 36

     7.      Paine Webber and Merrill Lynch Accounts ................ 37

     8.      Krause's Control and Management of the PW and ML

         Accounts      ...................................... 38

D.      Trusts      ........................................ 39

     1.      Creation of Krause Children Trusts (KCTs) ............... 39

     2.      Gary E. Krause Trust (GEKT) and Krause Irrevocable

         Trust (KIT)      ...................................... 41

     3.      Transfers to Trusts ................................... 41

         a.      KCTs      ................................... 41

         b.      GEKT      .................................. 43

         c.      KIT      ..................................... 43

     4.      Gary's Control over Trust Assets ....................... 44

         a.      Mission property .............................. 44

         b.      7711 Oneida Property and Teresa's Gift Mortgage ..... 45

         c.      Wentworth Property-Section 1031 Tax Free Exchange .. 46

         d.      Gary's Car Loan from KCT ....................... 48

         e.      FIMCO loan from KCT for Dream Swing Investment .. 48

E.      Gary-Teresa 2000 Divorce ................................. 49

     1.      Teresa's Allegations of Tax Fraud ....................... 50

|   |   | 2. | Reconciliation and $170,000 Settlement . . . . . . . . . . . . . . . . . . 52 |

2. Reconciliation and $170,000 Settlement . . . . . . . . . . . . . . . . . . 52

3. 2002 Divorce . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

F. Post-Divorce Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

1. Domination of KCT Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

2. Reimbursement of FIMCO/Fed Gas for Krause Living
Expenses and Credit Card Bills . . . . . . . . . . . . . . . . . . . . . . . . . 57

3. Lease of Oneida to FIMCO and Krause . . . . . . . . . . . . . . . . . . 58

G. IRS Collection Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

1. July 2005 Collection Summons . . . . . . . . . . . . . . . . . . . . . . . . . 59

2. Creation of PHR, LLC and Transfer of Oneida Property . . . . . . 59

3. Krause Files Bankruptcy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

4. Government Commences this Adversary Proceeding . . . . . . . . . 61

III. ANALYSIS AND CONCLUSIONS OF LAW . . . . . . . . . . . . . . . . . . . . . . . . 62

A. Dischargeability of Krause's Tax Debt Under 11 U.S.C. § 523(a)(1)(C) 63

1. Fraudulent Tax Return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

2. Willful Evasion of Collection . . . . . . . . . . . . . . . . . . . . . . . . . . 69

B. KCTs as Krause's Nominees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

1. Krause's Property Interest in the KCTs Under Kansas Law . . . . 76

a. Statute of Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

b. Badges of Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

c. Transfers of Life Insurance Policies . . . . . . . . . . . . . . . . 81

d. Resulting Trust Theory for Krause's Property Interest . . 83

2. The KCTs as Krause's Nominees Under Federal Law . . . . . . . . 85

a. Control Over the KCTs . . . . . . . . . . . . . . . . . . . . . . . . . . 85

b. Use of KCTs to Pay Personal Expenses . . . . . . . . . . . . . 88

c. Relationship Between Taxpayer and KCTs . . . . . . . . . . . 92

d. Lack of Oversight Over Taxpayer's Actions . . . . . . . . . . 93

e. Lack of Consideration for Transfers . . . . . . . . . . . . . . . . 94

C. Fraudulent Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

1. The Court's Determination of KCTs Nominee Status

-4-

Renders a Determination on the Fraudulent Transfer

Claims Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

    2.    Quivira . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

        a.    Facts Pertaining to Quivira . . . . . . . . . . . . . . . . . . . . . . 101

        b.    Fraudulent Transfer of Quivira Ownership Interest . . . 104

  D.    Permanent Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

# I.  INTRODUCTION

*Just . . . follow the money . . .*[1]

Gary E. Krause is a man who has everything and owns nothing, largely by his own design. As will be described at considerable length in this opinion, debtor and defendant Gary E. Krause has spent the last two decades taking actions intended to shield his assets from the collection efforts of the United States.  Following the money over the trail of Krause's asset manipulation is torturous. It involves numerous inter-entity and intra-family transfers that often occurred in close temporal proximity to proceedings or determinations by the IRS or the Tax Court that adversely affected Krause.  At the center of these manipulations is Krause's antenuptial agreement with his former wife, Teresa Briggs, and transfers he made to her that violate the clear terms of that agreement.  The sheer number and scope of the transactions assure that these are not coincidences.  And, all of Krause's schemes had one ultimate goal:  the protection of his property by placing it in the names of third parties or entities while retaining its full use and control.

    Both the United States and chapter 7 trustee, Linda S. Parks sue for a determination that

---

[1] Attributed to "Deep Throat," former senior FBI officer, William Mark Felt, II, in William Goldman's screenplay for the 1976 motion picture,"All the President's Men," based upon Carl Bernstein and Bob Woodward's 1974 book of the same name about their experiences reporting the Watergate Affair that ultimately led to the impeachment and resignation of President Richard M. Nixon.

-5-

assets held by corporations, partnerships, and trusts associated with Krause are in fact his assets, subject to his dominion and control, and therefore subject to the legitimate claims of his principal creditor, the Internal Revenue Service.

The Court conducted a nine-day trial on the claims of the United States of America ("Government") and the chapter 7 trustee in this multiple count adversary proceeding. The Government appeared by Hilarie E. Snyder and Thomas W. Curteman, Jr. with the United States Department of Justice, Tax Division. The chapter 7 trustee Linda Parks ("Trustee") appeared in person and by her attorney, F. James Robinson of Hite, Fanning & Honeyman L.L.P. The interveners Drake Krause and Rick Krause ("Interveners"), Krause's sons and trust beneficiaries, appeared by their attorney, John Val Wachtel of Klenda, Mitchell, Austerman & Zuercher, L.L.C. The defendant-debtor Gary E. Krause ("Krause" or "Gary") appeared *pro se*. The defendant Richard Krause ("Richard"), trustee of the Krause Children Trusts ("KCT") and Krause's brother, appeared only as a witness and did not otherwise appear or participate at trial in defense of the plaintiffs' claims against him as trustee.

After the close of the evidence, the Court directed the parties to submit briefs on one legal issue. The Court has now fully reviewed the evidence, including designated deposition testimony and the parties' briefs,[2] and is ready to rule.

A.    **Nature of Case**

Krause owes the Government approximately $3,359,001 for federal income taxes for the years 1975, 1978-1983, 1986, 1994 and 1995.[3]  Nearly all of this claim is secured by notices of

---

[2]  Dkt. 515-518.

[3]  No. 05-17429, Proof of Claim No. 3 filed January 25, 2006 amending Claim No. 1.

federal tax lien.  The Government and the Trustee seek to have the five KCTs that Krause created

in the late 1980's and 1990 declared to be Krause's nominees, rendering KCT-held assets his

property and subject to the Government's federal tax liens.  They then seek turnover of that property

to the bankruptcy estate.  They also seek a determination that certain property and assets held by the

KCTs were fraudulently transferred to the trusts under the Statute of Elizabeth as enacted in Kansas,[4]

the Kansas Uniform Fraudulent Transfer Act ("KUFTA"),[5] or 11 U.S.C. § 548.  Finally, the

Government seeks to have Krause's tax debt excepted from his discharge under 11 U.S.C. §

523(a)(1)(C) and for entry of a permanent injunction enjoining him from transferring trust property

and assets.

### B.    Procedural History

Krause filed his voluntary chapter 7 petition on October 10, 2005, after he unsuccessfully

attempted to quash an IRS collection summons seeking KCT records.  The Government filed a

petition in the United States District Court for the District of Kansas to enforce the summons.[6]

Krause is licensed to practice law in Kansas but does not hold himself out as a practicing lawyer.

He elected to proceed without counsel in this case since his attorney withdrew in October 2006 after

the Court rejected Krause's request to pay his attorney from potential assets.[7]  Richard is Krause's

brother, a podiatrist, and is the named trustee of all of the KCTs.  Richard was also initially

represented by counsel but his attorney withdrew when the Court declined to permit KCT funds to

---

[4]  KAN. STAT. ANN. §§ 33-101, 33-102 (2000).

[5]  KAN. STAT. ANN. § 33-201 *et seq.* (2000).

[6]  Ex. 314.  The IRS collection summons was issued pursuant to Internal Revenue Code ("IRC") (Title 26, U.S.C.) § 7602 and the enforcement action was authorized by § 7604.

[7] Dkt. 128, pp. 15-22; Dkt. 148, 174.

be used to pay his attorney.[8]  Richard has not actively participated in the proceedings since filing

an answer to the adversary complaint.  He remains a party defendant and the trustee of the KCTs.

The Interveners are Gary's two sons, Drake and Rick, who are the named beneficiaries of the KCTs.

At the time of trial, Drake was a freshman in college and Rick was a senior in high school.

The Government commenced this adversary proceeding against Gary and Richard on

November 1, 2005.   In its complaint, the Government sought to enjoin transfers of property and

assets, a declaration that the KCTs and several other entities and trusts connected to Krause  –  the

Gary E. Krause Trust, the Krause Irrevocable Trust, Federal Gasohol Corporation (Fed Gas),

Financial Investment Management Corporation (FIMCO), Drake Enterprises, Inc., and PHR, LLC

– are his nominees and subject to federal tax liens, to except from discharge Krause's tax liability

pursuant to 11 U.S.C. § 523(a)(1)(C), and to set aside alleged fraudulent transfers by Krause and

have its federal tax lien attach to fraudulently transferred property.

On November 21, 2005, the Government obtained an *ex parte* temporary restraining order

preventing the transfer of assets held by the above entities and trusts.  The Court conducted a two-

day hearing on the preliminary injunction and the Court granted the Government's request,

effectively freezing all assets and accounts of the above entities and trusts during the pendency of

this adversary.[9]

Shortly thereafter, the Trustee intervened in this adversary proceeding and filed her own

turnover complaint.[10]  Like the Government, the Trustee alleged that the entities and trusts were

---

[8]  Dkt. 128, pp. 22-25; Dkt. 151, 179.

[9]  Dkt. 17, 80.

[10]  Dkt. 42, 50.

-8-

Krause's nominees and property of the bankruptcy estate subject to turnover. The Trustee also sought to avoid and preserve for the estate fraudulent transfers allegedly made by Krause into the trusts.

Approximately one year later, after Richard's counsel withdrew and Richard ceased to participate in the proceedings, Drake and Rick were permitted to intervene to protect their purported interests as beneficiaries of the KCTs and to defend the validity of the KCTs.[11]

Following a protracted and contentious discovery period, all parties filed dispositive motions. Krause and Interveners filed motions to dismiss and for partial summary judgment.[12] Highly summarized, they asserted that the Government lacked standing to pursue the fraudulent transfer claims and that both plaintiffs' fraudulent transfer claims were barred by applicable statutes of limitation and repose. They also challenged the plaintiffs' nominee claim as a "reverse piercing" claim that is not cognizable under Kansas or Tenth Circuit law. The Government and the Trustee also filed comprehensive motions for summary judgment on all their claims.[13] In three separate opinions, the Court denied all of the motions, thus leading to a trial of the claims.[14]

### C. The June 4, 2007 Sanctions Order[15]

Early in the course of discovery, the Government served requests for production of documents on Krause, seeking, *inter alia*, information, communications, and records maintained by Krause on computers. When Krause failed to produce this electronic evidence, the Government

---

[11] Dkt. 232.

[12] Dkt. 395, 400, 408, 410.

[13] Dkt. 405 and 415.

[14] Dkt. 482, 493 and 494.

[15] *United States v. Krause (In re Krause)*, 367 B.R. 740 (Bankr. D. Kan. 2007).

-9-

and the Trustee obtained an order compelling Krause to turnover his actual computers for inspection. Upon inspection, the plaintiffs discovered that Krause had loaded and operated a wiping software program on his computers that permanently destroyed or erased electronic evidence.

This discovery led plaintiffs to move for discovery sanctions and contempt proceedings for spoliation of electronic evidence.[16]  They sought entry of default judgment on all of their claims, including a determination that all of the entities and trusts at issue be deemed to be Krause's nominees.  The Court conducted a three day evidentiary hearing on the motions and then issued its sixty-one page opinion on those motions ("Sanctions Order"), finding that Krause willfully destroyed electronic evidence and assessing sanctions against him.[17]  The Court also entered *partial* default judgment against Krause as a sanction for his spoliation of electronic evidence, determining that the following entities were Krause's nominees and that the assets held by them were subject to turnover as property of the estate:  Gary E. Krause Trust, Krause Irrevocable Trust, FIMCO,  Fed Gas, Drake Enterprises, Inc. and PHR, LLC.  The Court declined to default Krause with respect to the KCTs, leaving the Government's and the Trustee's nominee claims with regard to the KCTs for trial.

## II.  FINDINGS OF FACT

The Court makes the following findings of fact from the evidence presented at trial. Interspersed throughout these findings are the uncontroverted facts established by the summary judgment motions that were  previously deemed established for purposes of trial pursuant to Fed.

---

[16]  Dkt. 219 and 235.

[17]  Dkt. 314.

R. Civ. P. 56(d).[18]  The Court may reference from time to time the previously defaulted entities to place in context their relationship to Krause and the events in this case as well as to demonstrate Krause's pervasive pattern of removing his name from virtually all of his assets.

### A.   Krause's Business Ventures and Corporate Activity

Krause is a self-described entrepreneur.  He has been involved in a variety of business ventures and industries including real estate development, management services, and oil and gas or energy development.  Gary obtained his masters in business administration and juris doctor degrees in 1973.  He obtained his Kansas law license in 1973.  He began work with Garvey Industries in the 1970's; he worked the for several years before leaving Garvey and striking out on his own in the late 1970's.  While at Garvey, Krause was involved in finding international investors for Garvey ranching and real estate development and housing enterprises.  In more recent years, Krause has been involved with enterprises and individuals overseas in developing what Krause has termed an "anti-aging product."

### 1.   Real Estate Partnerships - Section 8 Housing Projects

Krause became aware of Section 8 real estate while employed at Garvey.  When he left Garvey, Krause became involved in several Section 8 housing projects.  He acknowledged that he used Section 8 housing as a tax shelter.  Section 8 housing is low-income housing subsidized by the federal government's contribution to reach market rental rates.[19]  The following limited partnerships

---

[18]  Dkt. 493 at p. 19; Dkt. 494 at p. 39.

[19]  As described by one bankruptcy court, "Section 8" refers to Section 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974, 42 U.S.C. § 1437f. The Section 8 program provides low-income tenants with a subsidy towards rent of a participant unit, requiring the tenants themselves to pay no more than thirty (30%) percent of their adjusted income, 42 U.S.C. §§ 1437f(c)(3)(B)(1), 1437a(a)(1), with the balance of the established rent paid by the federal government, 42 U.S.C. § 1437f(c)(1), under a program administered by local housing authorities. *See* 42 U.S.C. § 1437f(b).  *See In re Sweeney*, 215 B.R. 97, 99 (Bankr. E.D. Pa. 1997).

-11-

were Section 8 housing projects established by Krause:  Liberal Commons Ltd., Norton Commons Ltd., Great Bend Duplex Housing Ltd., Hutchinson Duplex Housing Ltd., Liberal Duplex Housing Ltd., Norton Duplex Housing Ltd., and Rural Housing Associates, Inc.

### 2.    Barton Enhanced Oil Recovery Income Fund ("Barton")

Barton was one of a number of partnerships created in the early 1980's by various promoters for the development of previously unprofitable oil and gas properties using new and unproven technologies.  Krause was the tax matters partner for Barton and admitted that the enhanced oil recovery (EOR) partnerships were tax shelters.  For the years 1981 and 1982, the IRS challenged the legitimacy of Barton's debt structure and the tax benefits flowing to the Barton investors.  This became the "test case" under the Tax Equity and Fairness Reform Act of 1985 (TEFRA) that is the subject of the Tax Court case filed by Krause to contest the IRS's disallowance of certain tax deductions based upon the partnership's debts.[20]  Krause's Tax Court challenge was unsuccessful and the disallowed deductions flowing to the Barton partners forms the basis for part of Krause's income tax liability.

### 3.    Energy Associates, Inc. ("Energy")

Although the record is unclear, it appears that Energy was formed in the 1970's or early 1980's and that Gary owned 100% of its stock.  Energy was the corporate general partner of Barton.  The IRS determined that Energy's payment of Krause's personal expenses in 1981, 1982 and 1983 constituted taxable income to Krause.  This determination was one of several that were the subject of notice of tax deficiencies and unsuccessful challenge by Krause and comprises part of Krause's

---

[20]  *See Krause v. Commissioner*, 99 T.C. 132 (1992), *aff'd sub nom., Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir. 1994) *cert. denied* 513 U.S. 1079 (1995) for the general background regarding these partnerships and the tax issues.  For ease of reference, this Tax Court case will be referred to as the *Barton* Tax Case in this opinion.

-12-

income tax liability.

### 4. Federal Gasohol Corporation ("Fed Gas")

Gary established Fed Gas in 1980. The original purpose of Fed Gas was a venture to convert a winery into an ethanol plant. Later on, Fed Gas was involved in the operation of an oil tanker, the MV Sillery, in the Caribbean. Fed Gas paid management fees to Financial Investment Management Corporation ("FIMCO") for its operational and management services in connection with the tanker. Fed Gas also financed the tanker operations and held a mortgage on the tanker to secure its loan to the owner of the tanker. Gary was the sole owner of Fed Gas until 1989, when he transferred Fed Gas to the Gary E. Krause Trust for no consideration. Gary is the sole beneficiary and Richard is the trustee of that trust. Gary continued to manage Fed Gas, even after the transfer to the Gary E. Krause Trust. He is the sole signatory on the Fed Gas accounts. Fed Gas was the primary generator of Krause's income in the 1990's.

### 5. Financial Investment Management Corporation ("FIMCO")

Krause founded FIMCO in 1980 together with C. Norris Taylor with whom he had worked at Garvey Industries. At formation, Krause was the majority shareholder of FIMCO, owning 51%, or 510 shares of stock, while Taylor owned 49%, or 490 shares of stock. FIMCO largely provided financial and management services for Krause's other entities but did not own any assets; Taylor referred to it as a "shell company" in his testimony. Taylor described FIMCO's activities as a servicing operation for Krause's other companies and business interests, providing accounting, tax return preparation, and operational management.

Taylor acquired an additional 4,000 shares in FIMCO in 1985, becoming its president and the owner of 90 per cent of its stock. On September 1, 1992, Krause transferred his 510 shares of

-13-

FIMCO stock to Taylor thereby making Taylor the 100% owner of FIMCO. Taylor did not pay Krause any consideration for the transfer, although each share had a par value of $1. This transfer was made within 40 days after the Tax Court disallowed Barton's and the related partnerships' losses and accrued interest deductions,[21] and within two years after the IRS issued Gary notices of deficiency for his personal Forms 1040 for tax years 1975-1983 and 1986. Some five months after Krause's transfer, Taylor signed a contract dated February 8, 1993 obligating him to transfer FIMCO upon his retirement to the Krause Irrevocable Trust – of which Krause is the sole beneficiary.

While Taylor was owner and president of FIMCO, Krause retained signing authority on the corporate bank account. When Taylor retired on February 5, 2001, Krause became president of FIMCO again and was the only authorized signatory on the FIMCO bank account. On September 9, 2002, Taylor transferred FIMCO to the Krause Irrevocable Trust, belatedly complying with his previous contractual obligation. The Krause Irrevocable Trust paid no consideration for that transfer. Richard, the trustee of the Krause Irrevocable Trust, provided no oversight when it acquired FIMCO. Richard testified that Gary negotiated the transaction. Since the 2002 transfer of FIMCO to the Krause Irrevocable Trust, Krause has controlled FIMCO without any oversight from Richard.

Operating under Gary's direction, FIMCO invested in various ventures, including Live Wire Media Partners, L.L.C. which was formed to acquire and operate a radio station. FIMCO financed part of its interest in Live Wire through a Liberian company called Overseas Trust Company.[22]

---

[21] *See Krause*, 99 T.C. at 177-78.

[22] Ex. 24.

-14-

FIMCO has contributed at least $215,120 to Live Wire since 2003.[23]  Richard played no role in evaluating this transaction, but rather delegated the entire responsibility for this acquisition and all of FIMCO's business dealings to Gary.  FIMCO also invested in Dream Swing Machine, L.L.C., a company formed to acquire a golf swing aid.  FIMCO engaged in the Dream Swing investment at a time when Gary was the president.  According to Richard and Gary the KCT 1 loaned $25,000 to FIMCO to fund the investment.

### 6. Development Associates, Inc.

This entity holds 10-20 acres of undeveloped land in Reno County, Kansas.  It was intended to be another Section 8 housing development but that never came to fruition.  Gary was its sole shareholder, director and officer.  He transferred Development Associates to the Gary E. Krause Trust on July 26, 1989 for no consideration from the trust, shortly after the IRS issued notice of examination of Gary's 1986 personal return.

### 7. Drake Enterprises, Inc.

Drake Enterprises was incorporated in October 1988.  Teresa Briggs ("Teresa"), Gary's wife at the time, was its sole shareholder.  Gary and Teresa are its only directors.  Teresa ran her "Cookie Diet" business through Drake Enterprises for a period of time and according to Gary, Drake Enterprises owned the formula developed for the Cookie Diet.  In February of 1996, Teresa conveyed the Mission property (Gary's former residence and marital home) to Drake Enterprises, which later sold the Mission house to third parties.  Gary, as president of Drake Enterprises, signed a limited power of attorney to attorney Nelson Van Fleet to enable Van Fleet to appear on behalf of Drake Enterprises in connection with the closing of the sale of the Mission property.  Gary signed

---

[23] Ex. 34.

-15-

the 1989 federal tax return of Drake Enterprises as vice-president. Drake Enterprises no longer owns any assets.

### 8. PHR, LLC

In late July or early August, 2005, shortly before Richard was due to appear on August 5, 2005 to respond to the IRS Collection Summons with KCT records, Gary formed a limited liability company called PHR, LLC. Gary testified it was formed to hold title to the family's residence on Oneida Circle (the "Oneida property") to effectuate a Section 1031 tax free exchange with another residential property he intended to acquire (the Wentworth property).[24] On August 5, 2005, Richard signed trustee warranty deeds conveying title to the Oneida property from the KCT 1 to PHR. The deed was recorded August 11, 2005. Gary prepared the operating agreement (dated August 7, 2005) for PRH, LLC[25] using a form LLC agreement. KCT 1, 2 and 5 were listed as the members of PHR. PHR was one of the entities upon which the Court defaulted Gary in its Sanctions Order, deeming PHR to be Krause's nominee.

### 9. Polo Executive Rentals ("Polo")

Polo is the named lessor under lease agreements with Gary and FIMCO for the Oneida property.[26] Polo has no record title interest in the Oneida property. Polo owns no assets. It is a non-entity, merely being a name on the checking account into which lease payments were

---

[24] The Court questions whether a like-kind exchange of real property used as personal residences qualifies as a tax-free exchange under IRC § 1031. In order to qualify for tax free treatment of a like-kind exchange, the exchanged properties must be held "for productive use in a trade or business or for investment." *See* 26 U.S.C. § 1031(a)(1). The Oneida property was used as Krause's residence and family home; it was not a business or investment property. *See Starker v. U.S.*, 602 F.2d 1341, 1350-51 (9th Cir. 1979). However, the Court need not make a determination because a like-kind "exchange" with the Oneida property never occurred.

[25] As conceded at trial, the operating agreement erroneously referred to PHR as PRH, L.L.C. Gary stated that it is a single entity correctly named PHR, L.L.C.

[26] Ex. 209 and 210.

-16-

purportedly deposited by Gary and FIMCO. It is unclear when the account was established but the lease agreements are dated with the year 2000. Richard signed the lease agreements on behalf of Polo. Gary testified the Polo account is owned or controlled by the KCT 1.

> **10.    Quivira Associates ("Quivira")**

Quivira holds title to 145-160 acres of real property in Stafford County, Kansas where a hunting lodge is located. It was incorporated in 1986 by Richard, who is also the president. Richard and Gary use the property for hunting. In addition, the pasture ground is rented out to a tenant part of the year to run cattle.

Initially Kanzoil Corporation (100% owned by Gary) owned 4,000, shares or a one-third interest in Quivira. In 1989, Gary transferred the shares to Teresa. In 1998, Teresa transferred the shares to the Gary E. Krause Trust or the Interveners.[27] A more detailed discussion of the chain of transfers is contained later in this opinion.[28]

> **B.    Krause and the IRS**

Krause's tax battles with the IRS began in the 1980's when the IRS sent letters both to Krause individually indicating that it was initiating an examination of his personal tax returns and to Krause, as Barton's tax matters partner, indicating that it was auditing Barton and other EOR partnership returns.

Marsha Waterbury, a revenue officer and 34 year employee of the IRS, explained the examination or audit process at trial as follows. First, an examination letter or audit letter is sent to the taxpayer, notifying the taxpayer that his tax return is being examined. The letter may be

---

[27] The parties dispute which party was the transferee from Teresa. As discussed in more detail *infra*, the documentary evidence is conflicting as to the true owner of the Quivira shares.

[28] *See* pp. 100-104, *infra*.

accompanied by a request to meet with the taxpayer and a request for additional information or documents to be brought to the meeting.  After its examination and review, the IRS issues a notice of deficiency which, based upon the IRS's review of the information and return, makes changes to the taxpayer's return.

Once a notice of deficiency is issued, a taxpayer can respond in several ways.  The taxpayer can agree with the changes and voluntarily pay the tax deficiency ending the tax dispute.  The taxpayer can challenge the tax deficiency and file a petition with the United States Tax Court.  If the taxpayer is unsuccessful in the Tax Court, he can appeal the Tax Court decision to the applicable Circuit Court of Appeals and from there, to the United States Supreme Court.  If the taxpayer loses the tax appeals, the notice of tax deficiency stands and the taxpayer can either voluntarily pay the tax liability or suffer the IRS's collecting the deficiency.  Once the tax deficiency has been fully litigated through the courts, or no challenge to the tax deficiency is made by the taxpayer, but the tax deficiency remains unpaid, the IRS then assesses the taxes.  Once the tax assessment is made, the IRS then attempts to collect the taxes from the taxpayer or the taxpayer's property by levy or attachment.  Included in the IRS's arsenal of collection tools is the ability to file a notice of federal tax lien on all of a taxpayer's property.[29]

### 1.    Krause's IRS Examinations

During the period from February of 1980 to July of 1985, the IRS selected Gary's personal Form 1040 returns for the tax years 1975 through 1983 for audit.  This audit pertained to multiple tax issues, principally the deductions Gary took in connection with operating losses of his enhanced oil recovery ("EOR") partnerships and also his alleged failure to report as income personal expenses

---

[29] *See* IRC, 26 U.S.C. § 6321.

-18-

paid by his wholly owned company Energy Associates, Inc. in years 1981, 1982 and 1983.[30]  The IRS issued a notice of deficiency on October 25, 1990 increasing Krause's tax liability by approximately $558,000 plus penalties and interest.  Krause filed Tax Court case no. 1279-91, discussed below, to challenge the deficiency.

Beginning on June 28, 1983 and through 1986, the IRS notified Gary in his capacity as Barton's tax matters partner that it was also auditing Barton's 1982 and 1983 partnership tax returns. Additionally, on June 28, 1983, the IRS sent Gary a notice informing him that it was auditing the 1981 and 1982 tax returns for his other EOR entities, Cardinal Oil Technology Partners, Energy Associates, Inc., Caxton Oil Technology Partners, and Harrow Oil Technology Partners.[31]  These audits questioned deductions taken by the partnerships for reported losses incurred by their respective enterprises stemming from their debt obligations.  The IRS challenged the validity of those debt obligations.  On April 11, 1986, the IRS issued a notice of administrative adjustment disallowing all partnership losses.  Acting as tax matters partner, Krause filed Tax Court case no. 16425-86 (the "*Barton* Tax Case"), also discussed below, to challenge the administrative adjustment.

On April 5, 1989, the IRS advised Gary that it was also examining his 1986 personal return.[32] The scope of the examination was limited to certain Schedule C bad debt losses he claimed. The IRS challenged both the existence of a debtor-creditor relationship as well as Gary's assertion that the debt had become worthless during the tax year.  According to Gary, the bad debt losses he claimed arose from loans he made to real estate partnerships Liberal Commons, Ltd. and Norton Commons,

---

[30]  Ex. 253 pp. 7-30; Schedule 1-A, Explanation of Adjustments, p. 18 note q; Exhibit F, pp. 26-28.

[31]  Ex. 253, p. 4.

[32]  Ex. 253, pp. 5-6, 31-37.

Ltd. The result of this audit was a notice of deficiency increasing Krause's income for 1986 by some $395,000 representing the disallowed bad debt loss and more than $3.15 million representing disallowed partnership net operating loss (NOL) carryforward. Krause then filed Tax Court case no. 1268-91 to challenge the bad debt findings. The NOL deficiency remained in controversy in the *Barton* Tax Case at that time.

On January 15, 1997, the IRS notified Gary that it was examining his 1994 Form 1040 and, on July 11, 1997, the IRS expanded its examination to include his 1995 Form 1040.[33] This audit resulted in upward adjustments to these returns of some $150,000 in taxes and penalties owed. These adjustments were a continuing consequence of Gary's claiming NOL carry-forward benefits from the abusive EOR tax shelters on his 1040 returns for 1994 and 1995. Even though the *Barton* Tax Case had been resolved adversely to Gary on appeal by June of 1994, he nevertheless included these losses on both his 1994 and 1995 returns. According to Gary's accountant, David Holste, C.P.A., these partnerships did not file their final returns until 1994 and 1995, resulting in the flow-through of income and other tax benefits from the partnerships to Gary and the other partners. Holste also stated that had he known that the Tenth Circuit had affirmed the *Barton* Tax Case on appeal, a conclusion adverse to Gary, he would have prepared Gary's 1994 and 1995 returns differently. This audit resulted in an assessment of some $60,725 for tax year 1994 and $239,267 for tax year 1995.

### 2. Krause's Tax Court Litigation

On May 28, 1986, after the IRS disallowed deductions taken by Barton for losses allegedly incurred by the partnership, Gary petitioned the United States Tax Court (No.16425-86) and

---

[33] Ex. 253, pp. 38-41.

challenged the IRS decision.[34]   According to the Tax Court, the *Barton* Tax Case was the test case for over 2,000 related, pending TEFRA partnership matters.  Alleged total tax deficiencies at issue in connection with this group of related cases and TEFRA partnerships were in excess of $2 billion. On July 29, 1992, the Tax Court disallowed Barton's and the other partnerships' losses and accrued interest deductions, stating:

> In summary, presented to us in this case is a chain or multi-layered series of obligations, stacked or multiplied on top of each other via the numerous partnerships to produce debt obligations in staggering dollar amounts, using a largely undeveloped and untested product, in a highly risky, very speculative, and non arm's-length manner in an attempt to generate significant tax deductions for investors. The transactions did not, and do not, constitute legitimate for-profit business transactions.
>
> Losses of the partnerships are disallowed under section 183, and accrued interest deductions are disallowed due to the non-genuine nature of the underlying debt obligations.[35]

The Tenth Circuit Court of Appeals affirmed the Tax Court decision in 1994, and the Supreme Court denied *certiorari* in 1995.[36]   Because Barton and the other EOR ventures were structured as partnerships, the disallowance of the partnership losses flowed through to the investors in those partnerships and significantly increased the individual partners' tax liabilities, including those of Krause.

On October 25, 1990, the IRS issued notices of deficiency to Krause personally which notified him that the IRS had determined that he had underpaid his taxes for the years 1975-1983 and 1986 by, in part, failing to report certain income paid to him by Energy Associates, by taking

---

[34]  Ex. 3, p. 1-9.

[35]  *Krause v. Commissioner*, 99 T.C. 132, 175-76 (1992).

[36]  *Krause v. Commissioner*, 99 T.C. 132, 150 (1992), *aff'd. sub. nom.*, *Hildebrand v. Commissioner*, 28 F.3d 1024 (10th Cir. 1994) *cert. denied*, 513 U.S.1079 (1995).

-21-

deductions for losses he claimed by participating in EOR partnerships such as Barton, and for disallowance of bad debt losses.[37] On January 22, 1991, Krause personally petitioned the Tax Court to challenge his 1986 deficiencies attributable to the bad debt losses disallowed by the IRS (Tax Court case no. 1268-91).[38] On that same day, Krause also petitioned the Tax Court to challenge his personal tax deficiencies for the years 1975 through 1983 (Tax Court case no. 1279-91).[39] Ten years later, in February 2001, Gary and the Commissioner settled their disputes with respect to Krause's 1975-1983 and 1986 tax years. In accordance with the settlement, Gary agreed that he owed taxes for 1975, 1978 through 1983, and 1986.[40] With respect to the bad debt losses for the year 1986, Gary agreed to the IRS's deficiency of $11,153.

On July 13, 1999, the IRS mailed Gary a notice of deficiency for tax years 1994 and 1995, which Gary did not challenge. The IRS assessed the deficiencies for those taxes in December 1999 pursuant to a settlement that Krause believed would put the EOR matters behind him. Krause testified that when the IRS assessed the 1975 through 1986 liabilities arising from the disallowed partnership NOLs, he "gave up" because he had no way to ever repay these liabilities.

### 3. Krause's Tax Assessments and Federal Tax Liens

In total, the IRS assessed federal income taxes, interest, and penalties in the following amounts and filed notices of federal tax liens in Sedgwick County, Kansas on the following dates:

| Tax Year | Amount | Date Of Assessment | Tax Lien Filed |
|---|---|---|---|

---

[37] Ex. 2.

[38] Ex. 3, p. 13-16.

[39] Ex. 3, p. 17-46.

[40] Ex. 3, pp. 47-48; 49-50.

-22-

| | | | |
|---|---|---|---|
| 1975 | $ 11,990.45 | 05/31/2001 | 10/12/2001 |
| 1978 | $393,919.32 | 05/31/2001 | 10/12/2001 |
| 1979 | $104,665.13 | 07/13/2001 | 11/16/2001 |
| 1980 | $178,438.54 | 07/13/2001 | 11/16/2001 |
| 1981 | $ 89,294.04 | 07/13/2001 | 11/16/2001 |
| 1982 | $711,092.52 | 05/31/2001 | 10/12/2001 |
| 1983 | $784,180.78 | 05/31/2001 | 10/12/2001 |
| 1986 | $ 40,460.99 | 07/13/2001 | 11/16/2001 |
| 1994 | $ 60,725.01 | 12/01/1999 | 04/06/2001 |
| 1995 | $239,267.18 | 12/01/1999 | 04/06/2001 |

At the date of his bankruptcy petition, with interest and penalties, Gary owes the United States about $3,359,001 for tax years 1975, 1978 through 1983, 1986, 1994, and 1995.

### 4. IRS Collection Summons

As an IRS Revenue Officer, Marsha Waterbury's duties include collecting unpaid taxes from taxpayers. Her duties begin after a tax assessment is made. Waterbury because responsible for the Krause account in June of 2005. She reviewed IRS records and files from the 1980's as well as the prior revenue officer's activity. According to Waterbury, the prior revenue officer had contact with Krause regarding his unpaid taxes, but Krause had been uncooperative. Krause has made no payments on the tax liabilities since the taxes were assessed. In the course of her review and investigation Waterbury found no assets titled in Krause's name.

On July 8, 2005, Waterbury served a collections summons issued pursuant to 26 U.S.C. § 7602 on Richard, as trustee of the trusts, to appear before her at the IRS offices in Wichita on August 5, 2005. The summons required that he provide, *inter alia*, "all records in [his] possession" pertaining to the KCTs and the Gary E. Krause Trust.[41] Upon receiving the summons, Richard

---

[41] Ex. 48. *See* 26 U.S.C. § 7602(a) provides, in part: "For the purpose of . . . collecting any such liability, the Secretary is authorized – (1) to examine any books, papers, records, or other data which may be relevant or material to such inquiry; (2) to summon the person liable for tax . .  or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax . . . or any other person the Secretary may deem proper, to appear before the Secretary at a time and place named in the summons and

-23-

contacted Gary and asked him how to respond. Gary referred Richard to attorney Brian Grace to respond to the summons. Rather than comply with this summons, Richard, through his attorney, filed a Petition to Quash Summons in the United States District Court for the District of Kansas on July 28, 2005.[42] This action was later dismissed.

### C.  Krause and Teresa Briggs

Teresa Briggs figures prominently in Krause's asset activities. Krause met Teresa in 1982. At that time, Teresa owned and ran an advertising agency and Gary was involved in his EOR partnerships as well as a variety of other business enterprises. They were married on April 5, 1986. Because of Gary's failed first marriage, he insisted on an antenuptial agreement. According to Gary, the attorneys worked on the terms of an antenuptial agreement for nearly a year before the final agreement was executed by Gary and Teresa on April 4, 1986, the day before their wedding.

After they were married, Teresa worked for the Fleming Companies in advertising and marketing for a period of time. She ceased working outside the home upon the birth of her youngest son, Rick. Teresa acknowledged that she was not a "numbers" or detail person, but by all accounts was talented in marketing, advertising, and creative work. She also holds a real estate license and buys properties and refurbishes them for rent or resale. While they were married, Teresa started her Cookie Diet venture. As the name suggests, Teresa oversaw the development of a formula for a nutritional cookie and began marketing the product. The evidence suggests that Teresa conducted the Cookie Diet venture from home as she raised the children. Teresa testified that the Food and Drug Administration ultimately shut down the Cookie Diet business. Teresa also retained an interest

---

to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; . . .".

[42] Ex. 312, 313.

in her family's business, a basement/foundation repair concern.  Thus, while Gary owned more property than Teresa, she did bring some property into the marriage.

### 1.     Krause's Premarital Holdings

Prior to his marriage to Teresa, Krause personally owned the following:

a)     partnership interests in several limited partnerships, including: Cardinal Oil Technology Partners, Caxton Oil Technology Partners, Harrow Oil Technology Partners, Bishop Energy Technology Associates, Barton Enhanced Oil Production Income Fund, and Trojan Energy Technology Associates;

b)     100% of the stock of Energy Associates, Inc.;

c)     100% of the stock in Federal Gasohol Corporation;

d)     51% of the stock or 510 shares of Financial Investment Management Corporation ("FIMCO");

e)     100% of the stock of Development Associates, Inc., which owned real property in Reno County;

f)     general partnership interests in several real estate limited partnerships, including Great Bend Duplex Housing Ltd., Hutchinson Duplex Housing Ltd., Liberal Commons Ltd., Norton Commons Ltd., Newton Associates, Liberal Duplex Housing Ltd., and Norton Duplex Housing Ltd.;

g)     100% of the stock of Rural Housing Associates, Inc.;

h)     sole ownership of the real property and personal residence at 37 N. Mission Road, Wichita, Kansas; and

i)     100% of the stock in Kanzoil Corporation.

In 1986, Krause was also the president of Federal Gasohol Corporation, Energy Associates, Inc., FIMCO, and Development Associates, Inc., as well as a director of Quivira Associates.

### 2.     Krause's Antenuptial Agreement[43]

_____

[43] Ex. 14.

-25-

Gary and Teresa entered into the antenuptial agreement ("Agreement") on April 4, 1986. In doing so, they agreed to keep their separate property and preclude any claim that their separate property would become marital property. The Agreement recognized that Gary and Teresa had their own separate businesses, and in fact the Agreement's introductory recitals state that "each party hereto is presently operating and conducting a business venture and *each is desirous of continuing such venture after their marriage* to each other."[44] Under the Agreement, Teresa waived any right, title or interest in and to Gary's assets and separate property. Those assets listed by Gary included the interests listed above: the Mission property; his interest in the real estate limited partnerships; Rural Housing Associates, Inc., Western Associates of Kansas, Inc.; his interest in the oil technology partnerships; Energy Associates, Inc.; and a note receivable from Beverly Terrace Apartments, Inc. Gary acknowledged at trial that it would have been in his best interest to list all of his assets in the Agreement but conceded that he did not. For example, he omitted his interest in FIMCO and Fed Gas. Nor did Gary disclose several notes owed to him by his companies, notes that he later assigned to Teresa. At the time the couple executed the Agreement, Gary knew that the IRS was auditing his personal tax returns as well as those of the Barton, Cardinal and Caxton oil partnerships. Indeed, Krause filed the tax court petition challenging the Barton tax deficiency in May of 1986, only a month after his marriage to Teresa.

Among the salient provisions of the Agreement was the ability to deem and treat separate property as marital property. Under paragraph 6 of the Agreement, Gary and Teresa did not consider their separate property to be held as marital property except as they might subsequently agree in a separate written agreement that referenced the Agreement. None of the transfers

---

[44] *Id.* (Emphasis added).

referenced in this opinion were documented in a manner that complied with this provision.

Paragraph 8 of the Agreement sets forth the rights of the parties upon a divorce. It provides that Teresa would receive $1,000 per month as alimony for a maximum of 120 months. Paragraph 9 addressed the property division between the parties. If Gary and Teresa remained married for a period of ten (10) years and she commenced the divorce action, Teresa would receive the greater of $50,000 or one-half of the marital assets as her property division.[45] Thus, the total amount of cash that Teresa stood to receive under the Agreement in the event of a divorce was $170,000. At all times during the marriage, Gary was to carry a $250,000 life insurance policy on his life with Teresa as the named beneficiary. In addition, if Gary died while he and Teresa had a minor child, Teresa was to inherit their principal residence.

Paragraph 12 of the Agreement required Gary to establish a Krause Children Trust upon the birth of children of the marriage; the trust was intended to be in lieu of child support in the event of a dissolution of the marriage. Specifically, the Agreement states:

A.  Upon the first child being born as issue of said marriage, Gary shall commence a spendthrift trust known as the "Krause Children Trust" and placed at a bank within the City of Wichita. Said trust shall name as trustees an individual named by each of the parties and a third person named by the two designated trustees. The original corpus of the trust shall be Fifty Thousand Dollars ($50,000.00). The corpus shall be increased by Fifty Thousand Dollars ($50,000.00) upon the second child being born as issue of said marriage or upon the Fifth (5th) birthday anniversary of the first child born as issue of said marriage, whichever event first occurs.

B.  In the event a third (3rd) child is born as issue of said marriage, *or upon the fifth (5th) birthday anniversary of the second (2nd) child being born whichever first occurs,* Gary agrees to add to the corpus of said trust assets equal to Fifty Thousand Dollars ($50,000.00). Regardless of the number of children born as issue of said marriage, the contributed total of the corpus of said trust

_____

[45] Ex. 14, ¶ 9B (Emphasis added)..

-27-

shall not exceed One Hundred Fifty Thousand Dollars ($150,000.00) *unless Gary should elect to add to said corpus.*

C.      The trust so established shall be a spendthrift trust with three (3) trustees, one to be named by Gary, one to be named by Teresa, and the third to be selected by the other two trustees.  The corpus of the trust estate shall be invested by the trustees, along with all accumulated earnings and income therefrom.  Provided, however, that in the event of termination of the contemplated marriage by divorce, . . . and beginning on the date of the entry of a decree of divorce . . ., the current earnings or income derived from the trust estate shall then be paid annually, or at other intervals if convenient, to Teresa for the general benefit, welfare, health and education of the child or children born of the marriage.  The trust shall provide that Teresa will continue to receive the current earnings or income from the trust estate until such time as each respective child attains the age of 25 years, or dies, whichever occurs first. . . .

D.      Upon the birth of the first child born as issue of said marriage, Gary agrees that he will maintain a policy of insurance on his life in the amount of Five Hundred Thousand Dollars ($500,000.00) naming as beneficiary or beneficiaries the trustee or trustees of a testamentary trust to be created by his last will and testament which trust shall be a spendthrift trust for the general benefit, welfare, health and education of the child or children born as issue to said marriage.  Said obligation to maintain life insurance under this subsection shall terminate upon the termination of the contemplated marriage by divorce . . .

*         *         *

F.      In the event that the children born as issue of said marriage desire higher education beyond their high school education, Gary agrees to pay for said higher education under the following terms and conditions: . . .

        iv.      Said obligation will not be due until funds have been exhausted from all other resources including but not limited to the above mentioned trusts, . . .

The parties hereto agree and understand that the intended purpose of establishing and creating the trust aforementioned, is to provide for the support and wellbeing of children born to Gary and Teresa's marriage, if any, in the event Gary and Teresa should terminate their marriage by divorce . . . before their children should attain the age of 25 years.  Gary and Teresa acknowledge, understand and agree that all payments and income received by Teresa pursuant to said trust arrangement for the benefit of the children

-28-

is in lieu of child support payments to which the custodial parent would normally be entitled pursuant to the laws of the State of Kansas. Teresa acknowledges and agrees that said trust income is deemed wholly and completely sufficient and satisfactory to her in light of her financial circumstances and station in life to allow her to adequately and sufficiently support the parties' children therefrom. . . .

In addition to these provisions in the Agreement, Gary orally advised Teresa that they would file separate tax returns.

Teresa and Gary had two sons. The eldest, Drake Krause, was born on May 4, 1988 and his brother, Richard ("Rick") Krause, was born on November 28, 1989. Teresa filed for divorce in 2000 but she reconciled with Gary and the case was dismissed. Proceedings in the 2000 divorce action are discussed in more detail later in this opinion. Gary and Teresa later separated again and were ultimately divorced in November of 2002.

### 3.      Gary's and Teresa's Health

Gary testified at trial that the transfers to Teresa and the KCTs were motivated in part by his concern about his health and family health history. Gary's mother died in 1982 at age 62 of heart disease and his father, diagnosed with prostate cancer in 1985, died in June of 1990. Gary discovered he had heart abnormalities in the early 1980's when he submitted to a medical examination in connection with an application for a life insurance policy. He has a heart arrhythmia and has had several stents inserted to alleviate blockages. According to Gary, medical tests in 1988 or 1989 detected that he had suffered a heart attack at some point previously. He undergoes an annual angiogram to monitor his heart condition. According to Teresa, Gary is an alcoholic who was abusive at times during their marriage.

Teresa endured a difficult pregnancy while carrying their second child. During that

-29-

pregnancy, she and Gary underwent divorce counseling. Teresa testified that she was angered by the antenuptial agreement and by Gary's insistence that she not work outside the home. She resented giving up her own career and was concerned for her financial security and the boys' future should something happen to Gary, notwithstanding the provisions made for them by the antenuptial agreement.

Sometime in the early 1990's, Teresa was diagnosed with Scleroderma. She described Scleroderma as a condition where one's soft tissues lose their elasticity resulting in severe pain. She took pain and anti-inflammatory medications to relieve her symptoms, but soon became addicted to the prescription drugs. She suffered from depression and in March of 1998, had a mental breakdown. After her 2002 divorce from Gary, Teresa went through a withdrawal program for her prescription drug addiction. Teresa continues to treat her Scleroderma today.

Teresa's memory of events during this period, and even today as evidenced by her testimony at trial, is poor. The Court is unsure whether her poor recall of events is attributable to memory loss resulting from her drug addiction or simply not being a "detail" person when it comes to financial matters. As the discussion of Teresa's and Gary's divorce battles will demonstrate, Teresa's present trial testimony about what she understood about the couple's financial affairs and how Gary dominated them differs greatly from the views she expressed in 2000. This, taken with the fact that she continues to reside in the same house as Gary, leads the Court to suspect that he had, by the time of this trial, exerted some influence over her. No party introduced evidence from medical witnesses regarding either Gary's or Teresa's state of health during their marriage or their current medical conditions.

### 4. Krause's Personal Financial Statements

-30-

Krause's personal financial statements dated September 15, 1988 and December 31, 1988 both listed as an asset notes receivable in the amount of $90,107.[46] This receivable was comprised primarily of notes made and given to Krause by FIMCO ($35,525.76) and Liberal Commons, Ltd. ($51,281.69). This asset remained unchanged on Krause's statement of assets and liabilities dated June 30, 1989.[47] The Liberal Commons, Ltd. note is the same note that Krause wrote off as a bad debt on his 1986 tax return and is the same note that he transferred to Teresa in 1989 as noted below. In addition, the notes receivable listed by Krause on his June 30, 1989 financial statement omitted several other existing notes owed to Krause that he transferred to Teresa in 1989.[48]

On all three financial statements, Krause listed the Mission property (his personal residence) as his asset with a value of $275,000. As noted below, Krause transferred a one-half interest in the Mission property to Teresa when he deeded the Mission property to himself and Teresa as joint tenants with right of survivorship in April of 1988. Teresa's interest in the Mission property was not disclosed on any of these financial statements. Krause made yet another financial statement on December 31, 1989,[49] again listing the Mission property as his sole asset notwithstanding the prior transfer of one-half of his interest to Teresa in April of 1988 and the conveyance of his entire remaining interest in the Mission property to Teresa in November of 1989, as noted below.

While Krause admitted his financial statements were incomplete, he testified that senior vice-president Bill Foster of Union National Bank suggested to Krause that they could be less than

---

[46] Ex. 533 and 534. These and subsequent financial statements were made to Union National Bank in Wichita.

[47] Ex. 535.

[48] *See* Ex. 15.

[49] Ex. 536.

-31-

complete. Unfortunately, the correspondence from Union National Bank requesting updated financials from Krause contains no such reference and Foster did not testify at trial. The Court finds that Krause's explanation for his omissions is simply not credible based not only upon Krause's own exhibits, but also the Court's experience with lenders' requests for financial statements.

## 5.     Krause's Transfers to Teresa

By 1989, Teresa knew that Gary was embroiled in litigation with the IRS. According to Gary, after the birth of his sons, he wanted Teresa to stay home and raise and care for Drake and Rick. He testified that he made the group of transfers described below to induce Teresa to stay home with the boys and provide financial security to Teresa. However, instead of making these transfers directly to the KCT as required by the antenuptial agreement, Gary began directly transferring and conveying assets to Teresa in November of 1989. Not coincidentally, only a few weeks earlier, on October 27, 1989, he had learned that his 1987 personal tax return examination concerning his claimed "bad debt loss" for a series of promissory notes he had taken from the Section 8 partnerships and other entities would be closed as "unagreed" after Krause failed to execute the forms evidencing his previous assent to the IRS's adjustment.[50] On November 29, 1989, Gary transferred all of these notes to Teresa along with security interests in the Great Bend and Hutchinson Duplex projects. On the same date, he transferred notes from Fed Gas and Kanzoil to Teresa. Also in November of 1989, he transferred all of his stock in Fed Gas to the Gary E. Krause Trust. All of these transfers to Teresa were done in writing, but none of the writings references the antenuptial agreement. All of the assets involved were assets owned by Gary prior to the marriage and, according to the antenuptial agreement, his separate property.

---

[50] Ex. 303.

At trial, Gary conceded that these transfers could have been accomplished through estate planning or a will, rather than by inter vivos transfers and assignments. Gary never rescinded or tore up the antenuptial agreement, which suggests to this Court that its purpose was more to shelter his assets than to provide financial security for his wife and children.

### a.    Mission property

When Gary and Teresa married they resided in the Mission property, Gary's separate property. Teresa had waived any interest in the property by virtue of the antenuptial agreement. On or about April 5, 1988, Gary conveyed to Teresa an interest in the Mission property; Teresa and Gary executed a quit claim deed on the Mission house naming themselves joint tenants with rights of

survivorship.[51]  On November 29, 1989, Gary conveyed all of his interest in the Mission house to Teresa by quit claim deed, making Teresa the sole owner of the Mission property. On January 2, 1996, Teresa transferred the Mission house to Drake Enterprises, Inc. by warranty deed.[52] On March 4, 1998, Drake Enterprises sold the Mission property to Stephen and Judy Burns. The same day, Gary executed another quit claim deed conveying any interest he may still have had in the Mission house to Drake Enterprises.[53]  The proceeds from the sale of the Mission property were deposited in the Paine Webber account, described later in this opinion.

### b.    Note Receivable Assignments

---

[51] According to Gary's testimony in an earlier hearing in these proceedings, this conveyance to his wife was a gift for the anticipated birth of their first son.

[52] By the fall of 1995, Teresa had purchased a new residence in her own name, the Oneida property, to which she, Gary and the boys moved.

[53] According to Gary, this conveyance was a formality to enable Drake Enterprises to convey clear title to the Mission property.

-33-

On November 29, 1989, Krause assigned to Teresa a series of promissory notes owed to him by his companies.[54] These included a promissory note between Gary E. Krause and Fed Gas, whereby Fed Gas agreed to pay Krause $695,161.86; a promissory note between Gary E. Krause and Rural Housing Associates, whereby Rural Housing agreed to pay Krause $188,938.94; a promissory note between Gary E. Krause and Liberal Commons Ltd., whereby Liberal Commons agreed to pay Krause $189,676.18; a promissory note between Gary E. Krause and Barton, whereby Barton agreed to pay Krause $75,000.00; and a promissory note between Gary E. Krause and Kanzoil Corp. whereby Kanzoil agreed to pay Krause $20,072.00. Krause admitted at trial that he believed the Liberal Commons note was worthless when he assigned it to Teresa and that he had previously written it off as a bad debt on his 1986 tax return.

Krause testified at his deposition that the only consideration Teresa provided for these assignments was love, devotion and the commitment to raise his two sons. At trial, Krause's story changed somewhat in that he claimed he made these transfers to induce Teresa to quit her job and become a stay-at-home mother and raise the boys.

Additional assignments and transfers followed the November 1989 transfers. On June 27, 1990, Krause transferred to Teresa another promissory note to Gary E. Krause from Norton Commons Ltd., whereby Norton Commons agreed to pay Krause $3,276.37. On December 1, 1990, Krause transferred to Teresa a second promissory note to Gary E. Krause from Liberal Commons Ltd., whereby Liberal Commons agreed to pay Krause $37,015.44. Again, none of the above assignments made reference to the antenuptial agreement.

As detailed below, payments on these assigned notes were made to Teresa and deposited into

---

[54] Ex. 15.

either the Paine Webber or Merrill Lynch money market accounts.[55]  A significant portion of the funds deposited to these accounts found their way into the KCTs.

### c.        Security Interests in Partnership Interests

On November 29, 1989 Krause granted Teresa a security interest in his general partnership interest in two housing complexes, Great Bend Housing Duplex Ltd. and Hutchinson Duplex Housing Ltd.  Krause granted these security interests even though he was not indebted to Teresa. He admitted that by granting the security interests, it clouded title to his interest in these limited partnerships.  The security agreements executed by Krause also made no reference to the antenuptial agreement.[56]    As in the case of the assigned notes, these partnerships, acting through Gary, deposited substantial sums in the Paine Webber and Merrill Lynch accounts.

### d.        Quivira

On November 29, 1989 Krause transferred to Teresa, his or his company Kanzoil's ownership interest in Quivira—which holds the hunting lodge and leases pasture acreage.  Teresa could not remember any details of this transfer.  In 1998 or 1999, Teresa transferred her interest in Quivira to the Gary E. Krause Trust or to her sons, as discussed more fully at pages 100-104, *infra.*

### 6.        Krause's Disclaimed Inheritance

According to both Gary and Richard, they met with their father, Lawrence Krause, around the holidays in either 1988 or 1989.  Lawrence was ill with cancer.  According to Gary, during this meeting and discussion he waived an inheritance from his father, Lawrence.  He also stated that his father held a power of appointment over certain testamentary trusts of Gary's grandfather Adam and

---

[55] *See* pp. 37-38, *infra.*

[56] Ex. 16.

his grandmother Florence Krause. Gary directed Lawrence to direct any inheritance from the Adam and Florence trusts to the GEKT. He directed that his share of Lawrence's estate be given to Teresa and his boys. Gary's explanation for the waiver was that he did not need the inheritance. At one point in his testimony, Gary referred to a waiver document that his uncle George had prepared and he signed, but that document was never presented at trial.

Richard's recollection of this family meeting varies slightly. At trial, Richard claimed that he did not know Gary had tax problems until 1992 or 1993. However, Richard had previously testified in deposition and in other hearings in this case that he and his father were well aware of Gary's tax disputes with the IRS much earlier, in 1989. Richard testified that the disallowed Barton deductions had posed problems for both Lawrence and Richard. While Richard denied at trial that Gary's waiver of the inheritance was motivated by his IRS problems, both the Trustee and the Government impeached Richard with prior testimony from the preliminary injunction hearing. At that hearing, Richard testified unequivocally that Gary waived his inheritance because he knew he might have to face the IRS at some point with regard to these liabilities. Having observed Richard's demeanor on both occasions, the Court believes his prior testimony to have been truthful. Gary himself testified at trial that his tax problems were a factor in waiving his inheritance. Thus, the Court finds it more likely than not that Gary's inheritance waiver in 1989 was motivated by his tax problems.

### 7. Paine Webber (PW) and Merrill Lynch (ML) Accounts

Shortly before June 1991, at Krause's instance, and with his assistance, Teresa opened a Merrill Lynch account solely in her name with a deposit of a $150,000 check drawn on the account of Energy Associates, Gary's wholly owned company. Teresa neither managed nor paid attention

-36-

to the ML account, and Teresa did not know who funded the account.

Shortly before February 1992, Krause assisted Teresa in opening a Paine Webber account solely in her name. Gary prepared the majority of the checks written on the PW account and decided what bills were paid and when. Teresa's only responsibility over this account was to sign the checks. Krause concedes that the handwriting on the monthly statements for the PW account is his own. Teresa left the monthly statements, deposit slips, and cancelled checks for both the PW and ML accounts at the Oneida property where Gary continued to live after their divorce in 2002.

Krause's companies and businesses made deposits totaling $204,803 into Teresa's ML account.[57] In addition to the $150,000 opening deposit by Energy Associates on June 29, 1991, Norton Commons and Liberal Commons made deposits of $3,276 and $11,851, respectively, on August 22, 1991. On August 27, 1991, Energy Associates made a $39,676 deposit.

Krause entities made deposits totaling $664,615.10 into Teresa's PW Account:[58]

| DATE | AMOUNT | PAYOR |
|------|--------|-------|
| 11/24/1993 | $99,000.00 | Great Bend Duplex Housing, Ltd. |
| 11/24/1993 | $16,000.00 | Great Bend Duplex Housing, Ltd. |
| 12/17/1993 | $50,000.00 | Hutchinson Commons |
| 12/31/1993 | $ 7,425.00 | Great Bend Duplex Housing, Ltd. |
| 12/31/1993 | $ 1,200.00 | Great Bend Duplex Housing, Ltd. |
| 3/16/1994 | $19,800.00 | Great Bend Duplex Housing, Ltd. |
| 3/16/1994 | $ 9,164.31 | Hutchinson Duplex Housing Ltd. |
| 5/12/1994 | $ 1,800.00 | Great Bend Duplex Housing, Ltd. |
| 5/12/1994 | $11,137.50 | Great Bend Duplex Housing, Ltd. |
| 1/10/1995 | $88,938.94 | Rural Housing Associates |
| 11/24/1995 | $97,415.37 | Rural Housing Associates |
| 1/12/1996 | $18,325.00 | Norton Commons |
| 1/16/1996 | $18,062.00 | Liberal Commons |
| 10/11/1996 | $14,606.85 | Liberal Commons |
| 10/11/1996 | $12,236.00 | Norton Commons |

---

[57] *See* Ex. 28.

[58] *See* Ex. 27.

-37-

| | | |
|---|---|---|
| 3/13/1998 | $142,351.73 | Drake Enterprises/Sale of Mission Home |
| 4/23/1998 | $23,393.00 | Norton Commons |
| 10/5/1998 | $ 1,378.80 | Drake Enterprises |
| 10/15/1999 | $18,109.09 | Norton Commons |
| 10/29/1999 | $12,651.45 | Kanzoil |
| 12/1/1999 | $ 1,539.06 | Development Assoc. |

These deposits represent proceeds from the sale of the Mission property and payments by the depositors on their notes assigned to Teresa in 1989. It is unclear where the depositors got the money to pay Teresa, but it is quite clear that these payments were caused or made by Gary with assets that he controlled. Teresa had no financial or other involvement with any of these entities, she did not know the source of the funds, and she did not know why these funds were deposited into her accounts.

### 8. Krause's Control and Management of the PW and ML Account

While Krause and Teresa were married, the funds in the PW account were used, in part, to pay their living expenses. From time to time, Teresa would write herself checks on this account. She testified that these funds were to cover living expenses. In the course of her 2000 divorce case with Gary, she advised her attorney that Gary would only allow her to have household money if she signed five to ten blank checks on this account every month. He would then use these checks for purposes of his own. While nearly all of the PW checks are signed by Teresa, nearly all of the pay information on them is either handwritten in Gary's hand or typed. Many checks are house payments on the Mission residence, but some are direct payments to the KCTs or to life insurance companies for premiums on Gary's life insurance. Also paid from the PW account are deposits to the Gary E. Krause Trust and an investment in Spaghetti Jack's, Inc.[59] Notably, on September 22,

---

[59] Spaghetti Jack's, Inc. was a fast-food concept. There is no evidence that it was related to any of the entities discussed here.

1995, Teresa made a withdrawal of $296,675, ostensibly to purchase the Oneida house. As will be detailed later, the Oneida house was originally titled in Teresa's name and subsequently transferred to the KCT 1.

All of the transfers out of the ML account involved transfers of money to the KCTs. All but two of the transfers into this account come from funds paid by Energy Associates and two of the Section 8 partnerships. As with the PW account, all of the deposits appear to come from assets formerly owned or controlled by Gary. And, in the case of both accounts, none of the transfers of property from Gary's entities appear to reference the antenuptial agreement.

### D. Trusts

#### 1. Creation of Krause Children Trusts ("KCTs")

On December 5, 1988, while the *Barton* Tax Court case was pending and while the IRS was auditing Gary's personal returns for 1975 through 1983 and 1986, Gary established the KCT 1 for the benefit of his eldest son, Drake, as contemplated by the antenuptial agreement.[60] On December 23, 1989, after Rick's birth, Gary established the KCT 2 for Drake and Rick.[61] On May 18-19, 1990, Gary created the KCT 3, 4, and 5.[62] Drake and Rick were the beneficiaries of these five KCTs, and Krause's brother, Richard, was the named trustee for all of the KCTs.

None of the KCTs had three trustees as contemplated by the antenuptial agreement. Furthermore, the Court heard no evidence that Teresa received distributions of trust income from the KCTs after her and Gary's divorce in 2002, as the antenuptial agreement provided. Although

---

[60] Ex. 5.

[61] Ex. 17.

[62] Ex. 18, 18B, 18C.

-39-

Gary established five KCTs, the antenuptial agreement contemplated only one KCT.

The format and terms of the KCT instruments were virtually identical. All of the KCTs were ostensibly created as inter vivos, irrevocable spendthrift trusts. Each KCT contained a provision whereby Gary, as grantor, renounced his interest in the trust property and prohibited him from using trust property to meet his legal obligations:

> No part of the principal or income of any Trust established herein shall ever revert to or be used for the satisfaction of legal obligations of the Grantor. Grantor renounces for himself and his estate any interest, either vested or contingent, including any reversionary right or possibility of reverter, in the principal and income of the Trusts, and any power to determine or control, by alteration, amendment, revocation, termination, or otherwise, the beneficial enjoyment of the principal or income of the Trust.[63]

Gary testified that by 1993, he had met his $150,000 funding obligation for the KCT as contemplated by the antenuptial agreement. He made a series of deposits into KCT 1, described on his own exhibits as "gift from Gary and Teresa" or "gift from Gary."[64] These deposits continued until 1998. Some were made from the ML and PW accounts that were initially funded with assets attributable to Gary.

Article III, paragraph 3 of the KCT agreement prohibited Gary from dealing with trust property unless adequate consideration was provided; the same provision precluded Gary from borrowing money from the KCTs unless adequate interest or security was provided. Only the trustee (Gary's brother, Richard) was authorized to direct and control the investments of the KCTs.

The trustee of the KCTs possessed all of the powers enumerated in the KCT trust agreement

---

[63] Art. V, para. 2.

[64] Ex. 795-797.

as well as the powers conferred under Kansas law by the Kansas Uniform Trustees' Powers Act.[65]

### 2. Gary E. Krause Trust ("GEKT") and Krause Irrevocable Trust ("KIT")

In February 1989, Krause's father, Lawrence E. Krause, ostensibly established two trusts, the Gary E. Krause Trust ("GEKT") and the Krause Irrevocable Trust ("KIT"). Gary is the sole beneficiary of both trusts. Richard is the trustee for both these trusts. Lawrence Krause died in June of 1990. Like the KCTs, these trusts contain spendthrift language that purports to shelter their assets and income from the beneficiary's creditors.

### 3. Transfers to Trusts

#### a. KCTs

The following funds were transferred from one of the brokerage accounts to an account in the name of one of the KCTs:[66]

#### KRAUSE CHILDREN'S TRUST I

| DATE | AMOUNT | PAYOR |
|------|--------|-------|
| 12/30/1993 | $4,000 | Teresa's Paine Webber Account |
| 3/31/1998 | $50,000 | Teresa's Merrill Lynch Account |
| 3/31/1998 | $40,000 | Teresa's Merrill Lynch Account |
| 3/31/1998 | $50,000 | Teresa's Paine Webber Account |
| 12/6/1999 | $30,000 | Teresa's Paine Webber Account |

#### KRAUSE CHILDREN'S TRUST II

| DATE | AMOUNT | PAYOR |
|------|--------|-------|
| 4/6/1998 | $90,000 | Teresa's Merrill Lynch Account |
| 4/6/1998 | $50,000 | Teresa's Paine Webber Account |

#### KRAUSE CHILDREN'S TRUST III

---

[65] Ex. 822.

[66] *See* Ex. 27 and 28.

-41-

| DATE | AMOUNT | PAYOR |
|------|--------|-------|
| 4/6/1998 | $90,000 | Teresa's Merrill Lynch Account |
| 4/6/1998 | $50,000 | Teresa's Paine Webber Account |

According to Gary, he made no contributions to the KCTs after 1993 and Teresa made no contributions to the KCTs after 1998.

In addition to funds transferred from the ML and PW accounts, Krause transferred several life insurance policies to the KCTs as shown below:

| Date | Policy Names/Numbers | Payee |
|------|---------------------|-------|
| July 12, 1991 | Prudential policy 31889332 | KCT 1 |
| July 31, 1991 | New England n/k/a Met Life policies 06688112, 06615461, 08392342, 06070162, and 02526725 | KCT 4 |
| June 4, 1991 | Maccabees policy 4108-193 | KCT 4 |
| August 31, 1991 | Maccabees policy 4110-925 | KCT 2 and 3 |
| July 30, 1991 | Maccabees policy 21N7001592 | KCT 3 |
| June 8, 1994 | Aurora policy C113244399L | KCT 3 |

### b. GEKT[67]

Although Krause's father ostensibly established the GEKT, Krause and not his father transferred his existing ownership interest in the entities listed below to the GEKT.  On July 26, 1989, Krause transferred 100% of the stock of Development Associates.  On October 31, 1989, Krause transferred 100% of the stock of Fed Gas to the GEKT.

These transfers were made after the filing of the *Barton* Tax Court case in 1986 and after the IRS notified Krause about his personal audits between 1980 and 1985.  The GEKT paid no

---

[67] Ex. 6

-42-

consideration for either Fed Gas or Development Associates, which still owned real property in Reno County. Richard, the trustee, has no recollection of ever negotiating on behalf of the GEKT its acquisition of Gary's company, Fed Gas, and never asked why Gary wanted to transfer Fed Gas to the Trust. Gary exercised control over the assets of the GEKT, including the operation of Fed Gas, without any oversight by Richard, and it was Richard's practice not to inquire about the use of the GEKT assets. The GEKT is one of the trusts previously defaulted by the Court under the Sanctions Order.

### c.    KIT[68]

Upon his retirement, C. Norris Taylor was required to transfer his FIMCO stock (previously conveyed to him by Gary) to the KIT. Although he retired on February 5, 2001, he did not comply with this 1993 contractual obligation until the transfer of the FIMCO stock to the KIT in September of 2002. This transfer vested KIT with a 100 per cent ownership interest in the company. The KIT paid no consideration to Taylor for his transfer of FIMCO stock. Consistent with his conduct with other trusts, Richard was not involved when the KIT acquired FIMCO even though he was the nominal trustee. Richard testified that Gary negotiated the transaction. Richard further testified that he did not know whether the FIMCO assets in the KIT had been invested wisely because Gary totally controls FIMCO without any oversight from Richard as trustee of the KIT. This control is demonstrated by Gary's causing FIMCO to contributing hundreds of thousands of dollars to Live Wire Media Partners, LLC for an investment and acquisition of a radio station.[69] Richard played no role in evaluating this transaction, but rather delegated the entire responsibility for this

---

[68] Ex. 7.

[69] *See* Ex. 34.

Case 05-05775    Doc# 535    Filed 04/21/08    Page 43 of 112

acquisition and all the rest of FIMCO's business dealings to Gary. The KIT is one of the trusts the Court previously defaulted under the Sanctions Order.

### 4. Gary's Control over Trust Assets

#### a. Mission property

In March of 1998, approximately three years after the purchase of the Oneida home, Drake Enterprises sold the Krauses' former family home at 37 N. Mission Road. The Mission property was Gary's separate property at the time of his marriage to Teresa and was among the assets he conveyed to Teresa in November 1989 with no reference made to the antenuptial agreement and after he was fully aware that the IRS was examining several of his tax returns. In January 1996, Teresa transferred title to the Mission home to Drake Enterprises, an entity owned by her but apparently managed by Gary as president. In March of 1998, Krause, acting as president of Drake Enterprises, granted a limited power of attorney to G. Nelson Van Fleet, Esq. to close on the sale of the Mission property for Drake Enterprises. Krause signed the warranty deed as president of Drake Enterprises conveying the Mission property to the buyers, Stephen and Judy Burns. The $142,351.73 sale proceeds were deposited into Teresa's PW account. Shortly after depositing the proceeds of this sale, on March 31, 1998, three checks for $50,000 were drawn on this account, one each made payable to the KCTs 1, 2 and 3.[70]

#### b. 7711 Oneida Property and Teresa's Gift Mortgage

Teresa purchased the home at 7711 Oneida in September of 1995 using $296,675 from the PW account. According to her testimony, she acquired the money to purchase 7711 Oneida from "moneys gifted to me [by Gary]." On September 22, 1995, within weeks of the closing, Teresa

---

[70] *See* Ex. 13, 255 and 80 at bates stamp DOJ3720.

-44-

executed a promissory note and "mortgage" in favor of the KCT 5 on 7711 Oneida for $305,000.[71] Title to the property remained in Teresa's name and the KCT 5, as the mortgagee, filed the mortgage of record in the Sedgwick County Register of Deeds office.[72] Teresa never received $305,000 from the KCT 5 and she never made any payments on this note or "mortgage." At trial, Gary referred to this transaction as the "gift mortgage."

Teresa deeded her entire interest in 7711 Oneida to the KCT 1 on February 11, 1999.[73] On February 15, 1999, Richard signed and issued a check in the amount of $64,816 from the KCT 1 account to Teresa for the Oneida property.[74] This transaction resulted in KCT 1 holding legal title to the property, subject to KCT 5's mortgage. This mortgage has never been released. As explained later in this opinion, the Oneida property was held by the KCT 1 until August of 2005, when Richard was served with the IRS Collection Summons.

At times during 1999, the Krause family resided in California for the ostensible purpose of occupying a residence close to a special school for Drake. While the Krause family was in California, the Oneida premises remained vacant. Gary returned to Kansas in 2000, and on December 16, 2000, Polo Executive Rentals (previously referenced as merely a name on a checking account) leased the ground floor of the Oneida property to Gary for $371 per month.[75] Richard signed this lease in his individual capacity. On February 24, 2000, Polo leased the "lower level floor

---

[71] Ex. 204.

[72] The Court notes that the mortgage dated September 22, 1995 was not recorded until April 7, 1998. *See* Ex. 204 at bates stamp DOJ1173.

[73] Ex. 204.

[74] Ex. 41, 41B

[75] Ex. 209.

and kitchen common area" of the Oneida property to FIMCO for $971 per month.[76]  Richard signed

this lease individually and C. Norris Taylor signed for FIMCO.  Rental payments, if made at all,

were sporadic.  Richard made no effort to enforce the terms of either lease.  These leases remained

in force when Gary filed his bankruptcy petition on October 10, 2005.

As noted previously, Polo does not exist as an entity separate from any of the other entities

and is simply a name on a bank account.  Krause drafted each of the leases. Although Krause listed

Polo as a creditor on his bankruptcy schedules, this purported entity has never filed a proof of claim.

### c.    Wentworth Property-Section 1031 Tax Free Exchange

On May 4, 2005, Richard, as trustee of KCT 1, signed a contract to purchase real property

located at 14215 E. Wentworth Ct., Wichita, Kansas (the "Wentworth property") from James and

Jonna Ellis.[77]  This property abuts Crestview Country Club in an exclusive neighborhood in East

Wichita and was intended to be the new home for Gary and his sons.  The realtor who arranged this

contract was Andrew Peressin, a close friend and confidant of Gary's.  Peressin owns a home nearby

the property in question.  Under the contract, KCT 1 agreed to pay the Ellises $415,000 for the

home.  Not coincidentally, on August 5, 2005, KCT 1 conveyed title to the Oneida property to PHR,

LLC.[78]  This conveyance was purportedly made to further a tax-free exchange of property under §

1031 of the Internal Revenue Code.[79]  Perhaps more important is the fact that on July 8, 2005,

Richard Krause had received the IRS collection summons to appear and deliver to the IRS all

---

[76]  Ex. 210.

[77]  Ex. 213.

[78]  Ex. 51.

[79]  *See* p. 16, *supra.*

Case 05-05775    Doc# 535    Filed 04/21/08    Page 46 of 112

records pertaining to the trusts and, as will be discussed below, consulted with Gary about how to proceed. According to Peressin's trial testimony, he agreed to handle the sale of this home to the KCT 1 for a reduced commission in order to save both Gary and the sellers some money. Peressin recommended that since the Oneida house was held in trust by KCT 1, it could be sold by the trust and its proceeds used to acquire the Wentworth house while deferring taxation on any gain on the Oneida sale. Although Richard was supposedly the decision-maker on the Wentworth purchase, Peressin appears to have had most of the discussions concerning the deal with Gary.[80] Peressin said that Gary conferred with an individual named Wes Tenaka who is supposedly an expert in § 1031 exchanges. According to Peressin, PHR was set up to act as owner of the Oneida property and having that property held by PHR might have furthered completion of a § 1031 exchange. Peressin also testified that the sale contract would have to have been amended to reference a § 1031 transaction and that such an amendment was never made. Because there was not a party who sought to buy Oneida at this time, no tax-free exchange had yet been structured. By the time of Gary's bankruptcy filing, the Wentworth sale had not closed and after entry of the preliminary injunction in this case in December of 2005, closing became impossible.

### d.    Gary's Car Loan from KCT

In February, 2000, Krause used $13,125.18 from the KCT 1 account located at Southwest National Bank to purchase a car from Andrew Peressin for Gary's personal use. Gary testified that he used the "wrong" trust (it should have been the GEKT) to acquire the vehicle, resulting in his

---

[80] In prior hearings, Peressin has testified that he and Gary have known each other since the 1970s when they worked together at Garvey Industries, Inc. In addition, Gary and Peressin through their companies FIMCO and Lincoln, both invested in Live Wire Media. *See* Ex. 34.

needing to issue a note to KCT 1.[81]  Gary repaid the note with ten per cent interest, but the payments were not made regularly as a conventional car loan would have required and the loan payoff was ultimately deposited into a KCT 3 account, rather than KCT 1.  In addition, Gary's exhibit of this transaction showed that the KCT 3 held a lien on this vehicle even though the funds to purchase it came from the KCT 1.[82]  This transaction occurred with Richard's knowledge and cooperation.  No explanation was given why the GEKT did not simply repay KCT 1 to correct the "error" of using the wrong trust.

### e.        FIMCO Loan from KCT for Dream Swing Investment

In 1999, while his sons were age 10 and 11, Gary used KCT 1 assets to provide $25,000 in financing to Dream Swing Machine L.L.C., a limited liability company established by Gary and owned by FIMCO, to market a product used to help improve a golfer's swing.  Richard did not 'seek' the advice of any independent financial advisors before making the investment, instead he relied solely on Gary's advice.  C. Norris Taylor, who was at that time president of FIMCO, ran this company.  FIMCO acquired the patent for the swing device from a Wichita golf instructor.  Krause testified that KCT 1 loaned FIMCO $25,000 to invest in Dream Swing's manufacture and marketing of a golf swing trainer.  Under the "agreement" between KCT 1, FIMCO and Fed Gas, KCT 1 would receive an option to purchase membership equity in the LLC.  FIMCO and Fed Gas each guarantied the loan.  KCT 1 was repaid the loan, with interest.[83]

### E.        <u>Gary-Teresa 2000 Divorce</u>

---

[81]  Ex. 40.

[82]  Ex. 770.

[83]  Ex. 236, 237 and 238.

In April of 2000, Teresa filed for divorce. The divorce case quickly became contentious with Teresa filing contempt motions for Gary's failure to pay temporary support and motions to compel discovery to gain documents and discovery responses from Gary. Teresa subsequently moved to join the KCTs as parties in the divorce, contending that part of the trust estates contained marital property to which she was entitled. In her motion, Teresa alleged:

3.      Respondent [Gary] has historically funded the Trusts [KCTs] using the following method: Respondent deposited funds obtained from an unknown source in a Merrill Lynch U.S. Treasury Money Fund or a Paine Webber Resource Management account that is marital property but is held in the name of Petitioner [Teresa]. Respondent then forced Petitioner to sign blank checks drawn on such account, which Respondent completed by making such checks payable to one or more of the Trusts in amounts of Respondent's choosing. Respondent either handwrote or typed all information regarding the payee and the check amount on the blank checks that had been signed by Petitioner . . .

4.      . . . although Respondent is not the named Trustee of the Trusts, Respondent has directed and continues to direct the distribution of funds from the Trusts by completing checks written on the Trusts' bank accounts, which the Trustee merely signs at Respondent's direction. . . Respondent either handwrote or typed all information regarding the payee and the check amount on checks drawn on the bank accounts of one or more of the Trusts and signed by Trustee . . .

5.      . . . although Respondent is not a named trustee of the Trusts, Respondent retains control over the trust assets by representing to third parties that he is a co-trustee of the Trusts . . .

6.      . . . Respondent routinely borrows funds from the Trusts to pay Respondent's personal and household expenses.

7.      . . . Respondent also withdraws funds from the Trusts for his personal use by directing the trustee of the Trusts to make distributions to Petitioner's and Respondent's minor children and to Respondent's personal friends; such funds are then given to Respondent, who uses them to pay his personal and household

-49-

expenses . . .[84]

The domestic court granted the motion to join the KCTs as parties in August of 2000.[85]

During the pendency of the divorce, Teresa made a number of allegations against Gary relative to the KCTs and tax fraud, both in pleadings filed with the court and in communications with her divorce attorney. The contents of Teresa's divorce attorney's file were admitted into evidence. Those pleadings and papers, prepared contemporaneously, paint a very different picture during this time period than did Teresa's testimony at trial seven years later.

### 1.    Teresa's Allegations of Tax Fraud

In completing the client questionnaire for her divorce attorney, Teresa was unable to provide information concerning Gary's finances or income. She did indicate that he was a recovering alcoholic and was verbally and physically abusive.[86]

Consistent with the motion to join the KCTs, Teresa asserted in correspondence with her divorce attorney that she was signing blank checks on the PW and ML accounts and Gary was supplying the remaining information. In correspondence dated May 24, 2000 Teresa wrote:

> This account [Paine Webber] was in my name and my husband used it to pass money through.
> Each month he made me sign 5 to 10 blank checks before he gave me a check for groceries and household expenses.
>
> He heard me mension [sic] once that I could prove I had no knowledge of where the money went because my signature was on the line but his handwriting filled in the checks. After this, he typed all checks . . .
>
> Today, he is using this same system by having his brother - Trustee of Krause

---

[84] Ex. 193.

[85] Ex. 194.

[86] Ex. 369.

Children's Trust - sign blank checks.[87]

Teresa wrote on an example of one of the checks made payable to Gary:

> Steve [her divorce attorney], I have been signing blank checks on this account since 1992. . . . This is how I believe $ tranfered [sic] to Children's Trust.[88]

> I had to sign blank checks each month before Gary would give me the household money. At first he handwrote checks, then after I mensioned [sic] this fact on the phone, within a week checks were all blank and he typed them in later. I had <u>no knowledge</u> money was being funneled into the Trust Acct through me.[89]

During the pendency of the divorce, Teresa alleged that Gary had hidden assets in offshore accounts and threatened to report Gary to the IRS. Several veiled references to reporting Gary to the IRS are reflected in the divorce file.[90] At one point in April of 2000, Gary dared Teresa to contact the IRS and supplied her a note with the IRS contact information.[91] On August 30, 2000 (the day after the domestic court hearing on the motion to join the KCTs) Teresa finally contacted the IRS indicating that "she wants to inform on ex and all the offshore money he has, like over a million."[92] The contact was recorded in the IRS's database and was noted as having "fraud potential." No evidence was presented that Teresa had any further communications with the IRS regarding Gary after late August of 2000, and she has not voluntarily cooperated with the IRS since that time, perhaps because of the divorce "settlement" discussed below.

2. **Reconciliation and $170,000 Settlement**

---

[87] Ex. 366.

[88] Ex. 367 at T2037.

[89] Ex. 367 at T2039.

[90] Ex. 373, 374, 375.

[91] Ex. 355.

[92] Ex. 22.

-51-

In early October 2000, after the domestic court joined the KCTs in the divorce, Gary prepared a divorce settlement agreement and presented it directly to Teresa via e-mail, notwithstanding the fact that both were represented by counsel.[93]  Under this proposed agreement, Gary offered to pay Teresa $170,000 as a property settlement in exchange for Teresa's dismissal of the KCTs from the divorce case.  At the time of this agreement, Gary had no liquid assets with which to fund the $170,000 property settlement.  The Court notes, too, that $170,000 is the exact amount of money to which Teresa would have been entitled under the antenuptial agreement.[94]  It is clear, notwithstanding Gary's denials at trial, that the intention behind making the reconciliation agreement was to secure the dismissal of the KCTs from the divorce action.

Gary accomplished this settlement in the following roundabout manner.[95]  On January 31, 2001, Fed Gas (wholly owned by the GEKT and effectively controlled by Gary) paid $170,000 to Teresa, supposedly to repay a promissory note held by her.[96]  At trial, the Trustee adeptly linked this payment to Gary's proposed $170,000 property settlement obligation to Teresa and proved that it was funded by the buyout of Fed Gas's interest in the tanker, MV Sillery, completed with the help of accomplices in Switzerland.  Gary is acquainted with a money manager/attorney in Switzerland, Urs Kallen, who was associated with an entity called Brayford Investments, Ltd, a British Virgin Islands company.  Both Brayford and Fed Gas had provided financing or capital infusions to Caribbean Oil and Supply Co. (COSCO), and a British Virgin Islands company, the successor

---

[93] Ex. 356.

[94] As noted above, under the Agreement, Teresa was entitled to receive 120 $1,000 monthly payments in lieu of alimony and a $50,000 payment in lieu of child support in the event of a divorce or separation resulting from an action commenced by Teresa (as this one was).  *See* Ex. 14, ¶¶ 8 and 9(b).

[95] Tr. Vol. III, pp. 14-

[96] Ex. 358 and 359.

operator of the Sillery (flagged in Belize). Fed Gas had also loaned money to Trafalgar Marine, Ltd., a Nevis company and the owner of the Sillery, provided financing to Caribbean Atlantic Petro Co. (CAPCO), another British Virgin Islands company and the previous operator of the tanker, and provided management services. In November of 2000, while the divorce action was pending, and after Gary's October 5, 2000 e-mail to Teresa containing the proposed "Divorce Settlement Agreement" providing for the $170,000 settlement, Fed Gas entered into an agreement with Overseas Trust, a Liberian company, by which Overseas agreed to pay all obligations owed by Trafalgar, CAPCO and COSCO to Fed Gas in exchange for Fed Gas selling its stock in COSCO to Brayford, Fed Gas releasing its mortgage on the tanker, and Overseas paying additional consideration of $430,000 over 3 years to Fed Gas as "consulting fees."[97] Overseas Trust Company is run by another Swiss lawyer, Urs Trepp, who was a colleague and classmate of Urs Kallen. On January 29, 2001, CAPCO wired $336,515 to Fed Gas' account.[98] The general ledger for Fed Gas shows that the next day, January 30, Fed Gas issued a $170,000 check to Teresa.[99] Thereafter, on May 31, 2001, the state court entered an order dismissing the KCTs from the divorce case, with prejudice.[100] Teresa then allowed the divorce case to be dismissed for lack of prosecution on June 25, 2001.

Gary strenuously denied the existence of any connection between CAPCO's January 29 wire and the payment to Teresa, but the Court finds the coalescence of these circumstances too

---

[97] Ex. 24B.

[98] Ex. 360, 361

[99] Ex. 359.

[100] Ex. 362.

compelling to overlook. It is apparent that this series of transactions was executed for the sole purpose of securing the dismissal of the trusts from the Krause divorce case and in a manner consistent with Gary's habit of using other entities to pay his debts and expenses.

### 3. 2002 Divorce

Teresa's and Gary's reconciliation did not last. She testified that she and Gary separated again in 2001 and she again filed for divorce in 2002. In November of 2002, Gary sought an emergency divorce citing stress and his heart condition.[101] The domestic court granted the emergency divorce. No provisions were made in that case for child support, alimony or maintenance.

### F. Post-Divorce Activity

From the time of the 2002 divorce until the date of the bankruptcy, FIMCO ( which is owned by the KIT) and Fed Gas (which is owned by the GEKT) paid Gary's family's personal and home expenses, including phone, electricity, utilities, insurance, country club membership, medical expenses, computers, and lawn care. For example, in April 2005, FIMCO "purchased" automobiles for Krause's sons, Drake and Rick. The automobile titles identify the owner of each automobile as FIMCO. Gary lived in the Oneida home from 1995 until September 2007 except for a brief period of time when he resided in California and the house was temporarily vacant. During this twelve year period, Teresa, then KCT 1, and finally PHR, LLC held legal title to the Oneida property. Gary paid no regular rent to the owners of the Oneida property, except for a brief period in 2000 or 2001 when he had his lease with Polo discussed previously. Even after his divorce in 2002 and continuing through his bankruptcy, Gary continued to live rent-free in the Oneida home.

---

[101] Ex. 200.

Krause did not report the living expenses contributed by FIMCO or Fed Gas as income on his federal income tax returns. He reported no wages or salary for the years 1998-2004. In fact, for the five years preceding his bankruptcy, 1999-2004, Gary reported no taxable income on his federal tax return.[102] During this same period, Gary reported minimal income from his businesses and partnerships and those years of positive income were offset by net operating losses. After the year 2000 Gary held no personal bank account until 2006, after he filed bankruptcy.[103]

### 1. Domination of KCT Assets

Although he made some minor investment decisions regarding certificates of deposits, Richard was an essentially passive trustee for the KCTs, and told Gary that he wanted it that way. Richard was unaware of who contributed money to the trusts or the sources of that money, describing his conduct as "stick your head in the sand and then you don't know what is going on." Richard does no accounting on behalf of the trusts and testified that he keeps no ledgers or records beyond aggregating bank statements in binders. He keeps no computer records of the trust activity. Richard simply receives the bank statements and forwards copies of them to Gary.

Whenever Gary needed a check from the KCT accounts, Richard would "grab the checkbook out, I sign it and I take it to Gary and I say, fill it out. I don't have to look at it." Gary then completed the payee information and amount and distributed the check to the appropriate party. Richard never objected to, or disagreed with, Gary about expenditures of any of the KCT funds. He did not exercise independent oversight over how the trusts' funds were spent. Gary, not Richard, told Richard whom to pay and when. Gary selected the private schools that Drake and Rick attended

---

[102] Ex. 261, Form 1040, line 39.

[103] During discovery, Gary produced no personal banking records to the Government for the period 1999-2005.

even though the KCTs paid the tuition charges.

Richard did make investments in certificates of deposits and recommended the purchase of gold coins, but Gary initiated the KCT funding of FIMCO's investment in Dream Swing. Gary initiated the financing of his personal car with KCT funds. Either Gary or C.N. Taylor, but never Richard, prepared the annual tax returns for all of the trusts. Richard never reviewed the trusts' tax returns for accuracy, but he did sign them.

In addition, in January of 1991, Gary opened an account, the Merrill Lynch Government Fund Account, using $50,000 funds from the KCT 1 Union National Bank account.[104] The Merrill Lynch account identified Gary as co-trustee of the KCT 1: "GARY E. & RICHARD D. KRAUSE TTEE [Trustees] FBO KRAUSE CHILDREN'S TRUST #1 DTD 12-5-88"[105] when at no time was Gary ever a "co-trustee" of any of the KCTs. Gary had signatory authority on this Merrill Lynch account.[106] The account statements were sent to the Sutton Place address in Wichita where Gary maintained his business office. Richard was wholly unaware of this account until the preliminary injunction hearing in December of 2005.

Perhaps most telling to the Court with respect to the degree of control exercised by Gary over the KCTs are Exhibits 795, 796 and 797 introduced by Gary at trial. These exhibits purport to be a summary or spreadsheet of the cumulative transactions in each bank account held by KCT 1, 2 and 3. Gary prepared these exhibits in the fall of 2006 in connection with this litigation. Richard did not assist in the preparation of the exhibits. Gary supplied the source and description or purpose of

---

[104] Ex. 795, p. 2

[105] Ex. 601.

[106] Ex. 603, p. 2.

-56-

the listed transactions. It was obvious to the Court from Richard's testimony about these exhibits at trial that he had little or no personal knowledge or recollection of the recorded transactions. Richard admitted that he would have been unable to describe the debits and credits without use of the exhibits prepared by Gary. Richard did not independently verify the information recorded on the exhibits by Gary.

**2.      Reimbursement of FIMCO/Fed Gas for Krause Living Expenses and Credit Card Bills**

Between November 2004 and August 2005, Richard signed six checks from the KCT 1 bank account that Gary drafted and made payable to Fed Gas, nominally owned by the GEKT of which Gary Krause was the sole beneficiary; those checks were in the amounts of $8,920.12, $5,058.73, $2,831.62, $2,282.42, $6,288.43, and $14,700.00.[107] At his deposition, Richard did not know why these checks were paid to Fed Gas, and admitted that he did not exercise much independent oversight on how the money from KCT 1 was spent. At trial, Richard testified that the checks were used to reimburse Fed Gas for Drake and Rick's expenses and other living expenses.

Prior to these checks reimbursing Fed Gas, FIMCO paid Gary's living expenses, including utilities, insurance, credit card bills, Crestview Country Club bills, phone bills, housecleaning or maid service, and trash service.[108]

**3.      Lease of Oneida to FIMCO and Krause**

As noted above, Gary claims that he and FIMCO "lease" space at 7711 Oneida from Polo Executive Rentals; however, Polo does not exist as an entity separate from any of the other entities and is simply a name on a bank account. Gary drafted the leases, which Richard signed. Neither

---

[107] Ex. 86.

[108] *See e.g.,* Ex. 330-338, 342-352.

Gary nor FIMCO paid rent to Polo on a regular basis, and Richard never enforced the terms of the lease agreements. And, although Gary listed Polo as a creditor, this purported entity never filed a proof of claim. Gary lived at the Oneida house for a twelve year period, mostly rent free.

## G.     IRS Collection Activity

Despite huge tax debts and little or no taxable income on his 1998 through 2004 tax returns, Krause continued to financially support his family. Teresa did not work outside the home after 1990 and suffered from scleroderma, a debilitating medical condition, so the family's financial support did not come from her. Additionally, Krause's sons, born in 1988 and 1989 are both full-time students, and, until this year, both were minors, so the family's financial support did not come from them. Despite subpoenaing banks (including Bank of America, Commerce Bank, and Intrust Bank) and requesting personal bank account records from Gary, the United States received no evidence that Krause had maintained a single personal bank accounts from 1986 through 2005, despite Gary's protestations to the contrary.

### 1.     July 2005 Collection Summons

As discussed *supra*, on July 8, 2005, IRS Revenue Officer Waterbury served a collections summons on Richard, as trustee, to appear at the IRS offices in Wichita on August 5, 2005 and provide, *inter alia*, all records in his possession pertaining to the GEKT and the KCTs.[109]

### 2.     Creation of PHR, LLC and Transfer of Oneida Property

Approximately one week after filing the petition to quash the IRS collection summons, on August 5, 2005, Richard signed a deed conveying 7711 Oneida from KCT 1 to a newly formed

---

[109] Ex. 253, pp. 46-48. *See also* pp. 23-24, *supra*.

company named PHR, LLC.[110]  The Operating Agreement for PHR, LLC was signed two days later, on August 7, 2005.[111]  The members of PHR were KCT 1, 2 and 5.  Richard left all the details of the PHR transaction to Gary.  As noted above, Gary attempts to "explain" this transfer by contending that it was necessary to get the property out of the trust to effectuate a tax-free exchange for the Wentworth property.  The Court previously defaulted PHR under its Sanctions Order.

### 3.    Krause Files Bankruptcy

On October 10, 2005, less than two weeks after the Government sought to enforce the IRS collection summons, Gary sought relief from the IRS summons by filing his chapter 7 bankruptcy petition.  By the time he filed bankruptcy, Krause had transferred nearly all of his premarital holdings, including his Mission home, Development Associates, Inc. (which held real property in Reno County), Fed Gas, FIMCO, and his or Kanzoil Corporation's interest in Quivira Associates (which held the hunting lodge in Stafford County).  Those Krause entities that were not transferred, or encumbered, were essentially defunct.

According to the schedules and statement of financial affairs filed by Krause, he received an income of approximately $5,500 for the first nine months of 2005 but the source of that income was not identified in question 1 of the Statement of Financial Affairs.  On question 2, Krause represented that he held or controlled two vehicles, one owned by Drake Enterprises, Inc. (a 1990 Mazda Miata) and one owned by FIMCO (a 2006 Jeep Grand Cherokee).  On question 18, Krause identified several businesses in which he was currently involved: Norton Commons, Ltd.; Liberal Commons, Ltd.; Rural Housing Associates, Inc.; Barton Limited Partnership; FIMCO; and Fed Gas.

---

[110]  Ex. 51.

[111]  Ex. 50.

On Schedule A, Krause states he owns no real property. On Schedule B, Krause listed no bank accounts and no vehicles. He did identify his ownership interests in Norton Commons, Liberal Commons, Rural Housing Associates and Barton as well as his beneficial interest in the GEKT and the KIT. Other than creditors IRS and Kansas Department of Revenue, Krause's other debts included several minor medical expense claims, his guarantee obligation on Norton Commons estimated at $120,000, and Polio [sic] Executive Rentals/KCT #1 for his residential lease of 7711 Oneida in the amount of $21,518. On Schedule I, Krause listed his occupation as a self-employed entrepreneur with no monthly income. He represented that his living expenses were paid with distributions from the GEKT. Krause declared monthly expenses of $2,171 on Schedule J.

Krause amended Schedule B on November 23, 2005 to add his working interest in an oil and gas lease in Stafford County. He amended no other schedules until August 23, 2007, after the Sanctions Order was issued defaulting and declaring PHR, LLC (owner of 7711 Oneida) to be his nominee. At that point, he amended Schedule C and filed a provisional claim of homestead exemption with respect to the 7711 Oneida property,[112] even though PHR, L.L.C. nominally owned it on the date Krause filed his bankruptcy petition.

### 4. Government Commences this Adversary Proceeding

The Government filed the instant adversary proceeding on November 1, 2005. The Court granted the Government's application for a preliminary injunction on December 2, 2005. Since that time, the funds and assets in the KCTs have been frozen, preventing their transfer, distribution, or exchange.

During the pendency of this case, Krause's personal and financial situation has changed.

---

[112] No. 05-17429, Dkt. 71 and 74.

Following the Sanctions Order, Krause was evicted from the 7711 Oneida property and the property was turned over to his bankruptcy trustee in September of 2007. He now resides with his two sons at 9302 Shannon Way Circle, an affluent neighborhood in east Wichita. His ex-wife Teresa occupies the basement of this rental property. According to Gary, Teresa located this rental property when she returned from Arizona in 2006, and she has lived at this address since that time. Gary stated that he pays full rent. Teresa testified at trial that she had lived in the Shannon Way basement for about three months. She indicated that the rent was $2,500 per month. There is no written lease, and other than identifying the landlord as a retired dentist, Teresa could not identify the landlord. In late summer or fall of 2006, Krause began receiving $8,000 per month as a consulting fee from Omnimedica, a Swiss entity with whom he has collaborated on the anti-aging project.

## III. ANALYSIS AND CONCLUSIONS OF LAW

Before addressing the merits of the plaintiffs' claims, brief comment about the credibility of the principal trial witnesses is in order. In the factual findings, the Court assessed Teresa Briggs' credibility and recall of events at trial as poor, whether attributable to memory loss, to her not being a detail person, or to some form of influence exerted over her to cause her to dramatically change her trial testimony when compared with information she provided during her 2000 divorce. Teresa gave no reasonable explanation why she continues to reside in the same house with Gary, albeit in the basement, seven years after their bitter first divorce proceeding and allegations of Gary's abuse during their marriage. The quality of her recollection, combined with the Court's suspicion that she remains under Krause's influence, significantly devalues the weight this Court elects to give to her trial testimony.

Richard Krause testified at length about the administration of the KCTs. Little of that

-61-

testimony, however, was based upon his personal knowledge.  Much of his testimony regarding the KCTs, which was elicited by Gary, came from his reading from exhibits prepared by Gary or from the trust instruments themselves.  In addition, some of Richard's trial testimony contradicted his earlier deposition testimony.  Having heard Richard testify at previous hearings concerning some of these same matters, it was clear that Richard had been "coached" on his new-found knowledge regarding some of these same events.  The Court discounts much of Richard's trial testimony as incredible.

This brings us to Gary.  The Court credits Gary for his intellect and shrewdness, but very little for his honesty.  After hearing only parts of this saga in pretrial matters, the Court was eager to hear Gary's explanations for the transfers and transactions at issue.  Very little was explained.  Gary's explanations and justifications of the manner in which he conducts his financial affairs beggar belief.

Having commented on the evidence and the reliability of Krause's key witnesses, the Court now turns to the legal claims of the Government and the Trustee.

A.    **Dischargeability of Krause's Tax Debt Under 11 U.S.C. § 523(a)(1)(C).**

The Government first seeks a determination that Krause's substantial income tax debt should be excepted from discharge under § 523(a)(1)(C) of the Bankruptcy Code.  That subsection excepts from discharge any debt which is a tax (1) with respect to which the debtor made a fraudulent return; or (2) which the debtor has willfully attempted to evade or defeat in any manner.[113]  The Government has the burden of proving by a preponderance of the evidence that Krause's tax debt

---

[113]  Section 523(a)(1)(C) contains two separate exceptions to discharge that are to be read in the disjunctive. *In re Tudisco,* 183 F.3d 133, 137 (2d Cir. 1999); *In re Epstein,* 303 B.R. 280 (Bankr. E.D. N.Y. 2004).

should be excepted from discharge.[114]  The Government asserts that it has proven both prongs of §

523(a)(1)(C) in this case.

### 1.    Fraudulent Tax Returns

As noted in the Court's ruling on the Government's motion for summary judgment on this

claim, there are no Tenth Circuit cases addressing the fraudulent return prong of § 523(a)(1)(C) but

there are cases from other circuits.  The legal principles and standards emanating from those cases

are recited here.  The elements of a fraudulent return are (1) knowledge of the falsehood of the

return; (2) an intent to evade taxes; and (3) an underpayment of the taxes.[115]  In general, courts

considering whether a return is fraudulent under the discharge exception of § 523(a)(1)(C) apply the

same standards as determining whether to impose the civil fraud penalty under § 6663 of the Internal

Revenue Code.[116]  The courts have identified certain activities by the taxpayer as "badges of fraud"

from which to infer or  circumstantially prove fraudulent intent.  Those badges include: (1)

understatement of income on a consistent basis; (2) failure to maintain adequate records; (3) failure

to file tax returns; (4) implausible or inconsistent behavior by the taxpayer; (5) concealing assets;

(6) failure to cooperate with taxing authorities; and (7) unreported income from an illegal activity.[117]

With these legal principles, the Court now turns to Krause's tax returns in question.  It is

not  readily apparent which returns the Government contends were fraudulent and therefore the

---

[114] *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L.Ed. 2d 755 (1991).

[115] *In re Fliss*, 339 B.R. 481, 486 (Bankr. N. D. Iowa 2006); *In re Schlesinger*, 290 B.R. 529, 536 (Bankr. E.D. Pa. 2002).

[116] 26 U.S.C. § 6663.  *See Berkery v. Comm'r, I.R.S.,* 192 B.R. 835, 841 (E.D. Pa. 1996), *aff'd* 111 F.3d 125 (3d Cir. 1997); *In re Sommers*, 209 B.R. 471, 481 (Bankr. N.D. Ill. 1997); *In re Carey*, 326 B.R. 816, 821 (Bankr. E.D. Cal. 2005); *In re Fliss*, 339 B.R. 481, 486 (Bankr. N.D. Iowa 2006).

[117] *Berkery, supra* at 841; *Sommers, supra* at 481; *Carey, supra* at 822;.*Fliss, supra* at 487 (identifying additional badges of dealing in cash and failing to make estimated tax payments).

Court collectively examines all of the returns that generated Krause's income tax liability.[118] As discussed below, some of the badges of fraud are present but some are not.

This Court has the benefit of the Tax Court's opinion in Krause's challenge to the deductions disallowed by the IRS with respect to the enhanced oil recovery partnerships and the resultant tax liability flowing to the partners.[119] This opinion relates to Krause's returns for tax years 1975-1983. As noted previously, the audit of Krause's returns for these years pertained to multiple tax issues, some of which related to deductions he took in connection with operating losses of his enhanced oil recovery partnerships, but also included the failure to report as income, personal expenses paid by his wholly owned company Energy Associates, Inc. in years 1981, 1982 and 1983. The Tax Court findings, as summarized in this Court's summary judgment ruling,[120] noted that the partnerships' debt was structured in a manner to guarantee the greatest possible tax benefits to the investors (deductions and operating losses) without any legitimate profit motive. In upholding the IRS determination of the tax deficiencies and penalties, the Tax Court declined to enhance Krause's taxes for negligence or intentional disregard of regulations, as it could have done under 26 U.S.C. § 6653. While it is apparent from the Tax Court's opinion that the businesses in which Krause was involved, and that generated his massive tax debt, were likely shams devised without any profit motive, no actual fraud is attributed to him, nor is it asserted that the returns he filed as tax matters partner were

---

[118] In closing argument, the Government focused on the 1986 return (Norton and Liberal Commons bad debt loss) and the 1994 and 1995 returns.

[119] *Krause v. Comm'r,* 99 T.C. 132 (1992), *aff'd sub nom., Hildebrand v. Comm'r,* 28 F.3d 1024 (10th Cir. 1994), *cert. denied,* 513 U.S. 1079 (1995).

[120] Dkt. 494, pp. 33-34.

false per se.[121]

The Court cannot conclude that the Government met its burden of proof that all of Krause's returns for years 1975 and 1978 through 1983 were fraudulent. While he obviously claimed deductions that the IRS disallowed in connection with the oil recovery partnerships and sought to maximize his tax benefits from participation in the partnerships, the Court can discern no evidence that he acted with the requisite fraudulent intent.[122] The disallowed deductions resulted in additional income and an attendant tax liability, but there was no proof that Krause recognized the impropriety of the claimed deductions during the years they were taken.[123] It was not until the *Barton* test case was adjudicated that the improper deductions were determined. However, Krause did fail to report as income personal expenses paid by his corporation for three consecutive years in 1981, 1982 and 1983. This is the type of unreported income the courts view with disfavor and provides some evidence of the first badge of fraud.[124] The Government did not, however, elicit directly from Krause that he understood at that time that he needed to report these paid personal expenses as income.[125] None of the unreported income was attributable to an illegal activity by Krause, and therefore, the seventh badge of fraud is not present. Nor are the second, third, or fourth

---

[121] Even though there was no fraud penalty or finding of fraud in the Tax Court case, the Government is not precluded from asserting and proving a fraudulent return in the bankruptcy proceedings. *See Levinson v. United States*, 969 F.2d 260 (7th Cir. 1992), *cert. denied*, 506 U.S. 989 (1992); *In re Carey*, 326 B.R. 816 (Bankr. E. D. Cal. 2005).

[122] *See Berkery v. Commissioner, I.R.S.*, 192 B.R. 835, 839 (E.D. Pa. 1996) (Finding of liability for income tax deficiency alone is not a finding of fraud for dischargeability purposes.).

[123] *See Schlesinger, supra* at 540 (A tax obligation arising from improper tax deductions will be dischargeable if the impropriety of the deduction was unknown to the debtor when his return was filed.).

[124] *Carey,* 326 B.R. at 823 (Under reported income was result of taxpayer's use of sham trusts to avoid personal tax liability).

[125] But it is reasonable to assume that Krause, as a licensed lawyer, possessed this knowledge.

badges of fraud present. There was abundant evidence of the fifth and sixth badges of fraud. Krause employed a pervasive scheme to transfer assets out of his name, individually, and used his companies, his wife, and the trusts to fund his lifestyle and his family's living expenses.[126] He failed to cooperate with the IRS in that he directed his brother's course of action to quash the IRS's collection summons, resisted the Government's discovery of assets in this adversary proceeding, and affirmatively spoiled electronic evidence during the pendency of the adversary.[127] Although it is a close question, the Court concludes that the Government has not proven by a preponderance of the evidence that the returns for 1975, 1978, 1979, 1980, 1981, 1982, and 1983 were fraudulent.

This brings us to Krause's tax return for the year 1986 and the challenge to his bad debt losses claimed with respect to his real estate partnerships Liberal Commons, Ltd. and Norton Commons, Ltd. These notes were assigned to Teresa on November 29, 1989 soon after Krause received notice that his 1986 tax return was being adjusted. The Government questions Krause's claiming the notes receivable as bad debt in 1986, but then transferring them to Teresa in 1989. Although Krause also challenged the IRS's deficiency and petitioned the Tax Court, this tax liability was resolved by agreement, along with the 1975-1983 tax years. Krause ultimately agreed to the amount of deficiency determined by the IRS with respect to his 1986 return. It does not appear that the 1986 return involved any unreported income as the 1981, 1982 and 1983 returns did.

Krause testified that the notes receivable he initially claimed were uncollectible later turned

---

[126] *Carey*, 326 B.R. at 824 (Taxpayer's use of sham trusts was designed to hide income and avoid personal tax liability while retaining complete control over the assets and income); *Fliss*, 339 B.R. at 487 (noting that fraudulent intent may also be inferred from making transfers to family members, making transfers for inadequate consideration, and making transfers that reduce the taxpayer's assets subject to execution);

[127] *Carey*, 326 B.R. at 823 (Taxpayer filed frivolous pleadings and IRS was required to enforce summonses and defend against motions to quash those summons.).

-66-

out to be partially collectible as a result of his participation in a settlement of class action litigation with the federal government over these Section 8 housing projects. Indeed, as noted above, Teresa received substantial payments on these notes after 1989. What the Court did not hear, however, is that Krause knew or believed the debts were actually collectible at the time he claimed them as uncollectible and deducted them as bad debt losses. The lack of this evidence negates the first badge of fraud - that he knew the return was false when it was filed. The fact that he ultimately settled with the IRS and conceded the IRS's position, does not, of itself, establish that he knew the return was false.

The best evidence on the first badge of fraud may be the fact that Krause later assigned (in 1989) the Liberal Commons and Norton Commons notes to his wife.[128] Assuming these were the same debts referenced on the 1986 return, this suggests either that Krause believed the debt was collectible some three years later or that Krause knew the notes were worthless when he assigned them to his wife. The Government has not proven that Krause knew the debts were collectible when he filed his 1986 tax return. The Court concludes from its review of the above badges that the same badges are present for the 1986 return as the previously analyzed returns but they are not enough for the Court to find the 1986 return was fraudulent. It is, however, a close question.

Finally, the Court addresses Krause's tax returns for the years 1994 and 1995. The tax liabilities resulting from these returns are attributable to Krause's net operating loss deductions carried forward from the EOR partnerships. The Court concludes that these years' returns stand on a different footing. Krause had received the *Barton* Tax Court decision (in 1992) and the Tenth Circuit Court of Appeals decision affirming the Tax Court (in 1994) before he filed his 1994 and

---

[128] It was not clearly shown at trial that the notes assigned to Teresa in 1989 represented the same debt claimed as bad debt losses on the 1986 return.

Case 05-05775   Doc# 535   Filed 04/21/08   Page 67 of 112

1995 returns.  Thus, he was clearly on notice that the deductions for his partnership investments were improper and were being disallowed.  Nevertheless, he continued to claim these deductions. The evidence at trial demonstrated that Krause did not inform his CPA David Holste of the adverse Tax Court decision, and Mr. Holste testified that he would have prepared these returns differently had he known of the adverse tax court ruling.  Given the presence of these additional badges of fraud,  the Court concludes that Krause's 1994 and 1995 returns were fraudulent and that the tax liability associated with these years should be excepted from discharge.

### 2.    Willful Evasion of Collection

The Court next considers the willful evasion prong of § 523(a)(1)(C).  It does so in light of the fresh start policy of the bankruptcy laws.  The willful evasion discharge exception contains both a conduct element and a mental state requirement.[129]  The conduct element is satisfied by a showing that debtor engaged in affirmative acts to avoid payment or collection of taxes, either through commission or omission.[130]  Unlike the fraudulent return exception to discharge, the willful evasion exception does not require proof that the debtor acted with fraudulent intent.[131]  Rather, a debtor's actions are willful if they are done "voluntarily, consciously or knowingly, and intentionally," a less stringent standard than fraud.[132]

---

[129] *In re Jacobs*, 490 F.3d 913, 921 (11th Cir. 2007); *In re Tudisco*, 183 F3d 133, 136 (2d Cir. 1999).

[130] *Jacobs,supra; Tudisco, supra* at 137.

[131] *See In re May*, 251 B.R. 714, 718-19 (8th Cir. BAP 2000); *In re Swenson*, 381 B.R. 272, 299 (Bankr. E.D. Cal. 2008).

[132] *Dalton v. I.R.S.,* 77 F.3d 1297, 1302 (10th Cir. 1996), *citing Toti v. United States (In re Toti),* 24 F.3d 806, 809 (6th Cir. 1994).  *See also, In re Jacobs*, 490 F.3d 913 (11th Cir. 2007); *In re Tudisco*, 183 F.3d 133 (2d Cir. 1999); *In re Fegeley*, 118 F.3d 979 (3rd Cir. 1997); *In re Birkenstock,* 87 F.3d 947 (7th Cir. 1996); *In re Bruner*, 55 F.3d 195 (5th Cir. 1997); *In re May*, 251 B.R. 714 (8th Cir. BAP 2000).

-68-

*Dalton v. I.R.S.*[133] is the leading Tenth Circuit authority on this exception. There, the Court of Appeals held that more than non-payment of one's taxes is required to establish a willful evasion.[134] It also held that concealment of assets to avoid payment or collection of taxes may constitute a willful evasion.[135] *Dalton* quoted with approval the following passage from *Spies v. United States*, interpreting the similar phrase "a willful attempt *in any manner* to evade or defeat" found in the Internal Revenue Code:

> Congress did not define or limit the methods by which a willful attempt to defeat and evade might be accomplished and perhaps did not define lest its effort to do so result in some unexpected limitation. Nor would we by definition constrict the scope of the Congressional provision that it may be accomplished "in any manner." By way of illustration, and not by way of limitation, we would think affirmative willful attempt may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal.[136]

The *Dalton* court concluded that the transfer of property by debtor to his wife with knowledge of a pending tax investigation constituted a concealment of assets and a willful evasion of a tax within the meaning of § 523(a)(1)(C).[137]

The evidence presented at trial demonstrates that Krause engaged in multiple affirmative acts to conceal his assets and avoid payment or collection of taxes.[138] He transferred his companies

---

[133] 77 F.3d 1297 (10th Cir. 1996).

[134] *Id.* at 1301.

[135] *Id.* at 1302.

[136] *Dalton*, 77 F.3d at 1301, *quoting Spies v. United States*, 317 U.S. 492, 499 (1943).

[137] *Id.* at 1302-04.

[138] *See May*, 251 B.R. at 718 (Conduct aimed at concealing income and assets constitutes a willful attempt to evade or defeat taxes.).

-69-

(Development Associates, Inc., Fed Gas and FIMCO) to trusts while he continued to run their businesses. He used Fed Gas and FIMCO to pay his personal and family living expenses. His companies held title to his vehicles. He transferred notes owed to him by his companies to his wife and ran payments on those notes through accounts set up in his wife's name (ML and PW accounts) but controlled by him.[139] He opted to keep no bank or other financial accounts or real property in his own name, lest the IRS find and levy against these accounts or property. And, all of these transfers occurred with no consideration and at a time when Krause was embroiled in tax litigation with the IRS.[140] He transferred his Mission home to his wife, notwithstanding the antenuptial agreement, and then had their next home (7711 Oneida), which was purchased with the funds paid on supposedly worthless promissory notes, titled in only his wife's name. Teresa later transferred the home to the KCT 1 which, in turn, conveyed it to PHR, LLC on the eve of bankruptcy and after the IRS had served its collection summons on the KCTs.[141] Krause lived in the Oneida home rent-free, even after his divorce, for all but a brief period of time. The Court could regurgitate other conduct by Krause that corroborates his intent to avoid payment or collection, but the picture is crystal clear.[142] Beginning in 1989, Krause "arranged" his assets so that they would be held by his

---

[139] *See In re Gardner*, 360 F.3d 551, 558 (6th Cir. 2004) (Placing assets in the name of others amounts to an affirmative act of tax evasion; debtor used nominee checking accounts.)

[140] *See Birkenstock, supra* at 951-52 (Debtors created family trust and conveyed all property to the trust and attempted to attribute personal income to the trust while disputing their tax liability.).

[141] *See In re Swenson*, 381 B.R. 272 (Bankr. E.D. Cal. 2008) (Debtors were actual, beneficial owners of residence and it was property of their bankruptcy estate, even though debtors' father and sister held title to property, father and sister paid little or no consideration for the residence, debtors paid the repair and maintenance costs, debtors maintained exclusive possession of residence, and father and sister acquired title to residence when debtors were facing $500,000 in federal income tax liabilities.).

[142] To mention just a few, Krause reported no taxable income for years 1999-2004. Krause had no personal bank account after 2000. Krause owned no home or vehicles. Krause lived in the Oneida property rent-free and continued to reside with his ex-wife after their divorce. In fact, Krause's conduct is similar in many respects to the debtor's conduct in *In re May,* 251 B.R. 714 (8th Cir. BAP 2000).

wife or trusts and beyond the reach of the IRS and its federal tax liens.[143]  Even though title was held

by others or transferred to his wife or the trusts, Krause retained control over them, and personally

benefitted from the assets.[144]

    In addition, the evidence is overwhelming that Krause acted voluntarily, consciously,

knowingly and intentionally.[145]  While Krause suggests that he observed the formalities required for

his companies and the trusts, which he clearly learned how to do from his legal training, it does not

negate the fact that his transfers and conduct were voluntary, knowing and intentional.  As the Tenth

Circuit noted in *Dalton*:

        To permit the true nature of a transaction to be disguised by mere formalisms,
    which exist solely to alter tax liability would seriously impair the effective
    administration of the tax policies of Congress.[146]

    The Court is also mindful of Krause's variously stated motives for his conduct.  He contends

that he transferred property to his wife out of love and affection and to induce her to stay home and

raise their then young boys.  He also claims these transfers were done to protect his wife and family

were he or Teresa to succumb to their respective health problems.  But those transfers ran directly

---

[143]  *See In re Griffith*, 206 F.3d 1389, 1396097 (11th Cir. 2000) (Section 523(a)(1)(C) applies to debtor's conduct occurring after the assessment to avoid payment of the tax; debtor's intra-family transfers of property for little or no consideration was a willful evasion of payment of taxes.); *In re Klayman*, 333 B.R. 695 (Bankr. E.D. Pa. 2005) (Systematic course of conduct by debtor over 25-year period where he transferred real property to third parties, failed to maintain bank accounts, used his corporation to pay personal debts and to hold automobiles satisfied conduct element of willful attempt to evade taxes; debtor engaged in this conduct without his lifestyle suffering and he benefitted from the assets without owning them.)

[144]  *See Bruner,* 55 F.3d at 200  (Debtor created a shell entity to hide income and assets aimed at avoiding the imposition of a tax assessment.).

[145]  *Birkenstock*, 87 F.3d at 951 (Debtor's conduct prior to the tax year in question was sufficiently related in time and character to be probative regarding whether the debtor's actions were deliberate evasion.); *Epstein, supra.*

[146]  *Dalton*, 77 F.3d at 1304 quoting *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S. Ct. 707, 708, 89 L.Ed. 981 (1945).

counter to his and his wife's stated intent in the executed antenuptial agreement and that agreement was never rescinded. He retained control over property that he transferred to Teresa. For example, there was no plausible reason to establish separate accounts in his wife's name to receive note payments on notes that Krause assigned to his wife. He could have just as easily made those note payments to her personal bank account. No lucid explanation or motive for his wife's execution of a so-called "gift mortgage" on the Oneida property has ever been given by Krause or his ex-wife. His ex-wife couldn't even describe the transaction or its purpose, let alone provide a legitimate non-tax evasion motive. No consideration exchanged hands for the mortgage. Krause even ignored provisions of the antenuptial agreement in the creation and funding of the KCTs. While the initial establishment of two trusts may have been made pursuant to the antenuptial agreement for the benefit of the children, it is apparent that the KCTs also served the dual purpose of "parking" Krause's assets out of sight and reach of the IRS. Further, the manner in which the KCTs were administered belies any claim that Krause had no control over them. If health concerns drove these transfers, Krause could as easily have transferred the property himself to a trust specifically designed to protect the children or made a will for that purpose. Instead, he chose a labyrinthine disposition of assets that had the additional benefit of stymying his principal creditor, the IRS, for nearly two decades.

Based upon the quality, if not the sheer quantity, of evidence presented by the Government, the Court is left with the inescapable conclusion that Krause engaged in a long-term and pervasive pattern of conduct of willfully evading the payment or collection of his income tax liability. He is not the honest but unfortunate debtor who is entitled to bankruptcy relief. The entirety of Krause's income tax liability should be excepted from discharge as a willful evasion under § 523(a)(1)(C).

-72-

**B.    KCTs as Krause's Nominees**

This brings the Court to the crux of the trial – whether the KCTs should be declared to be Gary Krause's nominees, subjecting them to turnover of their assets as property of the bankruptcy estate, to which the Government's federal tax liens attach.

Throughout these proceedings the Government and the Trustee have relied upon *United States v. Dawes*[147] in support of their nominee claim. In that case, the United States District Court for the District of Kansas recognized and applied the nominee theory in a federal tax lien case.[148] The District Court held that trusts in which the taxpayers had transferred their property were nominees of the taxpayers and the property held by the trusts were subject to federal tax liens. The District Court applied five factors to determine whether a trust serves as a taxpayer's nominee:

> 1) the taxpayer's control over the nominee and its assets; 2) the use of trust funds to pay taxpayer's personal expenses; 3) the relationship between the taxpayer and the nominee; 4) the lack of internal controls and the lack of nominee oversight of taxpayer's actions; and 5) the lack of consideration for transfers of property.[149]

Analyzing and applying those factors, the District Court found:

> . . . that the Daweses retained control over the nominee and its assets. As already noted, they freely used the trust funds for their personal expenses. There is no indication that they had other sources to pay for these personal expenses. They maintained no personal checking accounts for such expenses. The trustees exercised only superficial control and oversight of the Daweses' transactions. Additionally, the Daweses received no consideration for the transfer of their property. As a result, the court must find that the Plainsman served as the nominee of the Daweses.[150]

---

[147] 344 F. Supp. 2d 715 (D. Kan. 2004), *aff'd* 161 Fed. Appx. 742 (10th Cir. Dec. 5, 2005).

[148] *Dawes* was decided on the government's motion for summary judgment, unopposed by the defendants. *Id.* at 717.

[149] *Id.* at 721, citing *Shades Ridge v. United States*, 888 F.2d 725, 729 (11th Cir. 1989) and *Loving Saviour Church v. United States*, 728 F.2d 1085, 1086 (8th Cir. 1984).

[150] *Id.* at 722.

-73-

More recently, the Tenth Circuit Court of Appeals issued a published decision in *Holman v. United States*[151] that explored the nominee theory in more detail. *Holman* provides this Court with clear guidance for analyzing a nominee claim in the federal tax lien setting. As the Tenth Circuit stated:

> The nominee theory focuses upon the taxpayer's relationship to a particular piece of property. [citation omitted] The ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining some or all of the benefits of true ownership.[152]

Under § 6321 of the Internal Revenue Code, the IRS may enforce a tax deficiency by imposing a lien on any "property" or "rights to property" belonging to the taxpayer.[153] Thus, if a third party holds property as the taxpayer's nominee, the IRS's federal tax lien attaches to that property.[154]

The *Holman* court explained that application of the nominee theory requires a two step process involving both state and federal law.[155] First, the court must examine state law to determine if the taxpayer has a property interest or rights in the property the IRS seeks to reach.[156] If so, then the court must determine whether under federal law the nominee theory should apply, using the five

---

[151]   505 F.3d 1060 (10th Cir. 2007)

[152]   *Id.* at 1065.

[153]   26 U.S.C. § 6321. The reach of the federal tax lien extends to real or personal property, property exempt under state law, fraudulently transferred property, and property not unilaterally alienable, such as spendthrift trusts. *See Drye v. United States,* 528 U.S. 49, 59, 120 S. Ct. 474, 145 L.Ed. 2d 466 (1999) (exempt status under state law does not bind the federal collector); *United States v. Craft,* 535 U.S. 274, 122 S. Ct. 1414, 152 L.Ed 2d 437 (2002) (federal tax lien attaches to property that is subject to restraints on alienation); *Bank One Ohio Trust Co., N.A. v. United States*, 80 F.3d 173, 176 (6th Cir. 1996) (tax lien attached to taxpayer's interest in spendthrift trust notwithstanding restraint on alienation).

[154]   505 F.3d at 1065.

[155]   *Id.* at 1067-68.

[156]   *Id.* at 1067, citing *Drye v. United States,* 528 U.S. 49, 58, 120 S. Ct. 474, 145 L.Ed. 2d 466 (1999) and *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005).

-74-

factors recognized above.[157]  Because the lower court in *Holman* did not undertake the state law inquiry, the Tenth Circuit vacated the district court's decision and remanded the case for this determination.[158]

The Court now looks at the present case in light of *Holman's* teachings, and finds that the Government and the Trustee have glossed over the state law inquiry required by *Holman*.[159]  They appear to have analyzed the nominee claim looking exclusively at federal law and the five factors for imposing a nominee lien on the KCTs.  Accordingly, this Court will endeavor to determine whether Krause has a property interest or rights in the KCTs to which a tax lien could attach.

### 1.    Krause's Property Interest in the KCTs Under Kansas Law

Courts have applied a number of state law legal theories to establish the taxpayer's property interest in nominee cases.[160]  Some courts have looked to federal law for guidance in determining whether a nominee relationship exists if a state's law on nominee ownership is undeveloped.[161]  The Government and the Trustee have not clearly articulated Krause's property interest in the KCTs

---

[157] *Id.* at 1068.

[158] *Id.* at 1067.

[159] *See* Dkt. 407, pp. 42-44.

[160] *See e.g. Spotts v. United States*, *supra, on remand* 2007 WL 2137784 (E.D. Ky Jul. 23, 2007) (constructive trust under Kentucky law); *Dawes, supra* (fraudulent conveyance under Kansas law); *Drye, supra* (interest as an heir to mother's estate that taxpayer attempted to disclaim was property under Arkansas law); *United States v. Craft*, 535 U.S. 274, 122 S. Ct. 1414, 152 L.Ed. 2d 437 (2002) (taxpayer who was a tenant by the entirety possessed property or rights to property under Michigan law); *United States v. Novotny*, 184 F. Supp. 2d 1071 (D. Colo. 2001), *aff'd* 71 Fed. Appx. 792 (10th Cir. 2003) (Because transfers of property to trust did not comply with Colorado statute, the property was not legally conveyed and trusts did not hold legal title to property; taxpayers remained fee simple owners of property); *United States v. Thornton*, 859 F.2d 151 (Table) (4th Cir. 1988) (resulting trust under Maryland law).

[161] *See May v. United States*, 2007 WL 3287513 (11th Cir. Nov 8, 2007) (Alabama law failed to delineate a test for determining the "real intent" of a title transfer between spouses); *Scoville v. United States*, 250 F.3d 1198 (8th Cir. 2001) (Court looked to Missouri law "badges of fraud" for determining whether a conveyance is fraudulent since those elements were similar to determining whether a property holder is a nominee under federal law).

under state law, but in their summary judgment papers, they asserted that Krause may be found to be an equitable owner of the KCTs, citing the Tenth Circuit case of *United States v. Miller Bros. Const. Co.*[162]

The Court has carefully read *Miller Bros.* and is not convinced that it supplies the state law predicate necessary to establish the property interest of Krause *in this case*. In *Miller Bros.* the government sought to foreclose its federal tax liens against real property. The taxpayer purchased the property in question in 1952 but never took legal title to the property. He had the seller of the property deed it to his brother-in-law and sister-in-law. The property was subsequently mortgaged as security for a loan made to the taxpayer. Legal title changed hands several times in the next few years (but never vested in the taxpayer), ending up with a leasing company named Rapidways. Rapidways entered into a lease and option to purchase agreement with another company, Fairfax, which was managed by the taxpayer. Legal title was to be transferred to Fairfax upon payment of the lease payments and option price, but that never occurred. At all times after the taxpayer purchased the property, he took actions consistent with ownership of the property, including building a house on it and using it as his permanent residence. When the government sought to foreclose its tax liens, it joined Rapidways as the holder of the legal title and asserted that the property was subject to its tax liens. The court concluded that the legal title was held by Rapidways as security for loans and the lease and that the taxpayer was the equitable owner of the land. It therefore concluded that the property was subject to the taxpayer's tax liability and the government's tax liens could be foreclosed on the property.

Without ever specifically mentioning a state law nominee theory, the Tenth Circuit stated:

---

[162] 505 F.2d 1031, 1036 (10th Cir. 1974). *See* Dkt. 407, pp. 42-43.

The paramount issue on appeal concerns taxpayer's interest in the land in question. The government contended, and the district court found, that taxpayer was the equitable owner of the land and that legal title thereto was held by others, including Rapidways, only as a security interest. Rapidways asserts that taxpayer never had an interest in the land that could be reached by the government. . . .

We find no merit in Rapidways' position. It is clear that the option contracts given to taxpayer were part of more complex refinancing arrangements in which he remained the equitable owner of the land. Taxpayer stated, in his deposition, that the land was conveyed as a security interest and not as an absolute sale.[163]

It appears the Tenth Circuit applied Kansas law since the relevant property was located in Kansas, but it did not cite to any specific Kansas authority for the conclusion that the taxpayer had an equitable interest in the land under those circumstances.[164] While *Miller Bros.* differs from the present case on the facts, it is persuasive authority for distinguishing between the debtor-transferor's retained equitable interest in property he has fraudulently conveyed and the legal title held by his transferee. But, while that court generally recognized this distinction, the *Miller Bros.* opinion lacks the specific Kansas law predicate for finding Krause's alleged equitable interest in the KCTs that the later panel in *Holman* seems to require.

Kansas law, however, does recognize that the donor of a fraudulent conveyance retains an equitable interest in the transferred property. In *Gorham State Bank v. Sellens,*[165] the Kansas Supreme Court held that under Kansas law legal title passes to the donee of a fraudulent conveyance but equitable title remains with the donor. Such an equitable interest in property is subject to

---

[163]  505 F.2d at 1036.

[164]  This Court's own research of Kansas law would support this conclusion.  *See Roberts v. Osburn*, 3 Kan. App. 2d 90, 589 P.2d 985, *rev. denied* 225 Kan. 845 (1979) (discussing split of legal and equitable title to land); *Graham v. Claypool*, 26 Kan. App. 2d 94, 978 P.2d 298 (1999) (purchaser of sale of real estate using a contract for deed becomes the equitable owner of the property and the seller, who holds legal title, retains a secured interest in the property to protect future payments).

[165]  244 Kan. 688, 772 P.2d 793 (1989).

attachment even when the legal title is held by a third party.[166] The Kansas Supreme Court noted the policy that "a debtor's property shall be liable for his debts, and he cannot avoid liability by a fraudulent transfer."[167] Thus, this Court concludes that Krause does have an equitable interest in the KCT property, subject either to attachment of validly filed and perfected federal tax liens, or to recovery by the Trustee, if it determines that Krause fraudulently conveyed property to the KCTs.

### a.    Statute of Limitations

This Court has previously denied Krause's and the Interveners' motions for summary judgment based on the expiration of the statutes of limitation or repose that, in an ordinary situation, might bar pursuit by the Trustee or the Government of a fraudulent conveyance claim.[168] It must be recognized that, while many of the transactions that led to the vesting of legal title of Krause's property in entities other than himself happened long ago, whether a party can sustain a fraudulent conveyance claim at present is a different question than whether it can be shown that the ancient conveyances were fraudulent when they occurred. Thus, because the alleged fraudulent conveyances relate to the question of whether the KCTs are Krause's nominees, the statute of limitations issues raised by Krause and the Interveners are nothing but red herrings.[169]

### b.    Badges of Fraud

The Court next analyzes Krause's transfers to the KCTs to determine whether they were fraudulent, and whether Krause, as the donor of those conveyances, has an equitable interest in the

---

[166] *See Bremen State Bank v. Loffler*, 121 Kan. 6, 245 Pac. 742 (1926).

[167] 244 Kan. at 692, quoting *Bremen State Bank v. Loffler, supra.*

[168] Dkt. 493, pp. 11-18.

[169] *See* Dkt. 482, pp. 4-5. The statute of limitations defense would be pertinent to Krause's property that was *not* transferred to the KCTs and is not the subject of a nominee theory (*i.e.* Quivira Associates).

transferred property under Kansas law. The Court applies the badges of fraud to determine if Krause's transfers to the KCTs were made with the intent to hinder, delay, or defraud creditors.[170] This analysis is particularly pertinent to the $454,000 admittedly transferred by Krause from the PW and ML accounts to the KCTs. The Court finds that Krause structured the payments by first assigning notes receivable from his companies to his then-wife, Teresa. When his partnerships and companies made purported payments on those notes to Teresa, they were then deposited not in Teresa's personal bank account, but into two accounts established by Krause in Teresa's name: the PW and ML accounts. From there, Krause exerted almost total control over these accounts and directed transfers from those accounts to the KCTs. In effect, Krause used the notes receivable and the PW and ML accounts as conduits for the transfer of money to the KCTs. These two-layered transfers not only depleted the assets of Krause's companies and business, so his creditors could not reach them, but he then also placed those assets into accounts and trusts in the names of third parties, which the Court finds was also done with the intent to hinder, delay and defraud the IRS.

The evidence demonstrates the existence of several badges of fraud in this fraudulent scheme. The grantees of these multiple-layered transfers were his wife, accounts held in his wife's name, and the KCTs, of which Krause's brother was the sole named trustee and Krause was the settlor. Thus, there is a familial relationship between the grantor and the grantees.

Second, at the time of these transfers, both Teresa and Richard were well aware of Gary's dispute with the IRS and his tax litigation. Indeed, the $454,000 transferred from the PW and ML accounts to the KCTs occurred largely in 1998 and 1999, after the Tax Court decided *Barton* adversely to Krause in 1992 and after he had lost his tax appeals. Although the Court cannot

---

[170] *See Mohr v. State Bank of Stanley,* 244 Kan. 555, 770 P.2d 466 (1989) (6 badges of fraud recognized at common law).

conclude that either Teresa or Richard knew these funds were among the last of Krause's assets subject to execution, Krause, who was the settlor of the KCTs, most certainly knew the extent of his remaining assets.

Third, no consideration was given by Teresa for the notes Krause assigned to her and the KCTs provided no consideration for the transfers. The Court finds that the transfers were not made pursuant to his antenuptial agreement, because Krause testified that he had met his antenuptial obligations to fully fund the KCT by 1993.

Fourth, Richard made no inquiry into these large transfers at the time they were made and he had no knowledge of the source of these funds. He essentially admitted that "he didn't want to know." At best, Richard acquiesced in Krause's fraudulent scheme by accepting the transfers without question or inquiry.

Fifth, the manner in which Krause structured and carried out these transfers was contrary to normal business procedures. There was no reason to establish the PW and ML accounts for receipt of the payments on the notes assigned to Teresa. Krause's companies could have simply made payments on those notes to Teresa's personal bank account. If Krause had wanted to gift assets to the KCTs, he could have done so directly instead of running the assets through Teresa and these accounts.[171] Based upon all this evidence, the Court concludes that Krause fraudulently transferred $454,000 to the KCTs and that, as donor, he had an equitable interest in the monies under Kansas law.

###### c.      Transfers of Life Insurance Policies

In denying the parties' motions for summary judgment, the Court found that Gary owned and

---

[171] *Mohr, supra* at 568.

subsequently assigned six life insurance policies to several of the KCTs.[172]  At trial, he testified that one or two of these policies were taken out or maintained to fulfill his obligation under the antenuptial agreement to maintain life insurance of which Teresa was the beneficiary, and which had a death benefit value of $250,000.[173]  He ultimately admitted that the policy in question was the Aurora Life policy number C11324399L.  He testified that this policy was formerly carried by Executive Life, but that Executive entered receivership and Aurora was its successor.  There is no evidence in the record as to how Gary paid for these policies.

In December of 1990, Teresa obtained $56,318.92 of the cash value of this policy and paid it to the KCT 1.  Krause justified this action by stating that Teresa intended to gift these funds to the trust.  Instead, the "gift" was structured as a loan with Richard giving Teresa a note for a like amount on behalf of the KCT.  Teresa then incrementally forgave the note over the next several years.  The circumstances surrounding this loan are not very clear.  The evidence is, however, that Gary, not Teresa, requested the loan and received the money.  Thereafter, in June of 1994, Gary assigned the policy to KCT 3.  Gary also testified at trial that he had assigned some of the death benefit to FIMCO in early 1994.

It is clear from the evidence that in 1990, Gary, not Teresa, owned the policy and Gary, not Teresa, obtained the loan of its cash value to transfer to Teresa who, in turn, transferred it to the KCT 1 in return for a note she subsequently forgave.  This series of transactions resulted in Gary's property, the cash value, being conveyed to the KCT 1, for no consideration, at a time when his tax

---

[172]  *See* Dkt. 493, p. 5.  *See also,* pp. 42-43, *supra.*

[173]  Under paragraph 10 of the antenuptial agreement, Gary's obligation to carry life insurance applied "in the event the parties remain married."  While married, Gary was prohibited from changing Teresa as the beneficiary. *See* Ex. 14.

-81-

issues were coming to a head.  In fact, this transfer was made shortly after the IRS, on October 25,

1990, issued its notices of deficiency to Krause personally for tax years 1975-1983 and 1986.

Neither Gary, nor Teresa, ever explained the purpose or necessity of this transfer of funds to the

KCT 1.  In the absence of a better explanation from him, the Court can only conclude that this

transaction was motivated by his desire to obscure as many of his assets as possible from IRS

collection efforts.  Similarly, there was no explanation given by Krause why the other five insurance

policies were transferred to the KCTs.  Given his systematic course of conduct to remove assets

from his name, the Court can only conclude that Gary intended to hide his ownership of these

policies when he transferred them to the KCTs without consideration.  Thus, the Court concludes

that Gary fraudulently transferred the life insurance policies and the cash value of the Aurora Life

policy to the KCTs.

### d.  Resulting Trust Theory for Krause's Property Interest

Although the parties did not address any other state law basis for Krause's property interest

in the KCTs, the Court believes that Kansas law on resulting trusts may supply an alternative state

law basis for Krause's property interest.  The Court will therefore address this state law theory.

Kansas law contemplates the creation of a resulting trust where a transfer is made to one

party but the consideration is paid by another.[174]  A resulting trust is created by operation of law and

is a matter of equity.[175]  Under KAN. STAT. ANN. § 58-2407 (2005), such a conveyance is

presumptively fraudulent as against the prior creditors of the party supplying the consideration and

the transferee is said to hold the property in trust for those creditors having demands arising prior

---

[174] *See University State Bank v. Blevins*, 227 Kan. 40, 605 P.2d 91 (1980) (discussing law of resulting trusts).

[175] *Stauth v. Stauth*, 2 Kan. App. 2d 512, Syl. ¶ 5, 582 P.2d 1160, *rev. denied* 225 Kan. 846 (1978).

to the transfer.[176]   The Court notes that this statute first appeared in the General Statutes of 1868 as

an "exception" to what is now KAN. STAT. ANN. § 58-2406 (2005) which provides that when a

conveyance for valid consideration is made to a party and the consideration is paid by another, no

trust arises for the benefit of the payor and title properly vests in the transferee "subject to the

provisions of the next two sections."  The  exceptions in KAN. STAT. ANN. § 58-2408 (2005) are

situations where (1) the transferee takes the property in his own name without the payor's consent;

(2) the transferee purchases the property with funds not rightly his own; or (3) where it is shown that

by agreement, and in the absence of any fraudulent intent, the transferee was to hold the property

in trust for the payor.[177]   The bulk of the Kansas cases deal with the third exception.  This Court

could find no pertinent cases interpreting KAN. STAT. ANN. § 58-2407 as to fraudulent transfers

resulting in creditors' trusts, but notes that the language is unambiguous and clear.

KAN. STAT. ANN. § 58-2407 grants the creditors of a person supplying consideration for a

transfer to another a trust interest in the property unless the fraudulent intent of the payor "is not

disproved."  In the present case, Gary supplied much of the funds contained in the ML and PW

accounts by virtue of having assigned the real estate partnership and Fed Gas promissory notes to

Teresa and directing those note payments to the ML and PW accounts.  These funds can be directly

traced to the purchase of the Oneida property in 1995, which was initially titled in Teresa and

eventually conveyed to KCT 1.  The resulting trust that arises is legally distinct from the actual

KCTs.  As the treatises note, a resulting trust is not actually a trust; instead, it is "an equitable

remedy designed to prevent unjust enrichment and to ensure that legal formalities do not frustrate

---

[176] *See* KAN. STAT. ANN. § 58-2407 (2005).

[177] *See University State Bank, supra* (applying KAN. STAT. ANN. § 58-2408 (2005) statutory exception to find a resulting trust).

-83-

the original intent of the transacting parties."[178]

Here, the Court could easily conclude that the purchase of the Oneida home with funds essentially provided by Gary, but titled in Teresa, and later KCT 1, created a resulting trust for the benefit of Gary's creditors. This statute allocates the burden to prove a lack of fraudulent intent to Gary. Given his lack of any reasonable or credible explanation for these transfers (particularly in light of the existing antenuptial agreement), a Kansas court would likely conclude that, at least as to the Oneida home (and to the insurance policies), a resulting trust is shown.[179]

### 2. The KCTs as Krause's Nominee Under Federal Law

Having determined that Krause had a property interest in the property of the KCTs under state law, the Court now addresses the question of whether the KCTs should be deemed to be Krause's nominees under federal law. The Court analyzes and applies the five factors enumerated in *Dawes* and *Holman* to determine the ultimate inquiry – "whether the taxpayer [Krause] has engaged in a legal fiction by placing legal title to property in the [trusts] while actually retaining some or all of the benefits of true ownership."[180] As discussed below, all five factors clearly exist in this case.

### a. Control Over the KCTs

---

[178] 76 AM. JUR. 2D Trusts § 135 (2008).

[179] The Court observes that KAN. STAT. ANN. § 33-101 (2000) may provide another legal basis for Gary's property interest in the KCTs under state law. That statute provides: "All gifts and conveyances of goods and chattels, made in trust to the use of the person or persons making the same shall, to the full extent of both the corpus and income made in trust to such use, be void and of not effect, regardless of motive, as to all past, present or future creditors . . ." Although the express trusts created here by Gary, the KCTs, were by their terms not expressly for Gary's use, they were effectively administered for Gary's use by Richard's total acquiescence and assistance in all of Gary's requests. *See Herd v. Chambers,* 158 Kan. 614, 627-28,149 P.2d 583 (1944) ("From our examination of all the legal authorities herein referred to, and giving the language to be found in . . . [section] 33-101. . .we have no difficulty in reaching the conclusion that where a conveyance of personalty is made in trust for the use of the person making the same it is void irrespective of any fraudulent intent on the part of the grantor.").

[180] *Holman,* 505 F.3d at 1065.

-84-

This first factor looks at the taxpayer's control over the nominee and its assets. Krause established the KCTs, not one trust as contemplated by the antenuptial agreement but five trusts, purportedly for his two sons. He selected his brother, Richard, as trustee of the KCTs, not three trustees selected between him and Teresa as the antenuptial agreement contemplated. Krause testified that he had fully funded the trust with $150,000 as required by the antenuptial agreement by 1993. He determined not only what assets went into the KCTs but also the timing of those transfers and the disbursements therefrom. He prepared checks on the PW and ML accounts in Teresa's name and required her to sign whatever checks he gave her. Giving Teresa's allegations in the divorce credence, she also signed blank checks for Krause and he then later completed them, filling in the payee and the amount. The funds in these PW and ML accounts came from Krause, his companies, or the sale of his assets transferred to Teresa (*i.e.,* the Mission property).[181] Krause then turned around and caused funds of at least $454,000 to be transferred to the KCTs in 1998 and 1999. Teresa was apparently oblivious to these transfers as they were occurring, and Krause prepared the monthly reconciliation of the PW and ML accounts.

It was Krause, not his brother as trustee of the KCTs, who was able to explain the source of the property going into the KCTs and the purpose of the disbursements from the KCTs. No evidence was more compelling than Exhibits 795, 796, and 797, a running compilation of activity in KCT 1, 2 and 3 prepared for trial, not by the trustee of the KCTs, but by Krause himself. Richard did not attempt to verify the accuracy of those exhibits nor compare them to the bank statements. Richard did nothing more than read from these exhibits at trial; except for the most basic entries of interest

---

[181]   The ML account opened in Teresa's name in June of 1991 was funded with a $150,000 deposit from Energy Associates, Inc. (Gary's company). Teresa could not explain why Energy Associates funded the opening of this account.

accumulations, he was unable to explain the debits or credits appearing on the spreadsheets.

The manner in which Krause handled deposits to and checks drawn on the KCT accounts also indicates his total control. It was Krause, not the trustee, who endorsed for deposit to the KCTs, checks drawn on "Teresa's" ML and PW accounts. Krause prepared the deposit slip for funds transferred to the KCTs.[182] Krause commonly filled out the checks on the KCT accounts and procured his brother's signature on them. Given Teresa's allegations made during her divorce proceeding of how the PW and ML accounts were handled, the Court has little doubt that Richard signed blank checks on KCT accounts in the same manner that Teresa did, and delivered them to Krause who later completed the payees and amounts.

Krause prepared the tax returns for the KCTs over a ten-year period, from 1994 to 2004, and signed tax returns as Richard's attorney-in-fact during the same period.[183] On those few occasions that Krause did not personally prepare the tax returns, he selected the tax preparer for the KCT returns.

In January of 1991, Krause opened an account, the Merrill Lynch Government Fund Account, using $50,000 funds from the KCT 1 Union National Bank account.[184] He put this account in the name of "GARY E. & RICHARD D. KRAUSE TTEE [Trustees] FBO KRAUSE CHILDREN'S TRUST #1 DTD 12-5-88," when he had never been a trustee of the KCT 1.[185] Krause had signatory authority on this Merrill Lynch account.[186] The account statements were sent

---

[182] *See* Ex. 25.

[183] *See* Ex. 451-461; 468-478; 485-495.

[184] Ex. 795, p. 2.

[185] Ex. 601.

[186] Ex. 603, p. 2.

-86-

to the Sutton Place address in Wichita where Krause maintained his business office. Richard was unaware of this account until the preliminary injunction hearing in December of 2005.

Krause borrowed money from KCT 1 to purchase a car for his personal use. Richard did not prepare or submit any of the information for this borrowing. Gary prepared the promissory note, and handled the titling and registration of the vehicle and the lien notation. Although Richard admitted that it was an error for the KCT 1 to loan the money to Gary and that it was intended for the GEKT to loan the funds, neither Richard nor Gary ever corrected the "error." Instead of having the GEKT pay back KCT 1 for the supposedly erroneous loan, Gary set up a personal promissory note to KCT 1 and granted a security interest in the vehicle to secure repayment.[187] He repaid that note, but with sporadically-timed payments, an arrangement this Court doubts he could ever have made with a conventional lender.

The Court concludes that there is overwhelming evidence of Krause's control over the KCTs.

### b. Use of KCTs to Pay Personal Expenses

This factor looks at whether the taxpayer used the alleged nominee for his personal benefit. Krause benefitted personally by using the KCTs to pay his personal expenses in several ways. After the Oneida house was purchased in 1995 for nearly $300,000 with funds Krause or his companies deposited in the PW account,[188] Krause directed Richard to have the KCT 1 "purchase" the Oneida property. The KCT 1 paid approximately $65,000 to Teresa in 1999 and the Oneida property was

---

[187] Although it was the KCT 1 that made the car loan to Gary, it was KCT 3 that held the lien on the vehicle and to whom the loan payoff was made. *See* Ex. 770. No plausible explanation was given for this convoluted and layered transaction.

[188] The funds in the PW account were comprised of the proceeds from the sale of the Mission property in 1998, some $142,000, which Krause had deeded to Teresa, and the payments by Krause's companies on the notes assigned by Krause to Teresa in 1989.

transferred to the KCT1. Krause lived at the Oneida property during all this time except for a brief period in 1999 when he and his family temporarily resided in California. When Krause returned to Kansas he purportedly leased the Oneida property from Polo Executive Rentals, a non-entity. Except for a few lease payments during 2000, Krause did not pay rent. Richard never enforced the lease against his brother and Gary continued to reside in the Oneida property until September of 2007. Krause listed "Polo c/o KCT 1" as an unsecured creditor with a $21,000 claim on his bankruptcy schedules.

Prior to his divorce, Krause used his companies, Fed Gas and FIMCO, to pay personal and family living expenses, including phone bills, country club bills and membership fee, computers, house cleaning or maid service for Oneida, lawn service, utilities, medical expenses, and purchase of vehicles. After his divorce, Krause began to direct that the KCTs reimburse him or his companies, Fed Gas and FIMCO, for many of those personal and living expenses, including credit card bills.[189] While Krause or his companies had paid private school tuition expenses for his boys prior to his divorce, after his divorce he began to have the KCTs reimburse those expenditures. Between November 2004 and August 2005, KCT 1 issued six checks to Krause's company, Fed Gas, for reimbursement of expenses. Krause, through his company Fed Gas, was not only reimbursed by the KCT 1 for expenses, but according to Krause's own witness Mark Bernat, unallocated expenses of Fed Gas were credited against the Fed Gas note assigned to Teresa, reducing the note balance. In short, Krause used the KCTs to perform many of his legal support obligations as a parent.

Richard and Gary repeatedly testified that the KCTs were intended for Drake's and Rick's

---

[189] *See e.g.*, Ex. 631, 632, 633, 634.

education. Yet the inconsistent and relatively few number of checks drawn on KCT accounts for educational needs is startling, especially when compared to the other non-educational uses the KCTs funded. Richard testified that he would pay any educational expenses and tuition that were presented to him. The Trustee used a demonstrative exhibit at trial to show those payments.[190] The first payments from the KCTs for educational expenses and tuition began in 1999. While the Krause family was in California in 1999, the KCTs made payments for the boys' education in August, September, November and December of 1999. In 2000, payments for the boys' education were made in May and November. In 2001, payments for the boys' education were made in January, March and May. The KCTs paid no educational expenses or tuition in 2002 and 2003. In 2004, Richard paid educational expenses from the KCTs only in June. In sum, between 1999 and October 2005, when Krause filed his bankruptcy, Richard made payments from the KCTs for tuition or educational expenses a mere total of 10 months out of 82 months.

Krause used the KCT 1 as his personal bank. Instead of obtaining a car loan through conventional methods or using the GEKT, of which he was the only beneficiary, to fund his purchase of a car from his friend Andrew Peressin, Krause used KCT 1 to finance his car purchase. While Krause argues that he paid the money back with a market rate of interest, the payoff of the "car loan" went to KCT 3 and it was KCT 3, not KCT 1, that was noted as the lienholder on the certificate of title.

In November of 2000, the KCTs reimbursed Krause for the expenses and support of Rick that Krause was ordered to pay by the domestic court in the first divorce.[191] Krause used the KCTs

---

[190] *See* Ex. 795, 796 and 797, the supporting exhibits for the demonstrative exhibit.

[191] Ex. 797, p. 9, 11-17-00 $3,000 debit.

Case 05-05775   Doc# 535   Filed 04/21/08   Page 89 of 112

to pay legal defense fees incurred prior to the bankruptcy filing, including preparation of the frivolous petition to quash the IRS collection summons that he directed his brother file.[192]  He and Richard also attempted to use KCT funds to pay their personal legal expenses after the bankruptcy was filed, but the Court denied their requests.[193]

During closing argument, Krause argued that because funds from the KCTs were not used exclusively for his benefit, the KCTs cannot be declared his nominees.  Krause does not cite to any cases supporting his "exclusive and full use" argument, but relies instead on the IRS Manual. Section 5.17.2.5.7.2(2) (12-14-2007), Nominee Liens, provides:

> A nominee situation generally involves a fraudulent conveyance or transfer of a taxpayer's property to avoid legal obligations.  To establish a nominee lien situation, it must be shown that while a third party may have legal title to the property, it is really the taxpayer that owns the property and who *enjoys its full use and benefit.* No one factor determines whether a nominee situation is present, but a number of factors taken together may.  The following list is neither exhaustive nor exclusive, but nominee situations typically involve one or more of the following:
>
> A.    The taxpayer previously owned the property.
> B.    The nominee paid little or no consideration for the property.
> C.    The taxpayer retains possession or control of the property.
> D.    The taxpayer continues to use and enjoy the property conveyed just as the taxpayer had before such conveyance.
> E.    The taxpayer pays all or most of the expenses of the property.
> F.    The conveyance was for tax avoidance purposes.  (*Emphasis added*).

The Court concludes that Krause's "exclusive and full use" argument is untenable.  First, the Internal Revenue Manual ("IRM") does not have the force of law.[194]  While the manual provisions constitute persuasive authority as to the IRS's interpretation of the statute and the regulations, they

---

[192] Ex. 797, p.12, 8-29-05 $3,011.50 debit.

[193] Dkt. 128.

[194] *See Reisman v. Bullard,* 14 Fed.Appx. 377, 379, 2001 WL 856960, *2 (6th Cir. 2001);  *Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir.1996); *Griswold v. United States,* 59 F.3d 1571, 1576 n. 8 (11th Cir.1995);  *Anderson v. United States*, 44 F.3d 795, 799 (9th Cir.1995); and *Rhone-Poulenc Surfactants and Specialties, L.P. v. C.I.R.,* 114 T.C. 533, 570 (U.S.Tax Ct. 2000).

Case 05-05775    Doc# 535    Filed 04/21/08    Page 90 of 112

are not binding authority.[195]  Second, the IRM is ambiguous.  In Section 5.17.2.5.7.2(2) (12-14-2007), it mentions "full use and benefit" in the second sentence and then "continued use" in the last sentence.  Assuming, *arguendo,* that the KCTs had never been established, the funds would have been used no differently.  According to Gary, he set up the KCTs because of his antenuptial obligation.  This obligation stems from his marital and parental duties.  Thus, a portion of the funds, whether titled in the KCTs or Gary personally, would have been used to shelter, educate, and maintain the boys' lifestyle.  Arguably then, the IRM does not require exclusive and full use.  Third, many factors are considered in determining whether a nominee situation exists.  No one factor is dispositive.  To require "exclusive use" or "full use," as suggested by defendants, would be contrary to the concept of a non-exhaustive or nonexclusive list.  How the funds were used is simply one factor to consider.  Fourth, an "exclusive and full use" requirement for nominee status would create a loophole that allows taxpayers to easily avoid nominee status by using a nominal part of the trust funds for someone else's benefit.

Finally, there are no published cases that mention "exclusive use and enjoyment" or "full use and benefit" as a requirement to determine nominee status.  To the contrary, *Holman* instructs that "[t]he ultimate inquiry is whether the taxpayer has engaged in a legal fiction by placing legal title to property in the hands of a third party while actually retaining *some or all of the benefits* of true ownership."[196]  The Court concludes that Krause's "exclusive use" argument is without merit, as he most certainly retained significant benefits of true ownership.

### c.  Relationship Between Taxpayer and KCTs

---

[195] *Anderson, supra* at 799.

[196] Emphasis added.  505 F.3d at 1065.

The third factor dealing with the relationship between the taxpayer and the nominee is satisfied here. A close, familial relationship exists between Krause and the KCTs. Krause was the grantor of each of the KCTs. His brother, Richard, was the sole trustee of each of the KCTs. While the trust instruments vested broad powers and discretion in Richard, the evidence at trial established a pattern of conduct whereby Richard blindly complied with his brother's requests, suggestions and direction in administering the KCTs.

### d. Lack of Oversight Over Taxpayer's Actions

The fourth factor concerning lack of internal controls and lack of nominee oversight of a taxpayer's actions is also satisfied. Krause controlled the KCTs with virtually no oversight from Richard. His brother's testimony regarding his philosophy concerning the KCTs is most revealing. Richard wanted to be a passive trustee and did not want to spend a lot of his time on the trusts. He testified that he was willing to serve as trustee of the KCTs so long as it was not "complicated." He did not know the source of funds contributed to the KCTs and he described this philosophy as "stick your head in the sand and then you don't know what is going on." Richard admitted to giving Gary signed blank checks and permitting Gary to complete them. He did not ask for or obtain receipts for checks at the time he signed them. He kept no books or records regarding KCT activity and performed no bookkeeping or accounting of the KCTs' activities. Without exception, Richard agreed to every investment or disbursement suggested or requested by Gary. He exercised no independent oversight on how KCT funds were spent, nor did he make any effort to independently determine the wisdom of any investments. It was Gary who suggested that KCT 1 purchase the Oneida property from Teresa. It was Gary who suggested the Dream Swing investment. When Richard was served with the IRS Collection Summons in the summer of 2005, he contacted Gary

-92-

and responded lockstep with Gary's direction. Richard also delegated to Gary the preparation and even the signing of the KCT tax returns. Richard transferred the Oneida property to PHR, LLC without receiving consideration; he did not enforce the alleged "mortgage" given by Teresa in favor of the KCT 5. And when it came time to defend the KCTs from the Government's and the Trustee's claims in this proceeding, Richard defaulted on his duties as trustee and deferred to Krause and the KCT beneficiaries. The very presence of the Interveners in this case underscores Richard's complete failure to act independently of Krause in administering the trust assets.

The evidence is overwhelming that Richard exercised no oversight over his brother's activities vis-a-vis the KCTs.

### e. Lack of Consideration for Transfers

The Government and the Trustee have also demonstrated the existence of the last factor, whether there was adequate consideration for the transfers. The vast majority of the transfers to the KCTs were comprised of sources linked to Krause or his companies and were without consideration: (1) sale proceeds of $142,000 from the 1998 sale of the Mission property that Krause had deeded to Teresa during their marriage were deposited into the PW account Krause established in Teresa's name and from there were transferred to the KCTs 1, 2 and 3; (2) Krause's companies transferred in excess of $800,000 into the PW and ML accounts that Krause established in Teresa's name; some of these deposits into the PW and ML accounts consisted of payments on the notes allegedly owed Krause by his companies and which he assigned to Teresa in 1989. From the PW and ML accounts, Krause caused at least $454,000 to be transferred to the KCT 1, 2 and 3 during 1998 and 1999; and (3) Krause transferred six life insurance policies he owned to the KCTs in 1991 and 1994.

No consideration exchanged hands between the KCTs and the transferors. The Court does

Case 05-05775   Doc# 535   Filed 04/21/08   Page 93 of 112

not find persuasive Krause's defense that the consideration was the prior antenuptial agreement or love and affection. In addition, the Court notes that Krause had satisfied his funding obligation for the KCTs under the antenuptial agreement by at least 1993. Thus, the extensive transfers of cash from the PW and ML accounts in 1998 and 1999 were not part of Krause's initial cash funding of the KCTs required by the antenuptial agreement.

In summary, applying the factors under federal law, the Court finds that Krause's relationship to the KCTs and the assets and property they hold are such that Krause has effectively retained the benefits of true ownership in those assets. The Court concludes that the KCTs are Krause's nominees. The Government's tax lien attaches to the property held by the KCTs and such property is subject to turnover to the Trustee as property of the bankruptcy estate. Judgment should be entered in favor of the Government and the Trustee on their nominee claims.

## C.   **Fraudulent Transfers**

Having resolved the nominee theory in favor of the Government and the Trustee, the Court considers whether it need decide the alternative fraudulent transfer claims asserted here. At the close of trial, the Court raised the question whether the fraudulent transfer claims would be moot if it decided the nominee claims in favor of the plaintiffs. The parties submitted legal memoranda on this question.[197]

### 1.   The Court's Determination of KCTs Nominee Status Renders a Determination on the Fraudulent Transfer Claims Moot

If the assets and property held by the KCTs are held as Krause's nominees, the Court questions whether it also needs to determine whether such property held by the KCTs was

---

[197] Dkt. 515, 516, 517 and 518.

fraudulently transferred to the KCTs.[198]  The Court agrees with the Government and Trustee on this issue and concludes that the fraudulent transfer claims are moot with respect to property held by the KCTs.  However, the fraudulent transfer claims remain viable with respect to property not held by the KCTs.  Krause's transfer of his interest in Quivira Associates falls into this category and will be addressed in the next subsection.

The Court concludes that its question is answered by two cases:  *May v. A Parcel of Land*,[199] and the *Holman* case discussed in the preceding section.[200]  Both are federal tax liability cases discussing attachment of a federal tax lien to property held by a taxpayer's nominee.

In *May*, the government argued that its federal tax lien attached to property titled in the taxpayer's wife under the common-law nominee theory and, alternatively, under the theory that the taxpayer fraudulently transferred the property to his wife to shield it from the IRS' collection efforts and that the transfer was void under the Alabama Uniform Fraudulent Transfer Act.[201]  Under either of the government's theories, its federal tax lien attached to the property – either as property held by the nominee or as property fraudulently transferred.

The court in *May* first addressed the government's nominee theory and, after applying the law to the uncontroverted facts,[202] concluded that the taxpayer's wife held title to the property as her

---

[198]  As a practical matter, the Court has already decided the fraudulent conveyance theory when it applied state law to determine that Krause had a property interest in the KCTs for the nominee claim.  *See* pp. 76-83, *supra*.

[199]  458 F. Supp. 2d 1324 (S.D. Ala. 2006), *aff'd May v. United States,* 2007 WL 3287513 (11th Cir. Nov. 8, 2007).

[200]  505 F.3d 1060 (10th Cir. 2007).

[201]  458 F. Supp. 2d at 1327, 1333.

[202]  The case was presented to the district court on cross-motions for summary judgment. *Id.* at 1327.

-95-

husband's nominee and thus federal tax liens filed against him attached to the property.[203]  Having found for the government on the nominee theory, the district court concluded that "it is unnecessary to reach the Government's alternative argument that James May fraudulently transferred the Property . . . ."[204]

In *Holman,* the Tenth Circuit Court of Appeals addressed an issue of proof to establish the nominee theory.  The government asserted a federal tax lien against real property in which the taxpayer's wife and a friend held legal title, claiming that they held the property as the taxpayer's nominees.  The taxpayer's wife challenged the validity of the tax lien attaching to this property, claiming that her husband had never transferred legal title to the property to her.  The *Holman* court concluded that it was *not* essential to the imposition of a nominee lien that the taxpayer actually transfer legal title to a third party, as follows:

> A delinquent taxpayer who has never held legal title to a piece of property but who transfers money to a third party and directs the third party to purchase property and place legal title in the third party's name may well enjoy the same benefits of ownership of the property as a taxpayer who has held legal title.  In both instances, the third party may be the taxpayer's nominee.
>
> Thus, as the IRS argues, this court has recognized that a tax lien may be enforced when the taxpayer has never held legal title to the property but has directed that title be placed in a third party's name.[205]

---

[203] *Id.* at 1340.

[204] *Id.* at n. 28.  *See also United States v. Davenport*, 412 F. Supp. 2d 1201, 1208-10 (W.D. Okla 2005) (In the Government's action to foreclose its federal tax liens, the district court found that the taxpayers fraudulently transferred property to various trusts and that those transfers were void; thus, the federal tax lien attached to the fraudulently transferred property and based upon this determination, the district court concluded that it "need not determine whether the trusts are the Davenports' nominees.").

[205] *Id.* at 1065 [citation omitted.].  *See also LiButti v. United States,* 107 F.3d 110, 125 (2d Cir. 1997) (explaining that for nominee purposes an actual transfer of the property from the taxpayer to a third party is not required; a third party may be found to be a taxpayer's nominee by "finding that [the taxpayer] *funded* the acquisition and reacquisition of the [property].")

As a result of this conclusion, the Tenth Circuit held that the lack of a transfer of legal title by the taxpayer to a third party was insufficient by itself to defeat a nominee lien.[206]  Since no transfer of title is required to establish a nominee claim, the holding of *Holman* suggests that a finding of a fraudulent transfer is also not required.

Krause and the Interveners argue, without benefit of authority, that the Internal Revenue Manual ("IRM") requires a finding of fraudulent conveyance to establish the nominee theory, and therefore contend that this Court must decide the fraudulent transfer claim before it can even consider applying the nominee theory.  This Court rejects their argument on the express authority of *Holman*.[207]

Krause and the Interveners also argue that the Court must decide both the fraudulent transfer and the nominee theories, citing to *United States v. Dawes*.[208]  *Dawes* does not support this position. In *Dawes*, the district court did make a finding of fraudulent transfer before going on to find that trusts served as the taxpayers' nominee or alter ego.  In doing so, the *Dawes* court addressed both theories separately, and its findings were made in the alternative.[209]  *Dawes* does not stand for the proposition that proof of a fraudulent transfer is a precondition to determining a nominee claim. Moreover, it is not evident from the district court's opinion in *Dawes* that the necessity of ruling on

---

[206]  *Id.* at 1066.

[207]  In addition, Krause and the Interveners do not accurately rely on the IRM.  Section 5.17.2.5.7.2(2) (12-14-2007) states that a nominee situation *generally* involves a fraudulent conveyance or transfer of a taxpayer's property to avoid legal obligations.  The word "generally"indicates  a fraudulent conveyance is not a prerequisite.  It indicates only that it is not uncommon for a nominee claim to involve a fraudulent conveyance or a transfer of property.

[208]  344 F.Supp.2d 715 (D. Kan. 2004).

[209]  In addressing the taxpayers' conveyance of real property, the district court stated: "The Government first argues that the transfer of Parcels 1-8 was fraudulent and must be set aside.  In the alternative, the Government argues that Plainsman Property Company holds Parcels 1-9 as nominees of the [taxpayers]."  *Id.* at 720.

-97-

both theories was raised as an issue or determined by the district court.[210]  The district court could have just as easily organized its opinion to discuss the nominee theory prior to the fraudulent conveyance theory.

While the factual basis necessary to establish each theory may bear similarities and have some common elements, the fraudulent transfer and nominee theories are discrete claims used by the government to assert that its federal tax liens attach to property held by a third party.  The distinction was explained in *Smith v. United States*:[211]

> Fraudulent transfer requires pleading elements in addition to what is required to demonstrate that a transfer was made to a nominee.  A nominee theory focuses on whether or not the taxpayer is the true beneficial owner of the property based on how the taxpayer treats the property.  *Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 (5th Cir. 2000).  A fraudulent conveyance theory looks at the conditions at the time of the conveyance, and whether the transfer was affected with the intent of preventing a creditor from collecting on its interests.  *Kirkeby v. Sup.Ct.*, 33 Cal.4th 642, 648, 15 Cal.Rptr.3d 805, 93 P.3d 395 (2004).  Fraud is not necessarily required to prove a nominee theory under California law.  *Sequoia Property & Equip. v. United States*, 1998 WL 471643, *3 (E.D.Cal.1998) (Wanger, J.).[212]

Finally, the Court also rejects Krause's "reverse piercing" argument.  Krause persists in recasting the Government and the Trustee's federal common law nominee claim as impermissible reverse piercing of the trusts under Kansas law.  The Court has previously considered this argument and rejected it.[213]  The claim presented at trial by the Government and the Trustee was a nominee claim.  That is the claim the Court has decided today.

---

[210]  In *Dawes, supra* the district court noted that there were no fraudulent transfer allegations with respect to one parcel of real property, Parcel 9.  However, Parcel 9 was subject to the government's tax lien because a trust held it as a nominee.  344 F. Supp.2d at 722.  Thus, it is apparent that *Dawes* did not require a finding of fraudulent transfer to establish a nominee claim.

[211]  2007 WL 2554142  (N.D.Cal. 2007).

[212]  *Id.* at *3.

[213]  *See* Dkt. 494, pp. 37-38. *See also* Dkt. 434, Final Pretrial Order.

-98-

The Court concludes that based upon its determination of the Government's and the Trustee's nominee claim, it need not and does not reach the question of whether Krause fraudulently transferred property to the KCTs. The Government's federal tax liens attach to the property held by the KCTs as Krause's nominees. However, since none of the KCTs hold an interest in Quivira Associates, the Court must determine whether Krause fraudulently transferred his interest in Quivira to Teresa and others.

## 2.      Quivira

As noted previously, Quivira holds title to a quarter section of real property in Stafford County. Quivira was formed by Richard in 1986 to acquire the property,[214] and Krause, or his wholly-owned company Kanzoil, owned a one-third interest in Quivira. Gary and Richard use the property for recreational hunting and also lease the pasture ground to a tenant for cattle grazing part of the year. A "hunting lodge" is located on the property.

Krause caused his or Kanzoil's one-third interest in Quivira to be conveyed to Teresa in November 1989, at the same time he conveyed the Mission property to Teresa and assigned the company note receivables to her.[215] There is no dispute that the interest in Quivira was assigned to Teresa in 1989. However, the parties do dispute to whom Teresa later transferred the Quivira interest. Gary contends Teresa transferred her interest in Quivira to Rick and Drake in 1998. As explained below, the books and records of Quivira suggest that Teresa transferred her interest in Quivira to the GEKT.

### a.      Facts Pertaining to Quivira

---

[214] Ex. 782.  Richard has been the president of Quivira at all times.

[215] *See* pp. 33-35, *supra.*  Among the notes receivable Gary assigned to Teresa was a $20,000 note from Kanzoil.

Before applying the badges of fraud to the Quivira transfer(s), the Court reviews the evidence pertaining to Quivira. Teresa's familiarity with Quivira was sketchy at best. She recognized it as the "hunting lodge." Teresa believed she had an ownership interest in Quivira but could not recall how she acquired that interest and did not know if she had ever sold whatever interest she might have. On cross-examination, she indicated that she had no recollection of any Quivira ownership transactions. She testified that she spent little to no time at the Quivira property, while Gary regularly hunted on the property.

When originally formed, Quivira had three shareholders who owned a one-third interest: Richard, Kanzoil Corporation, and Southwest Properties Co., Inc. Each contributed $4,000, for total capital stock of $12,000.[216] Krause was the 100% shareholder of Kanzoil and Kent Weltmer was the principal of Southwest Properties. The Court thus concludes that Krause initially controlled, through his company, a one-third interest, or 4,000 shares, in Quivira. According to Krause, the Quivira property was encumbered by an interest held by Fed Gas, which had provided the funds for Kanzoil to acquire the 4,000 shares of stock.[217] In 1990, Quivira bought back Southwest's 4,000 shares and reflected them as treasury stock.[218] This left 4,000 shares of stock each for Richard and Kanzoil/Fed Gas and later, Teresa.

According to Gary's trial testimony, Kanzoil transferred its interest in Quivira to Teresa in

---

[216] Ex. 721; Ex. 174B, pp. 1-3.

[217] An equity contributions worksheet in the 1997 tax return supports this testimony. It can be interpreted to read that Kanzoil or Fed Gas (both Krause's companies) owned a one-third interest in Quivira from 1986 to 1988 and made capital contributions during this three year period. *See* Ex. 732, p. 12.

[218] *See* Ex. 732, p. 12

1989, and in late 1998, Teresa transferred those shares equally among her sons, Drake and Rick.[219] Neither Teresa nor her sons paid any consideration for the stock. With respect to Krause's transfer to Teresa in 1989, this occurred during the time when Krause's individual tax returns and the Barton tax return were being audited and while Krause was litigating the Barton tax issues in the United States Tax Court. The transfer to Teresa did not reference the antenuptial agreement, and in fact, no writing evidenced the transfer other than the stock certificate issued in Teresa's name.

The books and records of Quivira provide information that conflicts with Gary's trial testimony. Quivira's federal tax returns contradict the second transfer from Teresa to her sons and in fact, the tax returns would indicate that neither Drake nor Rick owned any interest in Quivira. According to Krause, the Quivira tax returns were prepared by FIMCO.[220] One return introduced into evidence by Krause shows that another of his companies, Energy Associates, Inc., prepared the Quivira return for tax year 1989.[221] The tax return for 1990 shows Richard and Teresa each owning 50% of the stock of Quivira and $4,000 of treasury stock; this is consistent with the testimony regarding the transfer to Teresa in late 1989 and the buy-back of Southwest Properties' one-third interest in 1990. The same is true for the 1991, 1993, 1994, 1996, 1997, and 1998 tax returns.[222] The Quivira tax returns for 1999, 2000, 2001, and 2002, however, show Richard and the GEKT (of

---

[219] *See* Ex. 780, Stock Certificate No. 4 dated December 8, 1989 and Stock Certificate No. 5 and 6 dated April 30, 1998.

[220] Ex. 737 shows FIMCO as the paid preparer for the 2002 Quivira tax return. No evidence was introduced that Quivira received a 1099 tax form or W-2 form from FIMCO.

[221] Ex. 724. No evidence was introduced that Quivira received a 1099 or W-2 from Energy Associates.

[222] Ex. 725, 726, 728, 729, 731, 732, 732A. Interestingly, the journal entries worksheet dated 12/31/97 for the 1997 return showed a $500 capital contribution by Richard and a $700 capital contribution for Teresa. *See* Ex. 732, p. 7. But the computer generated spread sheet on the next page of the exhibit attributes the capital contribution to "GEK" [Gary E. Krause] rather than Teresa. *See* Ex. 732, p. 8. *See also* Ex. 732A, p. 7 for tax year 1998, again attributing capital contributions to Gary, rather than Teresa. And the state franchise tax was paid by "EA" [Energy Associates]. *See* Ex. 732, p. 11.

-101-

which Gary is the beneficiary) each owning 50% of Quivira.[223]  The tax returns then suggest that Teresa transferred her 4,000 shares to the GEKT, rather than to her sons, in late 1998 or early 1999. For tax years 2003-2005, Quivira only listed Richard as "50% or More Owners;" the other 50% shareholder (whoever that was) was not identified.[224]

The Quivira annual reports also contradict Gary's trial testimony concerning the ownership of Quivira.  He testified that the Quivira annual reports were prepared by C. Norris Taylor until he retired and then by Mark Bernat, both former FIMCO employees.  The first annual report for 1986 shows Kanzoil Corporation as one of three shareholders.[225]  However, the 1987 annual report shows Fed Gas as one of three shareholders.[226]  The annual report for 1988 shows Gary individually as one of three shareholders.[227]  The Quivira annual report for 1989 is missing.  The annual reports for 1990 and 1991 show Teresa as one of two shareholders of Quivira, thus evidencing the transfer to her in late 1989 and supporting the buy-back of Southwest Properties stock during 1990.[228]  The annual report for 1999, however, shows the GEKT as a shareholder, thus suggesting a transfer from Teresa to the Trust in late 1998 or 1999.[229]  The GEKT was again shown as a shareholder on the 2000 annual report.[230]  None of the annual reports introduced into evidence reflect that Drake or Rick were

---

[223] Ex. 734, 735, 736, 737

[224] *See* Ex. 738, p. 6; Ex. 740, p. 6

[225] Ex. 174B, pp. 1-4.

[226] Ex. 174B, pp. 5-8.

[227] Ex. 174B, pp. 9-10.

[228] Ex. 174B, pp. 11-17.

[229] Ex. 174B, pp. 21-22.

[230] Ex. 219.

ever stockholders in Quivira.

As recently as November of 2005, after Krause filed his bankruptcy, he was still linked to Quivira. The insurance billing statement for the Quivira property was sent to Krause as the named insured of the Quivira property.[231] Krause continues to hunt on the Quivira property to this day.

Given these factual circumstances, the Court concludes that Krause transferred his interest, or caused the interest of his companies (Kanzoil or Fed Gas) in Quivira to be transferred to Teresa in late 1989 and then to the GEKT in late 1998 or 1999. The only documentary evidence of Interveners' ownership interest in Quivira is the stock certificates issued to them. The Court simply places more credence in publicly filed documents and tax returns than it does in the stock certificates, which may be easily manipulated. Even some of the internal books and records of Quivira, such as the supporting schedules and statements to the tax returns, clearly evidence Krause's interest in Quivira - either individually or through his companies. Having determined that Krause transferred his interest in Quivira to Teresa, and that she transferred the Quivira ownership interest to the GEKT, the Court next examines whether those transfers were fraudulent.

### b. Fraudulent Transfer of Quivira Ownership Interest

The effect of the fraudulent transfer claims asserted by the Government and the Trustee differ slightly. While the Trustee has the power to avoid a fraudulent transfer and preserve the same for the benefit of the bankruptcy estate,[232] the Government may also prove a state law fraudulent transfer

---

[231] Ex. 54.

[232] *See* 11 U.S.C. §§ 544(b), 548(a)(1), 551.

-103-

with the consequence that its federal tax lien attaches to the fraudulent conveyed property.[233]  This technical distinction was discussed previously by the Court when ruling on Krause's and the Interveners' pretrial motion to dismiss the Government's fraudulent transfer claims for lack of standing.  The Court will not repeat that analysis here and refers readers of this opinion to the Court's previous ruling.[234]

The Court is also mindful of Krause and the Interveners' continued assertion that the fraudulent conveyance claims are barred by statutes of limitations and statutes of repose, defenses which they preserved at the close of trial.  The Court previously denied Krause's and the Interveners' motions for summary judgment based on these defenses.  The Court will not repeat its analysis here other than to note its previous conclusion that the Trustee enjoys the same limitations period as the Government and because that statute of limitations had not expired when Krause commenced his bankruptcy case, the Trustee's state law fraudulent conveyance claim pursued under 11 U.S.C. § 544(b) is timely because she asserted the claim within two years of Krause's bankruptcy petition.[235]

The state law fraudulent conveyance claims originally pled are KAN. STAT. ANN. § 33-101, § 33-102, § 33-103, § 33-204, § 33-205 and the common law.[236]  The Court will first address the plaintiffs' common law fraudulent transfer claims regarding Quivira.  At common law, the courts

---

[233] Pursuant to the Internal Revenue Code, 26 U.S.C. § 6321, federal tax liens attach to fraudulently conveyed property deemed void under state law.  *See Dawes, supra; Davenport, supra; Macks v. Clinton*, 843 F. Supp. 1440 (M.D. Fla. 1993).

[234] *See* Dkt. 482.

[235] *See* Dkt. 493, pp. 11-16.

[236] KAN. STAT. ANN. §§ 33-204 and 33-205 are part of the Kansas Uniform Fraudulent Transfer Act. Because the KUFTA did not become effective until January 1, 1999 the Court will not analyze the Quivira transfers under the KUFTA, except for those transfers, if any, occurring on or after January 1, 1999.

-104-

apply a number of badges of fraud from which a court may infer that the transfers were made with the intent to hinder, delay or defraud creditors.[237] The common law badges of fraud are described as: (1) a relationship between the grantor and grantee; (2) the grantee's knowledge of litigation against the grantor; (3) insolvency of the grantor; (4) a belief on the grantee's part that the asset transferred was the grantor's last asset subject to a Kansas execution; (5) inadequacy of consideration; and (6) consummation of the transaction contrary to normal business procedures.[238] In addition, the fraud must be proven by clear and convincing evidence. The parties agree that this is a correct recitation of the badges of fraud; where they disagree is on the facts and the inferences drawn from the facts when applying those badges of fraud.

The Court's analysis of the facts surrounding the Quivira transfers lead it to conclude that several badges of fraud are present. Close relationships between the grantor and grantee exist. Gary and Teresa were husband and wife at the time of the transfers. Gary is the beneficiary of the GEKT and Richard, his brother, is the trustee of the GEKT. No explanation was proffered at trial for the second transfer, a transfer that effectively returns the ownership interest to Gary.[239] Even if the Court were to consider the alleged transfer from Teresa to her minor sons, no explanation is given why it was necessary to convey a 50% interest in Quivira to minor children in 1998. No explanation is given why this ownership interest in Quivira was not transferred to the KCTs, for the benefit of the minor children, if it was truly intended to be conveyed to the boys. The Court concludes that

---

[237] *See Mohr v. State Bank of Stanley,* 244 Kan. 555, 770 P.2d 466 (1989) (6 badges of fraud recognized at common law). *Cf.* KAN. STAT. ANN. § 33-204(b) (11 statutory badges of fraud listed under the KUFTA).

[238] *Mohr, supra* at 568

[239] *See Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 107, 716 P.2d 180 (1986) (a finding of badges of fraud may warrant an inference of fraud if unexplained in the evidence); *City of Arkansas City v. Anderson*, 243 Kan. 627, 634, 762 P.2d 183 (1988) (transfers between members of a family are properly subjected to stricter scrutiny as are transfers between persons and a corporation wholly owned by them).

the transfers made here were simply window dressing to disguise Gary's continuing interest in Quivira.[240]

Both grantees here, Teresa and the GEKT, knew that Gary was embroiled in tax audits, litigation or disputes with the IRS at the time of the two transfers in 1989 and 1998. Indeed, the second transfer to the GEKT was made after Gary had lost his challenge in the Tax Court (1992) and the Tenth Circuit had affirmed (1994). The second transfer was made after the IRS had issued notices of deficiencies for several years. Both Richard, trustee of the GEKT, and Gary, beneficiary of the GEKT, were fully aware of Gary's looming tax liability by this time and the second transfer of the ownership interest in Quivira was an attempt to place another of Gary's assets in the hands of a third party and beyond reach of the IRS.[241]

The third badge of fraud – insolvency of the grantor – runs in favor of Krause. There was no evidence presented at trial that Krause was insolvent at the time of the 1989 transfer to Teresa. The 1998 transfer to the GEKT is a closer question because by this time most of Krause's holdings had been transferred to trusts. The Court concludes, however, that the Government and Trustee have made an insufficient showing of Krause's insolvency in 1998.

The fourth badge of fraud – transfer of Gary's last asset – weighs both in favor of and against him. There was no clear evidence that Krause's interest in Quivira was his last asset at the time of either the 1989 or 1998 transfers. It is apparent, however, that Teresa received a substantial portion

---

[240] *City of Arkansas City, supra* at 635 (the relationship badge is established where transfer is only a matter of bookkeeping, transferring title to one pocket to another while remaining in control of the property for all practical purposes)

[241] To the extent Krause claims the tax returns and annual reports are erroneous in their listing of the GEKT as a shareholder of Quivira, there was no evidence presented that Krause ever attempted to amend or correct the error. *See City of Arkansas City, supra* at 634.

-106-

of Gary's assets in 1989. It is also revealing that Gary made those transfers (including his Quivira interest) when he was protected from any claims Teresa might have to that property under their antenuptial agreement. In fact, Gary's transfers of his separate property to Teresa are directly contrary to the antenuptial agreement. By the time of the 1998 transfer to the GEKT (or the boys), however, nearly all of Gary's corporate holdings had been transferred to the GEKT or the KIT. The oil partnerships were essentially defunct. His separate property had been transferred to Teresa (notes receivable and Mission property). He had waived his inheritance. Thus, by 1998, Quivira would have been one of the few remaining assets that Gary had.

The fifth badge of fraud – inadequacy of consideration – has been clearly established by the evidence. Neither Teresa nor the GEKT paid any consideration for Gary's or his companies' ownership interest in Quivira, and Gary received nothing of value for the transfers.

The sixth and final badge of fraud at common law is consummation of the transaction contrary to normal business procedures. While the transfers themselves may have complied with Quivira's bylaws and a stock certificate duly issued, it is not a "normal business procedure" for Gary in 2005 to be named the insured on property in which he allegedly has no insurable interest.[242] The normal business procedure would be to address insurance matters to the president of the corporation, Richard. Nor is it normal to incorrectly identify the stockholders of the corporation on the tax returns. If the Court is to believe the testimony of Gary, and even Richard, the tax returns (and the annual reports) are in error when they show the GEKT as a shareholder of Quivira. Yet those tax

---

[242] The suggestion that the sixth badge of fraud is absent because Gary complied with the bylaws and duly issued a stock certificate for the stock transferred to Teresa (and then she transferred to the GEKT) is faulty. Just as the execution of an "estate plan" to transfer assets to children through a closely held corporation was deemed fraudulent in *City of Arkansas City*, *supra* at 638, so too here Gary's compliance with the bylaws and issuance of stock certificates to transfer his interest in Quivira to Teresa and back to the GEKT must be deemed fraudulent.

returns and annual reports were prepared by Gary's company, FIMCO, and were never amended to correctly identify the actual shareholders. And Richard signed those documents, under penalty of perjury, as president of Quivira.

The Interveners argue that to prove a fraudulent transfer claim, the Government and the Trustee must show that the grantee participated in the fraudulent scheme.[243] While there is no *direct* evidence of Richard's participation as trustee of the GEKT, the circumstantial evidence certainly points to his acquiescence in the transfer. He accepted the transfer without questioning Gary as to its purpose. The GEKT paid no consideration for Quivira. Richard well knew by 1998 that Gary had lost the *Barton* Tax Case and was facing a large tax liability. As trustee of the GEKT, Richard knew that Gary had transferred Fed Gas and Development Associates to the GEKT in 1989 for no consideration, at a time when Gary's father, the grantor of the trust, was still living.[244] Richard had delegated the management and operation of those entities to Gary, without any oversight on his part. In short, Richard's total failure to exercise his duties as a trustee of the GEKT, and acceding authority over the GEKT assets to Gary, is tantamount to participation in the fraudulent transfer.

If this Court were reviewing the Quivira transfers in isolation, it might be inclined to give Krause the benefit of the doubt. But here, when considered in light of all of the other transfers and machinations employed by Krause to hide assets and place property out of reach of the IRS, the Court is firmly convinced that the Quivira transactions were similarly made with the intent to hinder, delay or defraud the IRS, particularly when viewed with the parallel time line of Krause's tax

---

[243] *Mohr v. State Bank of Stanley, supra* at 568 (quoting *Credit Union of America v. Myers*, 234 Kan. at 778).

[244] Ex. 6. The GEKT permitted other persons to transfer or contribute property to the trust corpus. *See* Art. II, ¶ 4; Art. IV, ¶ 2.

Case 05-05775   Doc# 535   Filed 04/21/08   Page 108 of 112

disputes with the IRS.[245]  Because of the result the Court reaches under state common law, it does

not reach the fraudulent transfer claim asserted under the KUFTA, 11 U.S.C. § 548 or other state

law theories.  The transfers of the Quivira ownership interest are void, and the Government's federal

tax liens attaches to Gary's 50% ownership interest in Quivira.  The Trustee may avoid the transfers

under 11 U.S.C. § 544(b) and preserve the same for the benefit of the estate under 11 U.S.C. §

551.[246]

      **D.**      **Permanent Injunction**

Because the Government has prevailed on its nominee claim with respect to the KCTs, the

fraudulent transfer of Quivira, and the nondischargeability of Krause's income tax liability as a

willful evasion under 11 U.S.C.  § 523(a)(1)(C), it has succeeded on the merits.  Nothing the Court

heard at trial would alter or affect in any way its previous findings and conclusions regarding the

remaining factors for granting the preliminary injunction in December of 2005, and it incorporates

them here as though fully set forth in this opinion.[247]  Indeed, the breadth of the evidence received

at this trial and at the previous spoliation trial make clear that Gary, with Richard's indulgence, has

secreted his assets and would, whether in the absence of an injunction or in spite of one, continue

to do so.  Judgment should therefore be entered, granting a permanent injunction restraining and

---

[245]  *See Koch Engineering Co. v. Faulconer*, 239 Kan. at 105 noting that the enumerated badges of fraud are
not intended to be exclusive.

[246]  The Court also notes that the GEKT was one of the trusts that the Court defaulted in the Sanctions
Order, due to Gary's spoliation of evidence.  Accordingly, by finding that the second transfer of Quivira was made
to the GEKT, the ownership interest in Quivira is arguably subject to turnover on this additional basis, without
reaching the fraudulent transfer claims.

[247]  *See Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (The only
measurable difference between the standards for a preliminary injunction and the standards for a permanent
injunction is that the latter requires a showing of actual success on the merits while the former requires a showing of
substantial likelihood of success on the merits.)

enjoining Gary Krause and Richard D. Krause, Trustee of the Krause Children Trusts 1-5, from transferring, liquidating, disposing of, or distributing any property, funds, or assets held by the Krause Children Trusts 1-5 except as ordered by this Court. The defendants shall cooperate with the Government, the Trustee, financial institutions, and life insurance companies to carry out the terms of this Memorandum Opinion, including but not limited to, executing any instruments or documents necessary to effectuate a turnover of all property, funds, and assets held by the Krause Children Trusts 1-5. Moreover, Gary and Richard are restrained and enjoined from transferring any assets of any kind to any other Krause entity or trust without obtaining the prior order of this Court.

## IV. CONCLUSION

Gary Krause, either with the cooperation or acquiescence of his brother Richard, has engaged in a decades-long scheme to keep all of his assets out of his own name while enjoying the benefits of those assets and utilizing the KCTs as a vehicle for supporting himself and his family, while artfully avoiding the legitimate claims of his principal creditor, the IRS. Nearly every action taken by Gary over the past 22 years reflects an intent to avoid his creditors. Even after four lengthy evidentiary hearings, this Court is unable to divine what the legitimate business purposes, if any, of Gary's enterprises are, nor can it fathom how he makes his money. With the exception of a copied paycheck from FIMCO, a company that Krause controlled, Krause offers no evidence of income via pay, rents, revenues, or other sources. Yet, he has lived lavishly despite lacking any visible means of support. He has simply failed to supply any legitimate purpose for these tortured financial arrangements.

The Court concludes that the KCTs are his nominees and that the liens of the IRS attach to the property of the trusts as though it were titled in himself. The Court also concludes that the

-110-

Government's tax liens attach to Gary's 50% interest in Quivira, which he fraudulently transferred to Teresa and the GEKT. In addition, the property held by the KCTs, as Gary's nominees, is subject to turnover to the Trustee, and the interest in Quivira that Krause fraudulently transferred should be recovered and retained for the benefit of the estate pursuant to § 544(b) and § 550. Richard Krause, as trustee of the KCTs, is therefore directed to forthwith turnover any and all trust property in his custody and control to the Trustee under § 542. Richard, as trustee of the GEKT, is further ordered to turnover custody and control of the GEKT's interest in Quivira to the Trustee on the same basis. Gary and Richard are restrained and enjoined from transferring or trafficking in any asset attributable to Gary, whether held in the Trusts or otherwise maintained, in the absence of an order of this Court.

Judgment should be entered in favor of the Government on its claim under 11 U.S.C. § 523(a)(1)(C). Gary's tax debt attributable to tax years 1994 and 1995 is excepted from his discharge as a fraudulent return and the entirety of Gary's tax debt is excepted from his discharge as a willful evasion.

Judgment should be entered in favor of the Government and the Trustee on their nominee claims. The Krause Children Trusts 1-5 are determined to be the nominees of Gary E. Krause. The Government's federal tax liens attach to all property and assets held by the nominee KCTs. The assets and property held by the nominee KCTs constitute property of the estate and are subject to turnover to the Trustee.

Judgment should be entered in favor of the Government and the Trustee on their claims with respect to the fraudulent transfer of Gary's interest in Quivira Associates, Inc. to Teresa and the Gary E. Krause Trust. The Government's federal tax lien attaches to the fraudulently conveyed

-111-

Quivira interest and the Trustee is entitled to avoid the transfer under 11 U.S.C. § 544(b) and preserve the same for the benefit of the estate under 11 U.S.C. § 550.

Judgment should be entered in favor of the Government on its claim for a permanent injunction.

In light of the determinations reached today, the Trustee's Second Motion for Sanctions for Spoilation of Evidence[248] and the Government's Second Motion for Contempt and Default Judgment[249] are MOOT.

The Court strongly discourages post-trial motions; any such motions shall be limited to five (5) pages in length.

A Judgment on Decision will issue this day.

# # #

---

[248] Dkt. 416.

[249] Dkt. 422.